PAE AO 241
(Rev. 05/2018

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### Petition for Relief from a Conviction or Sentence
### By a Person in State Custody
### (Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus)

## <u>INSTRUCTIONS</u>

1.  To use this form, you must be a person who is currently serving a sentence under a judgment against you in a state court. You are asking for relief from conviction of the sentence. This form is your petition for relief.

2.  You may also use this form to challenge a state judgment that imposed a sentence to be served in the future, but you must fill in the name of the state where the judgment was entered. If you want to challenge a federal judgment that imposed a sentence to be served in the future, you should file a motion under 28 U.S.C. § 2255 in the federal court that entered the judgment.

3.  Your habeas corpus petition must be filed within the 1-year statute of limitations time limit set forth in 28 U.S.C. § 2244(d)(1). (There are limited circumstances in which the petition may be amended, within the one-year time period, to add additional claims or facts, <u>see</u> Federal Rules of Civil Procedure 15; or amended after the one-year period expires, in order to clarify or amplify claims which were timely presented, <u>see United States v. Thomas</u>, 221 F. 3d 430 (3d Cir. 2000)).

4.  Make sure the form is typed or neatly written.

5.  You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

6.  Answer all the questions. You do not need to cite law. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a brief or argument, you must submit them in a separate memorandum.

7.  You must pay a fee of $5. If the fee is paid, your petition will be filed. If you cannot pay the fee, you may ask to proceed in forma pauperis (as a poor person). To do that, you must fill out an Application to Proceed in District Court without Prepaying Fees or Costs. **Also, you must submit a certificate signed by an officer at the institution where you are confined showing the amount of money that the institution is holding for you**.

PAE AO 241
(Rev. 05/2018)

8.  In this petition, you may challenge the judgment entered by only one court. If you want to challenge a judgment entered by a different court (either in the same state or in different states), you must file a separate petition.

9.  As required by 28 U.S.C. § 2254(b)(1), you must have exhausted all claims that you are making in your petition. This means that every claim must have been presented to each level of the state courts. If you file a petition that contains claims that are not exhausted, the federal court will dismiss your petition. 28 U.S.C. § 2254(b)(2) provides that the federal court may deny your petition on the merits even if you have not exhausted your remedies.

10. As required by 28 U.S.C. § 2244(b)(1), a federal court must dismiss any claim in a second or successive habeas corpus petition that was presented in a prior habeas corpus petition.

11. As required by 28 U.S.C. § 2244(b)(2), a federal court must dismiss any claim in a second or successive habeas corpus petition that was not presented in a prior habeas corpus petition unless you show:

    (A)  the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the U.S. Supreme Court, that was previously unavailable; or

    (B)  (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence, and (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found you guilty of the offense in question.

    Before such a second or successive petition may be filed in the district court, however, the petitioner must move in the court of appeals for an Order authorizing the district court to consider the petition. Petitioner's motion for such an Order must be determined by a three judge panel of the court of appeals, which must grant or deny the motion within 30 days. The court of appeals may grant the motion only if it determines that the petition makes a prima facie showing that it satisfies either (A) or (B) above.

12. When you have completed this form, send the original and **these instructions** to the Clerk of the United States District Court at this address:

> **Clerk**
> **United States District Court**
> **for the Eastern District of Pennsylvania**
> **601 Market Street, Room 2609**
> **Philadelphia, PA 19106**

13. **<u>CAUTION</u>: You must include in this petition all the grounds for relief from the conviction or sentence that you challenge and you must state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

14. **<u>CAPITAL CASES</u>: If you are under a sentence of death, you are entitled to the assistance of counsel and should request the appointment of counsel.**

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

| United States District Court | District:  Eastern District of Pennsylvania |
|---|---|
| **Name (under which you were convicted):** <br> **Charles Rice** | **Docket or Case No.:** |
| **Place of Confinement:  SCI Coal Twp.** | **Prisoner No.:  LA6788** |

| **Petitioner** (Include the name underwhich you you were convicted): <br><br> **CHARLES RICE**_____ | **Respondent** (Name of Warden, Superintendent, Jailor, or authorized person having custodyof petitioner): <br><br> **TOM MCGINLEY, SUPT, SCI COAL TWP**___ <br><br> **and** <br><br> **The District Attorney of the County of:PHILADELPHIA**_____ <br><br> **and** <br><br> **The Attorney General of the State of: PENNSYLVANIA**_____ |

**V.**

## PETITION

1.  (a)  Name and location of court that entered the judgment of conviction you are challenging:

    Philadelphia Court of Common Pleas, Philadelphia, PA 19107

    _____

    _____

    (b)  Criminal docket or case number (if you know): CP-51-CR-0013974, 3975, 3976, 3978, 3979, 39805, 3981 - 2011_____

2.  (a)  Date of judgment of conviction (if you know):2/8/13_____

    (b)  Date of sentencing: 5/24/13_____

3.  Length of sentence:30 to 60 years. _____

4.  In this case, were you convicted on more than one count or of more than one crime?        X Yes        No

5.  Identify all crimes of which you were convicted and sentenced in this case: 4 cts Att. Homicide; 4 counts Consp. __
    to commit 3 cts. A/A;3 cts. Consp. To Com. Hom; 1 ct each of VUFA,
    and VUFA by a Minor.

    _____

PAE AO 241
(Rev. 05/2018

6.    (a)   What was your plea?  (Check one)

        XXX    Not Guilty                          Nolo contendere (no contest)

                Guilty                              Insanity plea


       (b)   If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what
             did you plead guilty to and what did you plead not guilty to? _____

             _____

             _____

             _____

             _____


       (c)   If you went to trial, what kind of trial did you have? (Check one)

             XX Jury              Judge only

7.    Did you testify at a pretrial hearing, trial, or a post-trial hearing?

             Yes              XNo

8.    Did you appeal from the judgment of conviction?

             X Yes              X No

9.    If you did appeal, answer the following:

       (a)   Name of court:  Superior Court _____

       (b)   Docket or case number (if you know): 1287 EDA 2014_____

       (c)   Result: Affirmed _____

       (d)   Date of result (if you know): 1/20/16_____

       (e)   Citation to the case (if you know): 2016 Pa. Super. Unpub. LEXIS 167_____

       (f)   Grounds raised: Sufficiency of Evidence; Weight of Evidence; improper charge regarding uncontradicted__
             evidence. _____

             _____

             _____

             _____

             _____

             _____


       (g)   Did you seek further review by a higher state court?
                  Yes              XNo

If yes, answer the following:

(1)   Name of court: _____

(2)   Docket or case number (if you know): _____

(3)   Result: _____

(4)   Date of result (if you know): _____

(5)   Citation to the case (if you know): _____

(6)   Grounds raised: _____

_____

_____

_____

(h)   Did you file a petition for certiorari in the United States Supreme Court?

   Yes _____   X No

If yes, answer the following:

(1)   Docket or case number (if you know): _____

(2)   Result: _____

(3)   Date of result (if you know): _____

(4)   Citation to the case (if you know): _____

(i)   Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?

   X Yes _____   No

10.   If your answer to Question 10 was "Yes," give the following information:

(a)   (1)   Name of court: Philadelphia Court of Common Pleas _____

   (2) Docket or case number (if you know): CP-51-CR-0013974, 3975, 3976, 3978, 3979, 39805, 3981 -2011__

   (3) Date of filing (if you know): Feb. 23, 2016_____

   (2)   Nature of the proceeding: PCRA_____

   (3)   Grounds raised: IAC for failing to move to decert; failing to effectively cross examine witness with available evidence; failure to ask for Kloiber instruction; failure to properly prepare expert; failure to effectively put on alibi defense.

_____

_____

_____

_____

_____

_____

_____

  (4) Did you receive a hearing where evidence was given on your petition, application, or motion?

    X Yes  No

  (5) Result: PCRA denied_____

  (6) Date of result (if you know): May 30, 2019_____

 (b) If you filed any second petition, application, or motion, give the same information:

  (1) Name of court: _____

  (2) Docket or case number (if you know): _____

  (3) Date of filing (if you know): _____

  (4) Nature of the proceeding: _____

  (5) Grounds raised: _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

  (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

    G Yes  G No

  (7) Result: _____

  (8) Date of result (if you know): _____

 (c) If you filed any third petition, application, or motion, give the same information:

  (1) Name of court: _____

  (2) Docket or case number (if you know): _____

  (3) Date of filing (if you know): _____

  (4) Nature of the proceeding: _____

  (5) Grounds raised: _____

    _____

    _____

    _____

    _____

(6)   Did you receive a hearing where evidence was given on your petition, application, or motion?

        G Yes      G No

(7)   Result: _____

(8)   Date of result (if youknow): _____

(d)   Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion:

    (1)   First petition:       X    Yes               No

    (2)   Second petition:    G    Yes         G    No

    (3)   Third petition:      G    Yes         G    No

(e)   If you did not appeal to the highest state court having jurisdiction, explain why you did not:

       _____

       _____

11.      For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

        **CAUTION:** To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court.  Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

GROUND ONE: The Commonwealth Violated Petitioner's right to Due Process Pursuant to Brady v. Maryland, and Napue v. Illinois, By Suppressing Exculpatory Evidence Casting Doubt on the Integrity of Witness Johnson's Identification of Petitioner, and then By Eliciting False Testimony From Her that She Identified Petitioner the Night of the Incident

       _____

       _____

    (a)   Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

       _____

This is a counseled petition, please see attached petition and memorandum for factual and legal

     Development. _____

       _____

       _____

       _____

(b)   If you did not exhaust your state remedies on Ground One, explain why: Due Process violation, Brady error. The Commonwealth suppressed this evidence. _____

_____

_____

_____

(c)   **Direct Appeal of Ground One:**

　　　(1)   If you appealed from the judgment of conviction, did you raise this issue?

　　　　　　Yes　　　　　X No

　　　(2)   If you did not raise this issue in your direct appeal, explain why? It was Brady error. Kept from counsel..

　　　　　　_____

　　　　　　_____

　　　　　　_____

(d)   **Post-Conviction Proceedings:**

　　　(1)   Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

　　　　　　Yes　　　　　X No

　　　(2)   If your answer to Question (d)(1) is "Yes," state:

　　　　　　Type of motion or petition: _____

　　　　　　Name and location of the court where the motion or petition was filed: _____

　　　　　　_____

　　　　　　Docket or case number (if you know): _____

　　　　　　Date of the court's decision: _____

　　　　　　Result (attach a copy of the court's opinion or order, if available): _____

　　　　　　_____

　　　(3)   Did you receive a hearing on your motion or petition?　　　G   Yes　　　G   No

　　　(4)   Did you appeal from the denial of your motion or petition?　　G   Yes　　　G   No

　　　(5)   If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

　　　　　　G Yes　　　G No

　　　(6)   If your answer to Question (d)(4) is "Yes," state:

　　　　　　Name and location of the court where the appeal was filed: _____

　　　　　　_____

　　　　　　Docket or case number (if you know): _____

　　　　　　Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7)   If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this

issue: This was Brady error, evidence suppressed by the Commonwealth. To the extent that PC

counsel

should have been aware of it, PC counsel was ineffective.

_____

_____

_____

_____

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies,
etc.) that you have used to exhaust your state remedies on Ground One: _____

_____

_____


GROUND TWO: Trial Counsel was Ineffective Under the Sixth Amendment for Stipulating to the
Fact that One of the Victims, Khalief Ladson, was a Person of Interest in the Shooting of Petitioner
that Occurred Three Weeks Earlier, and For Ignoring a Bruton Violation that Compounded the
Error _____

_____

(a)   Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

This is a counseled Petition and Memorandum, please see Pet and Mem for full
Factual and legal development.

_____

_____

_____

_____

_____


(b)   If you did not exhaust your state remedies on Ground Two, explain why: Did not -   IAC of PC counsel. __

_____

_____

_____


(c)   **Direct Appeal of Ground Two:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes          X No

(2)   If you did not raise this issue in your direct appeal, explain why? IAC issue not cognizable. _____

_____

_____


**(d)   Post-Conviction Proceedings:**

(1)   Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes            X No

(2)   If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3)   Did you receive a hearing on your motion or petition?            G   Yes            G   No

(4)   Did you appeal from the denial of your motion or petition?            G   Yes            G   No

(5)   If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

G Yes            G No

(6)   If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7)   If your answer to Question (d)(4) or Question (d)(5) is  "No," explain why you did not raise this

issue: IAC of PC counsel. _____

_____

_____

_____

(e)  **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: _____

_____

_____

_____

GROUND THREE: ____Trial Counsel was Ineffective Under the Sixth Amendment for Failing to Object to an Improper Alibi Instruction

_____

_____

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

This is a counseled petition, please see Petition and Consolidated Memorandum.

_____

_____

_____

_____

_____

(b)  If you did not exhaust your state remedies on Ground Three, explain why: _____

IAC of PC counsel.
_____

_____

_____

(c)  **Direct Appeal of Ground Three:**

(1)  If you appealed from the judgment of conviction, did you raise this issue?

Yes              X No

(2)  If you did not raise this issue in your direct appeal, explain why? IAC not cognizable on Dir. App. __

_____

_____

(d)  **Post-Conviction Proceedings:**

(1)  Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes        X No

(2)  If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3)  Did you receive a hearing on your motion or petition?           G     Yes           G     No

(4)  Did you appeal from the denial of your motion or petition?      G     Yes           G     No

(5)  If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

  G Yes          G No

(6)  If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7)  If your answer to Question (d)(4) or Question (d)(5) is  "No," explain why you did not raise this

issue:   IAC of PC counsel. _____

_____

_____

_____

(e)  **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies,

etc.) that you have used to exhaust your state remedies on Ground Three: _____

_____

_____

GROUND FOUR: Trial Counsel was Ineffective for Failing to Request a *Kloiber* Instruction

_____

_____

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

This is a counseled petition, please see attached pet and consol memorandum.

_____

_____
_____
_____

\
(b)   If you did not exhaust your state remedies on Ground Four, explain why: _____

_____
_____
_____
_____

**(c)   Direct Appeal of Ground Four:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes          X No

(2)   If you did not raise this issue in your direct appeal, explain why? IAC not cognizable on dir. App. __

_____
_____

**(d)   Post-Conviction Proceedings:**

(1)   Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

X Yes          No

(2)   If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: PCRA _____

Name and location of the court where the motion or petition was filed: Philadelphia Common Pleas __

_____

Docket or case number (if you know): CP-51-CR-0013974, 3975, 3976, 3978, 3979, 39805, 3981 -2011
_____

Date of the court's decision: May 30, 2019_____

Result (attach a copy of the court's opinion or order, if available): Claim denied. _____

_____

(3)   Did you receive a hearing on your motion or petition?          X   Yes          No

(4)   Did you appeal from the denial of your motion or petition?          X   Yes          No

(5)  If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

     X Yes       No

(6)  If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: PA Superior Court

Docket or case number (if you know): 1709 EDA 2019

Date of the court's decision: June 7, 2021

Result (attach a copy of the court's opinion or order, if available): Common Pleas Ct. denial affirmed.

(7)  If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)  **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four:

## PLEASE SEE ADDENDUM FOR 3 ADDITIONAL CLAIMS.

12.  Please answer these additional questions about the petition you are filing:

(a)  Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?

      Yes       X No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: Ground 1 not presented, as it involves a Brady violation. Ground 2 and 3 and 7 not presented due to IAC of PC counsel.

(b)   Is there any ground in this petition that has not been presented in some state or federal court?  If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

_____

_____

_____

13.   Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?

          Yes                    X  No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available. _____

_____

_____

_____

_____

_____

14.   Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?

          Yes                    X  No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised: _____

_____

_____

_____

15.   Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a)   At preliminary hearing: Sanjai Weaver, Esq. _____

_____

(b)   At arraignment and plea: Sanjai Weaver, Esq. _____

_____

(c)  At trial: Sanjai Weaver, Esq. _____

_____

(d)  At sentencing: Sanjai Weaver, Esq. _____

_____

(e)  On appeal: Sanjai Weaver, Esq. _____

_____

(f)  In any post-conviction proceeding: Jason Kadish, Esq. _____

_____

(g)  On appeal from any ruling against you in a post-conviction proceeding: Jason Kadish, Esq. _____

_____

_____

16.  Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?

            Yes            X  No

(a)  If so, give the name and location of the court that imposed the other sentence you will serve in the future: _____

(b)  Give the date the other sentence was imposed: _____

(c)  Give the length of the other sentence: _____

(d)  Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?

            G  Yes            G  No

17.  **TIMELINESS OF PETITION:** If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition*

Petition is timely filed. _____

_____

_____

_____

_____

_____

    \* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1)    A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State Court. The limitation period shall run from the latest of -

    (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

    (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

    (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

    (D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)    The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

    Therefore, petitioner asks that the Court grant the following relief: Grant the writ. _____

_____

_____

_____

or any other relief to which petitioner may be entitled.

                                      s/Karl Schwartz, Attorney for Charles Rice.
                                          *Signature of Attorney (if any)*

PAE AO 241
(Rev. 07/10)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system  on _____.

*(month, date, year)*

Executed (signed) on_____(date).

## THIS IS A COUNSELED PETITION

_____

*Signature of Petitioner*

If the person signing is not the petitioner, state the relationship to petitioner and explain why petitioner is not signing this petition. Attorney for Mr. Rice. **_____**

_____

_____

_____

_____

PAE AO 241
(Rev. 07/10)                                                                                                    Page 1

GROUND FIVE - Trial Counsel Was Ineffective Under the Sixth Amendment for Failing to
Effectively Utilize Incontrovertible Physical Evidence that Cast Doubt on the Ability of Witness
Latrice Johnson to Identify the  Perpetrator

_____

_____

(a)   Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

This is a counseled Petition and Memorandum, please see Pet and Mem for full
Factual and legal development.

_____

_____

_____

_____

_____

(b)   If you did not exhaust your state remedies on Ground Five,  explain why: _____

_____

_____

_____

(c)   **Direct Appeal of Ground Five:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes             X No

PAE AO 241
(Rev. 07/10)

(2)  If you did not raise this issue in your direct appeal, explain why? IAC issue not cognizable. _____

_____

_____


**(d)  Post-Conviction Proceedings:**

(1)  Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes X        No

(2)  If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: PCRA_____

Name and location of the court where the motion or petition was filed: Philadelphia Common Pleas

_____

Docket or case number (if you know): ): CP-51-CR-0013974, 3975, 3976, 3978, 3979, 39805, 3981 -2011_____

Date of the court's decision: May 30, 2019_____

Result (attach a copy of the court's opinion or order, if available): Claim denied. _____

_____


(3)  Did you receive a hearing on your motion or petition?              X Yes              No

(4)  Did you appeal from the denial of your motion or petition?        XX  Yes              No

(5)  If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

X Yes        No

(6)  If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: PA Superior Court _____

_____

Docket or case number (if you know): 1709 EDA 2019_____

Date of the court's decision: June 7, 2021_____

Result (attach a copy of the court's opinion or order, if available): Affirmed. _____

_____

_____


(7)  If your answer to Question (d)(4) or Question (d)(5) is  "No," explain why you did not raise this issue: IAC of PC counsel. _____

_____

_____

_____

(e)  **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Five: _____

_____

_____

_____

**GROUND SIX:** Trial Counsel was Ineffective Under the Sixth Amendment for Failing to Discuss Her Expert's Testimony With Her Expert Before He Took the Witness Stand

_____

_____

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

This is a counseled petition, please see Petition and Consolidated Memorandum.

_____

_____

_____

_____

_____

(b)  If you did not exhaust your state remedies on Ground Six, explain why: _____

_____

_____

_____

(c)  **Direct Appeal of Ground Six:**

(1)  If you appealed from the judgment of conviction, did you raise this issue?

Yes            x No

(2)  If you did not raise this issue in your direct appeal, explain why? IAC not cognizable on Dir. App. __

_____

_____

(d)  **Post-Conviction Proceedings:**

(1)  Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

X Yes        No

(2)  If your answer to Question (d)(1) is "Yes," state:

PAE AO 241
(Rev. 07/10)

Page 4

Type of motion or petition: PCRA _____

Name and location of the court where the motion or petition was filed: Philadelphia Ct. of Common Pleas
_____

_____

Docket or case number (if you know): CP-51-CR-0013974, 3975, 3976, 3978, 3979, 39805, 3981 - 2011_____

Date of the court's decision: May 30, 2019 _____

Result (attach a copy of the court's opinion or order, if available): Claim denied. _____

_____

(3) Did you receive a hearing on your motion or petition?        X    Yes           No

(4) Did you appeal from the denial of your motion or petition?        X    Yes           No

(5)  If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

　　　X Yes           No

(6)  If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: PA Superior Court _____

_____

Docket or case number (if you know): 1709 EDA 2019_____

Date of the court's decision: June 7, 2021_____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7)  If your answer to Question (d)(4) or Question (d)(5) is  "No," explain why you did not raise this

issue: _____

_____

_____

_____

(e)  **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies,

etc.) that you have used to exhaust your state remedies on Ground Six: _____

_____

_____

**GROUND SEVEN:** Petitioner Is Entitled to Relief Based on the Cumulative Prejudicial Effect of the Errors in
This Case

_____

_____

(a)   Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

PAE AO 241
(Rev. 07/10)

## This is a counseled petition, please see Petition and Consolidated Memorandum

_____

_____

\
(b)   If you did not exhaust your state remedies on Ground Seven explain why: _____

_____

IAC of PC counsel.
_____

_____

_____


(c)   **Direct Appeal of Ground Seven**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes        X No

(2)   If you did not raise this issue in your direct appeal, explain why? IAC and DP claims not cognizable/ripe
on direct appeal. _____

_____

_____


(d)   **Post-Conviction Proceedings:**

(1)   Did you raise this issue through a post-conviction motion or petition for habeas corpus in a
state trial court?

Yes        X No

(2)   If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3)  Did you receive a hearing on your motion or petition?          G    Yes          G    No
(4)  Did you appeal from the denial of your motion or petition?     G    Yes          G    No

(5)   If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

　　　G Yes　　　G No

(6)   If your answer to Question (d)(4) is "Yes," state:

　　　Name and location of the court where the appeal was filed: _____

　　　_____

　　　Docket or case number (if you know): _____

　　　Date of the court's decision: _____

　　　Result (attach a copy of the court's opinion or order, if available): _____

　　　_____

　　　_____

(7)   If your answer to Question (d)(4) or Question (d)(5) is  "No," explain why you did not

　　　raise this issue:  IAC PC counsel _____

　　　_____

　　　_____

　　　_____

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative
　　　remedies, etc.) that you have used to exhaust your state remedies on Ground Seven: _____

_____

_____

_____

_____

_____

# IN THE COURT OF COMMON PLEAS

## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

### CRIMINAL TRIAL DIVISION

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, <br><br>           APPELLEE <br><br> v. <br><br> CHARLES RICE, <br><br>           DEFENDANT | COURT OF COMMON PLEAS – PHILADELPHIA COUNTY <br> CP-51-CR-0013974-2011 <br> CP-51-CR-0013976-2011 <br> CP-51-CR-0013978-2011 <br> CP-51-CR-0013980-2011 <br><br><br><br> SUPERIOR COURT NOS. 1709 EDA 2019; 1791 EDA 2019; 1792 EDA 2019; 1793 EDA 2019 |

## OPINION

### A. FACTUAL AND PROCEDURAL BACKGROUND

On September 3, 2011, Defendant was shot in the leg and abdomen while riding his bike. Khalief Ladson was a person of interest in that shooting. Defendant and Mr. Ladson were both seventeen (17) years old and prior to this shooting incident had been friends. On September 25, 2011 at 9:30 P.M, Latice Johnson, Mr. Ladson's mother, was sitting on the front steps of her mother's home in South Philadelphia with her seven children—including Mr. Ladson—as well as several nieces and nephews. Two men approached and began shooting at the family. Ms. Johnson and three others suffered multiple gunshot wounds. Ultimately the victims were treated for their injuries and survived.

At the scene, Ms. Johnson described the shooters as two men, one in a gray hooded sweatshirt and black sweatpants and the other in a black hooded sweatshirt and black sweatpants. Mr. Ladson described the shooters as two or three black males in dark hoodies. A third adult victim, Latoya Lane, gave a description of the shooters as two or three black males.

On September 26, 2011, the day following the shooting, a detective showed Ms. Lane and Ms. Johnson a photo array containing a photo of Defendant and seven others. Ms. Johnson identified Defendant as one of the shooters. Officers obtained an arrest warrant for Defendant and on September 27, 2011 Defendant turned himself into police. Defendant was represented at this stage of proceedings by Sanjay Weaver, Esq.

On February 8, 2013, Defendant was found guilty of four counts each of Attempted Homicide[1] and Conspiracy to Commit Aggravated Assault[2], three counts each of Aggravated Assault[3] and Conspiracy to Commit Homicide[4], and one count each of Firearms Not to Be Carried Without a License[5], Carrying a Firearm in Public in Philadelphia[6], and Possession of a Firearm by a Minor[7]. On May 24, 2013, this Court sentenced Defendant to an aggregate of thirty to sixty years incarceration.

On June 2, 2013 Defendant filed a Post-Sentence Motion requesting that this Court reconsider Defendant's sentence. Said Motion was denied by operation of law on October 2, 2013. On October 25, 2013 Defendant filed an appeal to the Superior Court. In Defendant's Statement of Matters Complained of on Appeal, Defendant raised eight issues: (1) whether the evidence presented at trial was sufficient to convict where the verdicts were based on an

---

[1] 18 Pa. C.S. § 901 §§A (a felony of the first degree)
[2] 18 Pa. C.S. § 903 §§C (a felony of the first degree)
[3] 18 Pa. C.S. § 2702 §§A (a felony of the first degree)
[4] 18 Pa. C.S. § 903 §§C (a felony of the first degree)
[5] 18 Pa. C.S. § 6106 §§A1 (a felony of the third degree)
[6] 18 Pa. C.S. § 6108 (a misdemeanor of the first degree)
[7] 18 Pa. C.S. § 6110.1 §§A (a misdemeanor of the first degree)

2

identification made by a witness who had a limited opportunity to observe the perpetrator; (2) whether the verdict was against the weight of the evidence; (3) whether the trial court erred when it failed to provide the full *Kloiber* charge; (4) whether the trial court imposed an excessive, and thereby illegal, sentence; (5) whether the prosecutor committed prosecutorial misconduct by failing to properly instruct his witnesses not to make any references to 5th street or 7th street during their testimony; (6) whether the trial court erred in failing to grant a judgment of acquittal on the charges of attempted murder; (7) whether the trial court erred in providing a written copy of the definition of the charges to the jury; (8) whether the trial court erred in instructing the jury "you should not regard as true any evidence which you find to be incredible, even if uncontradicted." On January 20, 2016 the Superior Court, addressing each of Defendant's eight arguments in turn, affirmed the decision of the trial court.[8]

On February 23, 2016 Defendant filed a PCRA Petition, bringing several claims of ineffective assistance of counsel. Subsequently, counsel was appointed and filed a PCRA Petition reiterating Defendant's arguments pertaining to ineffective assistance of counsel and asking this Court to vacate Defendant's conviction and sentence.

On January 25, 2019, this Court held an evidentiary hearing as to five issues: 1. Failure to Pursue Decertification; 2. Failure to Discuss or Pursue a Plea Offer; 3. Failure to Request a Kloiber Instruction; 4. Preparation of Expert Witness Dr. Theodore Tapper; 5. Trial Counsel's Elicitation of Prejudicial Testimony Linking Defendant to Criminal and Gang Activity.  At this hearing, Defendant testified, along with Dr. Tapper, and Dr. Murray Cohen, the Defendant's surgeon. After considering the evidence presented at this evidentiary hearing, this Court denied Defendant's PCRA Petition on May 30, 2019.

---

[8] *Commonwealth v. Rice*, 2016 WL 238824, at 12. (Pa. Super. 2016).

3

On June 11, 2019, Defendant filed a Notice of Appeal with the Superior Court. This Court

issued a 1925(b) Order on June 19, 2019, and Defendant filed his Statement of Matters

Complained of on Appeal on July 23, 2019. On August 14, 2019, this Court granted Defendant's

Motion for an Extension of Time to file an Amended Statement of Matters Complained of on

Appeal. On September 13, 2019, Defendant filed this Amended Statement of Matters

Complained of on Appeal.

Defendant raises the following issues on appeal:

1. That this Court erred in dismissing Defendant's PCRA petition where Defendant proved that trial counsel was ineffective for having minimal contact with the Defendant prior to and during trial.

2. That this Court erred in dismissing Defendant's PCRA petition where Defendant proved that trial counsel was ineffective for failing to discuss or explore decertification of the case to family court.

3. That this Court erred in dismissing Defendant's PCRA petition where Defendant proved that trial counsel was ineffective for failing to conduct an investigation and present evidence concerning the inaccuracy of Latrice Johnson's eyewitness account.

4. That this Court erred in dismissing Defendant's PCRA petition where Defendant proved that trial counsel was ineffective for failing to request and argue for a *Kloiber* instruction concerning Ms. Johnson's testimony, where Ms. Johnson failed to identify anyone as the perpetrator of the crime on multiple occasions.

5. That this Court erred in dismissing Defendant's PCRA petition where Defendant proved that trial counsel was ineffective for failing to interview, prepare, and adequately question Dr. Theodore Tapper, M.D.; specifically, that the jury never heard that Defendant had over thirty (30) surgical staples lodged in his midsection during the time that the crime occurred, impairing his physical state.

6. That this Court erred in dismissing Defendant's PCRA petition where Defendant proved that trial counsel knowingly proceeded to trial with an incomplete discovery case file, for failure to present evidence that would impeach the credibility of Ms. Johnson.

7. That this Court erred in dismissing Defendant's PCRA petition where Defendant proved that trial counsel was ineffective for presenting a conflicting alibi defense to the jury.

8. That this Court erred in dismissing Defendant's PCRA petition where Defendant proved that trial counsel was ineffective for eliciting prejudicial testimony from Philadelphia

4

Police Officer Donna Simmons on cross-examination, which connected the Defendant with a gang.

9. That this Court erred in dismissing Defendant's PCRA petition where Defendant proved that trial counsel was ineffective for being generally unprepared for trial and failing to discuss strategy with the Defendant.

10. That this Court erred in limiting the evidentiary hearing to the following five (5) issues: 1. Failure to Pursue Decertification; 2. Failure to Discuss or Pursue a Plea Offer; 3. Failure to Request a Kloiber Instruction; 4. Preparation of Expert Witness Dr. Theodore Tapper; 5. Trial Counsel's Elicitation of Prejudicial Testimony Linking Defendant to Criminal and Gang Activity.

11. That this Court erred in not ordering a new trial, where trial counsel's ineffectiveness caused Defendant to be prejudiced such that a jury would have acquitted the Defendant with adequate representation.

## B. DISCUSSION

### Issues 1 and 9

First, Defendant's first and ninth issued raised address claims that trial counsel had minimal contact with Defendant, and did not discuss strategy with him. In Pennsylvania, counsel is presumed effective and a defendant bears the burden of proving otherwise. *Commonwealth v. Steele*, 961 A.2d 786, 796-97 (Pa. 2008). In order to meet this burden of proof a defendant must prove three requirements by a preponderance of the evidence: (1) the claim has arguable merit; (2) counsel lacked any reasonable basis for his action or omission; and (3) petitioner was prejudiced by counsel's conduct. *Id.*; *Commonwealth v. Gwynn*, 596 Pa. 398, 405–06, 943 A.2d 940, 945 (2008); *see Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564 (Pa. 2005); *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (Pa. 1987). Even where counsel is found to be ineffective, counsel's ineffectiveness is only deemed prejudicial where there is a reasonable probability that, *but for* counsel's ineffectiveness, the result would have been more favorable to the defendant. *Commonwealth v. Daniels*, 104 A.3d 267, 285 (Pa. 2014).

5

First, Defendant's claim does not have arguable merit. Defendant stated at the January 25, 2019 evidentiary hearing that he met with counsel three times in person and spoke with her three times on the phone before trial (N.T. 1/25/19, 29-31). He also said that counsel explained that her strategy would be to attempt to discredit the eyewitness, Ms. Johnson, and that they had discussed his alibi defense—which she presented at trial—when Defendant turned himself in (id., 16, 31-33). Clearly, there were discussions of strategy. Further, the docket indicates that an offer was "conveyed and will remain open until trial" on December 13, 2012, disproving Defendant's claim that no offer was conveyed. Moreover, Defendant stated on the record at trial that he was satisfied with counsel (N.T. 2/4/13, 164).

Second, whether counsel lacked any reasonable basis for her action or omission, Defendant has not proven whether or not this was the case. As stated above, trial counsel was unavailable to provide competent testimony at the time of the evidentiary hearing.

Third, Defendant's indication that, even if offered a plea deal, he would not have accepted one, causes this claim to fail. At the evidentiary hearing, Defendant testified that he did not wish to plead guilty and would not have accepted an offer anyway (N.T. 1/25/19, 33-34, 48). Therefore, even if counsel did not discuss plea offers, Defendant cannot prove he was prejudiced, as he said he would not have accepted an offer. Defendant clearly fails this prong, and cannot meet his burden of proof. As such, this claim should fail.

*Issue 2: Decertification*

Next, Defendant argues that counsel was ineffective for failing to discuss and explore decertification. This issue is without merit, as Defendant did not suffer prejudice through counsel's inaction. When a case involving a juvenile defendant goes directly to the criminal division, the juvenile can request treatment within the juvenile system through a transfer process

6

called decertification. *Commonwealth v. Thomas*, 67 A.3d 838, 842 (Pa. Super. Ct. 2013). A juvenile may obtain decertification if the transfer to the juvenile court system serves the public interest. *Id.* Factors to be considered are (1) the impact of the offense on the victims; (2) the impact of the offense on the community; (3) the threat of the safety to the public posed by the juvenile; (4) the nature and circumstances of the offense; (5) the degree of the child's cupability; (6) the adequacy and duration of dispositional alternatives; (7) whether the child is amenable to treatment, supervision, or rehabilitation. *Id.* The juvenile bears the burden of proof by a preponderance of the evidence. *Id.* Whether to grant decertification is within the discretion of the trial court. *Id.*

Whether counsel had any reasonable basis for her failure to file this Motion, the record is silent on this. At the January 25, 2019 evidentiary hearing, Defendant failed to present testimony as to this issue.

As stated above, Defendant was not prejudiced by counsel's decision not to file this Motion. Defendant has failed to provide much detailed information as to what facts would have warranted decertification. Defendant has stated that at the time of the underlying crime, he was in the process of joining the Army and had signed up for his SAT's. At the same time, looking to the nature and circumstances of the offense, the charges here are quite serious. Defendant opened fire on a family that included several very young children, suggesting a very serious danger to the community. Even though the injuries caused were solely to the victims lower extremities, such injuries could have been fatal. This incident was connected to gang activity and served as a retaliation for a prior shooting allegedly perpetrated by one of the victims, suggesting Defendant was involved in groups of individuals that pose a great danger to the community. Taken as a

7

whole, this set of circumstances would not have warranted decertification, even if Defendant's counsel had raised the issue. As such, this issue is without merit, and must fail.

*Issues 3 and 6: Testimony of Ms. Johnson*

Next, Defendant raises two issues concerning the adequacy of the testimony of Ms. Johnson. First, that this Court erred in dismissing Defendant's PCRA petition where Defendant allegedly proved that trial counsel was ineffective for failing to conduct an investigation and present evidence concerning the inaccuracy of Ms. Johnson's account. Second, that this Court erred in dismissing Defendant's PCRA petition where Defendant allegedly proved that trial counsel knowingly proceeded to trial with an incomplete case file, and failed to present evidence that would impeach the credibility of Ms. Johnson. Both of these claims are without merit, and must fail. As a preliminary matter, Defendant is seeking to re-litigate claims which this Court has previously addressed in its' December 23, 2014 opinion, and which the Superior Court declined to overturn on appeal. *Commonwealth v. Rice*, 2016 WL 238824, at 12. (Pa. Super. 2016). This Court held, and the Superior Court affirmed, that the Commonwealth, through Ms. Johnson's testimony, presented sufficient evidence for a jury to convict the Defendant. *Id.* In this Court's December 23, 2014 opinion, this Court noted that Ms. Johnson unequivocally identified Defendant at trial as one of the shooters in this case. Despite extensive cross-examination, Ms. Johnson never wavered. Ms. Johnson testified that she watched Defendant walk close to her (twenty feet away), that Defendant's face was fully visible because he was standing near streetlights, that she stared at Defendant's fully visible face when he started shooting, and that she noticed that Defendant had braided hair. Additionally, the day after the shooting, Ms. Johnson, without hesitation, unequivocally identified Defendant as the shooter in a photo array of eight individuals. This identification was corroborated by the fact that numerous witnesses

testified that Defendant had braided hair at, or near, the time of the shooting, and that all of the other interviewed victims in the shooting indicated that the shooters were dark males.  As Defendant did not prove that Ms. Johnson's testimony was inaccurate, his claims concerning trial counsel's ineffectiveness in failing to adequately challenge this evidence at trial and in the arrest warrant must fail.

*Issue 4: Kloiber Instruction*

Next, Defendant meritlessly argues that counsel was ineffective for failing to ask for a *Kloiber* instruction. Again, Defendant seeks to re-litigate claims which this Court addressed in its' December 23, 2014 opinion, and which the Superior Court declined to overturn on appeal. *Rice*, 2016 WL 238824, at 12. Therefore, this issue is without merit and improper. *See* 42 Pa. C.S.A. § 9543(a)(3). A *Kloiber* instruction cautions the jury as to the reliability of certain eyewitness testimony. *Commonwealth v. Kloiber*, 106 A.2d 820, 826-27 (Pa. 1954). A Defendant is entitled to a *Kloiber* instruction where a witness (1) was not in a position to clearly observe the Defendant or is not positive as to identity; (2) equivocated on the identification; or (3) failed to identify the Defendant on prior occasions. *Johnson*, 139 A.3d at 1281. Defendant's counsel did not request such an instruction at the time of trial.

First, this claim does not have arguable merit. Ms. Johnson testified that she had a clear opportunity to view the Defendant while he committed the act. Furthermore, Ms. Johnson knew the Defendant; this prior familiarity creates an independent basis for her in-court identification of the Defendant and weakens ineffectiveness claims based on counsel failure to seek a *Kloiber* instruction. *Commonwealth v. Ali*, 10 A.3d 282, 304 (Pa. 2010). Ms. Johnson never equivocated in identifying the Defendant, and never had difficulty in making that identification. When she was shown the photo array, she identified him without hesitation (N.T. 1/30/13, 68; 1/31/13,

9

183). At trial, she unequivocally identified him again, and testified that she was "100 percent" sure that Defendant was the shooter (N.T. 1/30/13, 41, 49, 68). Second, the record is silent as to whether counsel had a reasonable basis not to request this instruction. As stated above, trial counsel was unavailable to provide competent testimony at the time of the evidentiary hearing. Defendant did not elicit testimony at the evidentiary hearing regarding this factor. Third, this Court's previous opinion addresses the fact that Defendant did not suffer prejudice as a result of a failure to request a *Kloiber* instruction. In its' December 23, 2014 opinion, this Court held that, "even if a *Kloiber* charge was requested... no such charge was necessary for this case" due to Ms. Johnson's unequivocal and multiple identifications of Defendant (Trial Court Opinion, 12/23/14, 22). Therefore, as this Court has found, a *Kloiber* instruction was unwarranted, and trial counsel's failure to request such an instruction did not prejudice Defendant. Given that Defendant clearly fails this prong, this claim is without merit.

### Issue 5: Failure to Prepare Dr. Tapper

Next, Defendant meritlessly argues that trial counsel was ineffective for failing to properly prepare Dr. Tapper, the physician who treated Defendant for his original gunshot wound.

First, the lacks arguable merit. Dr. Tapper testified at trial that it was unlikely that Defendant could have been running on the day that he allegedly shot the victims because Defendant had staples in his abdomen and was in pain after being shot a few days prior. At the January 25, 2019 evidentiary hearing, Dr. Tapper stated that Defendant's incision would have burst open had he run, and that he would have provided such information to prior counsel if asked. Still, at the time of trial, Dr. Tapper went into this information in detail, stating that he was "very dubious as to whether he could walk standing up straight, let alone run with any degree of speed five days after I saw him" (N.T. 2/4/13, 22). On cross examination, when asked, he stated that his main concern

was the amount of pain Defendant was in (id., 36), and that he found it "extremely unlikely that he would have been running down the street on September 25th," although he admitted he was "not saying it's impossible" (id., 39). Dr. Tapper referred to the staples in Defendant's wound, although his estimate at that time was that there were "8 or 10 or 12" of them (id., 18, 33). Thus, at trial, Dr. Tapper was asked clearly whether Defendant could have run and why his condition would affect that ability. Dr. Tapper had every opportunity to explain his conclusions, and he did so, referring to Defendant's level of pain. If he wanted to opine that it was actually impossible for the Defendant to run, he would have known that at the time, and could have said so in answering any of those questions. At the evidentiary hearing, Dr. Tapper eventually backtracked, again admitting that it was not "impossible" for Defendant to run, but rather "virtually impossible" (N.T. 1/25/19, 56-57, 73-74).

Further, Defendant was not likely prejudiced here because a reasonable jury would not have reached a different conclusion had additional testimony been elicited from Dr. Tapper. This Court reasoned, and the Superior Court agreed, that Dr. Tapper's testimony was insufficient to disprove the eyewitness testimony in this case. At trial, the jury found the testimony of Ms. Johnson, one of Defendant's victims and a witness to the shooting, to be more credible than Dr. Tapper. Ms. Johnson never wavered in identifying the Defendant, whom she recognized because her son was friends with him. She had a clear, lit view of the Defendant as he and his accomplice walked towards her, and she stared at his face in disbelief as Defendant began shooting at her and her family. In doing so, she noticed that he had braided hair, a fact which was corroborated by Defendant's own godmother, who stated that Defendant's hair was braided on the day of the shooting. (Trial Court Opinion, 12/23/2014, at 17)

11

While, at the evidentiary hearing, only Dr. Tapper spoke as an alibi witness for Defendant, at trial, Defendant presented three alibi witnesses: Dr. Tapper, Defendant's godmother, Ms. Duncan, and her son, Mr. Malone. The testimony of these witnesses was riddled with inconsistencies. Dr. Tapper testified as an expert that it was "extremely unlikely" that Defendant would be able to run on the day of the shooting because he was in pain. (N.T., 2/4/13, at 39). However, Dr. Tapper had no insight into whether Defendant had taken his pain medication to alleviate any discomfort he may have had in fleeing from the scene. (N.T., 2/4/13, at 37) Likewise, Dr. Tapper's assessment was contrary to the hospital records for Defendant (dated nine days earlier than Defendant's visit to the Doctor). Those records indicated that Defendant, just one week after he was shot, could walk, stand up and sit down, and that Defendant could return to school with his classmates by the day of the shooting, September 25, 2011.

Ms. Duncan testified that Defendant stayed in her home in Philadelphia and that, aside from Defendant's police interview on September 16th and doctor's visit on September 20th, he had not and could not physically (due to his injuries) have left her home from September 11, 2011 to September 27, 2011 (N.T., 2/4/13, at 67). Likewise, Ms. Duncan testified that, on the date of the shooting, she was with Defendant from 7:00 a.m. to 7:00 p.m. and that she, her four children, and her mother and father were all home throughout that day (N.T., 2/4/13, at 70-71).

In contrast, Mr. Malone testified that he and Defendant spent nearly the entire day leading up to the shooting watching a movie, and that the only people who were home that day were Mr. Malone, Defendant, and Ms. Duncan's father. (N.T., 2/3/13, at 134-139).

This testimony was rebutted by two Commonwealth witnesses, Ms. Linder (the codefendant's mother) and Officer Simmons, both of whom testified that they saw the defendant either standing or walking around South Philadelphia on September 19th and September 24th. (N.T., 2/4/13, at

115-119). Given these inconsistencies (among others), and the fact that there was no record that either Ms. Duncan, Defendant's godmother, or Mr. Malone, the Defendant's "brother," had ever told anyone other than defense counsel or Defendant's mother that they were his alibi, the jury found that the prosecution's testimony was far more credible. (Trial Court Opinion, 12/23/2014, at 17-19). Given the inconsistencies in witness testimony and Dr. Tapper's lack of first-hand knowledge of the events of the day in question, it is unlikely that Defendant was prejudiced by any lack of preparation of Dr. Tapper, and this claim should fail.[9]

### Issue 7: Conflicting Alibi Defense

Next, the Defendant argues that this Court erred in dismissing Defendant's PCRA petition where Defendant proved that trial counsel was ineffective for presenting a conflicting alibi defense to the jury. Here, the Defendant once again attempts to re-litigate an issue already decided by the Superior Court. Nevertheless, this claim must fail.

First, this claim does not have arguable merit. Although Defendant correctly asserts that the three alibi witnesses contradicted each other, the Superior Court affirmed that each of these three alibi witnesses presented faulty conclusions. The fact that the jury ultimately believed Ms.

---

[9] Dr. Tapper's testimony was also rebutted by Defendant's operating doctor, Dr. Murray Cohen. Dr. Cohen actually *performed* Defendant's surgery, after which he closed the wound himself with sutures and staples (N.T. 1/25/19, 97-98). Dr. Cohen, who has seen thousands of similar patients, is the best expert as to whether a patient in Defendant's position have been able to run three weeks later. Dr. Cohen testified that the stitching and stapling used for these surgeries is quite strong (id., 98-99). He testified that a patient could often walk again the next day, and that one could be discharged and go back to a "relatively normal routine" within five to ten days (id., 99-100). He explicitly disagreed with Dr. Tapper's conclusions and testified that Defendant "could have very well been able to run on [September 25th]" (id., 101). He testified that any typical seventeen-year-old could have run twenty-one or twenty-two days after this surgery, again citing the strength of the materials closing the wound (id., 102). When asked if one could say with any certainty, as Dr. Tapper did, that running could cause the wound to rupture, he answered, "Not my staples and not my suture" (id.). He said that he had "never seen a patient come back after 22 days with a ruptured incision from activity" (id., 102). He testified that a typical patient like this "would be able to run after a week or so" (id.). He also pointed out that Defendant tolerated the procedure well, healed "dynamically," and had an "excellent prognosis" (id., 110). Dr. Cohen, a directly involved expert, would know more about Defendant's recovery than Dr. Tapper, a pediatrician who had never performed such a surgery. Defendant does not demonstrate prejudice, given that no one, especially Defendant's witness Dr. Tapper, can say exactly how far Defendant ran after the shooting.

Johnson's testimony did not solely derive from the fact that these three witness testimonies contradicted each other, but also from the fact that each of the three presented faulty conclusions regarding the alibi itself.

Furthermore, Defendant was not prejudiced by the introduction of these contradictory accounts at trial. The Superior Court emphasized that given the weight of all of the evidence against the Defendant – testimony from Ms. Johnson as well as Officer Simmons, specifically - the verdict could hardly be said to shock one's sense of justice and was fully consistent with the totality and weight of the evidence presented at trial. *Rice*, 2016 WL 238824, at 10-11 (affirming this Court's analysis concerning the weight of the evidence presented against Defendant).

### Issue 8: Prejudicial Testimony

Next, the Defendant meritlessly argues that this Court erred in dismissing Defendant's PCRA where Defendant allegedly proved that trial counsel was ineffective for eliciting prejudicial testimony about Defendant's gang involvement.

Prior to trial the parties agreed that such information would be inadmissible at trial, but at trial Defendant's counsel elicited testimony from Officer Donna Simmons, in a reference to a picture of the Defendant at the police station. When asked repeatedly by Defendant's Trial Counsel whether she knew the Defendant, Officer Simmons stated that she did not know his name, but she knew who he was because "Back in our district we have pictures of gentlemen from 7th Street and 5th Street." (N.T. 2/5/13, at 22). This picture was how the Officer was familiar with the Defendant. Defendant argues that this testimony was prejudicial to him.

Defendant has not proven that he was prejudiced by this information being introduced at trial. Officer Simmons did not actually say that Defendant was a gang member; she only referred to his picture in passing. A jury would not have deduced that he must be a gang member from

14

that vague testimony, which does not use the word "gang" at any point. Defendant simply opines that it painted him in a negative light to the jury. In its opinion, this Court found that this testimony "did not have the effect of prejudicing the jury," as it would not have implied any gang affiliation to a layperson (Trial Court Opinion, 12/23/14, 27). Thus, Defendant has clearly not proven that this insignificant detail affected the outcome of the trial. *See Commonwealth v. Albrecht*, 720 A.2d 693, 701 (Pa. 1998) ("If it is clear that Appellant has not demonstrated that counsel's act or omission adversely affected the outcome of the proceedings, the claim may be dismissed on that basis alone"). Thus, this claim is without merit.

### Issue 10: Limiting Evidentiary Hearing

Next, Defendant meritlessly argues that this Court erred in limiting the January 25, 2019 evidentiary hearing to the following five (5) issues: 1. Failure to Pursue Decertification; 2. Failure to Discuss or Pursue a Plea Offer; 3. Failure to Request a Kloiber Instruction; 4. Preparation of Expert Witness Dr. Theodore Tapper; 5. Trial Counsel's Elicitation of Prejudicial Testimony Linking Defendant to Criminal and Gang Activity. The right to a PCRA evidentiary hearing is not absolute, *Commonwealth v. Jordan*, 772 A.2d 1011, 1014 (Pa. Super. 2001), Pa.R.Crim.P. 907, and the decision not to hold a hearing will only be reversed where the court abused its discretion. *Commonwealth v. Rush*, 838 A.2d 651 (Pa. 2003). Generally, if there are factual issues to be resolved, a PCRA court should hold an evidentiary hearing. *Commonwealth v. Grayson*, 212 A.3d 1047, 1054 (Pa. Super. 2019) (citing *Commonwealth v. Morris*, 546 Pa. 296, 684 A.2d 1037, 1042 (Pa. 1996))

Defendant's PCRA raised seven (7) issues, on five of these this Court decided to hold an evidentiary hearing. The other two issues Defendant raised were: 1. Trial counsel ineffectiveness for failing to contradict the eyewitness testimony of Ms. Johnson and 2. Failing to develop

Defendant's alibi defense. This Court declined to hold an evidentiary hearing on these issues, where the Superior Court had already evaluated them on appeal. *Rice*, 2016 WL 238824, at 10-11. As such, no factual issues as to these two issues remained to be resolved, and this Court properly declined to include them in an evidentiary hearing. *Grayson*, 212 A.3d at 1054.

First, as discussed above, Defendant had already raised his claim concerning Ms. Johnson's eyewitness testimony on appeal, and the Superior Court held that there was sufficient evidence to convict Defendant based on eyewitness testimony. The Superior Court further held that a guilty verdict was not against the weight of the evidence because a reasonable jury could have found the evidence presented by the Commonwealth more persuasive since there were many inconsistences in the evidence put forth by Petitioner. *Id.*

Second, the Superior Court had also previously ruled on Defendant's claim concerning any alleged failure to develop an alibi defense. Again, Defendant has raised this issue on appeal now before this Court, as discussed above. In affirming this Court's opinion, the Superior Court noted that

> "While [Rice] did call two alibi witnesses and a doctor in his defense, and challenged the fact that Ms. Johnson did not identify [Rice] on the day of the shooting, any contention that the jury should have believed [Rice]'s alibi defense over that of the Commonwealth's witnesses is improper in a sufficiency of the evidence claim. *Commonwealth v. Gibbs*, 981 A.2d 274, 282 (Pa.Super.2009) ("An argument that the finder of fact should have credited one witness' testimony over that of another witness goes to the weight of the evidence, not the sufficiency of the evidence."). Therefore, the Commonwealth presented more than sufficient evidence that [Rice] was one of the shooters in this case." *Id,* at 9.

This Court, having determined that these two remaining issues of the seven (7) raised in Defendant's PCRA had properly been decided on appeal, chose within its discretion to limit the evidentiary hearing to the five (5) issues listed above. *Grayson*, 212 A.3d at 1054. As such, this issue is without merit, and must fail.

*Issue 11: Total Ineffectiveness*

Finally, Defendant meritlessly claims that this Court erred in dismissing Defendant's PCRA where Defendant allegedly proved that there is a reasonable probability that the jury's guilty verdicts were a result of trial counsel's cumulative errors. As stated in addressing the individual claims of ineffective assistance of counsel above, Defendant has not proven that his trial counsel was ineffective in representing him in any way. As such, the jury's guilty verdicts were not a result of any such errors, and this claim must fail.

**CONCLUSION**

For the foregoing reasons, the judgment of this Court should be affirmed.

BY THE COURT:

DENIS P. COHEN, J.

Dated: December 19, 2019

17

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, <br><br>              APPELLEE <br><br>    v. <br><br> CHARLES RICE, <br><br>           DEFENDANT | COURT OF COMMON PLEAS – PHILADELPHIA COUNTY <br> CP-51-CR-0013974-2011 <br> CP-51-CR-0013976-2011 <br> CP-51-CR-0013978-2011 <br> CP-51-CR-0013980-2011 <br><br><br><br> SUPERIOR COURT NOS. 1709 EDA 2019; 1791 EDA 2019; 1792 EDA 2019; 1793 EDA 2019 |

## CERTIFICATE OF SERVICE

I, Matthew P. Egler DiFerdinando, Law Clerk to the Honorable Denis P. Cohen, hereby

certify that on this 19th day of December, 2019, by first class mail, postage prepaid, a true and

correct copy of the attached opinion was served upon the following:

Chief-Appeals Unit
Office of the Philadelphia District Attorney
Three South Penn Square
Philadelphia, PA 19107

Charles Rice
LA6788
SCI Coal Township
1 Kelley Drive
Coal Township, PA 17866

_____
Matthew P. Egler DiFerdinando

18

 Neutral

As of: December 22, 2022 4:44 AM Z

## *Commonwealth v. Rice*

Superior Court of Pennsylvania

June 7, 2021, Decided; June 7, 2021, Filed

No. 1709 EDA 2019, No. 1791 EDA 2019, No. 1792 EDA 2019, No. 1793 EDA 2019

**Reporter**

2021 Pa. Super. Unpub. LEXIS 1499 *; 258 A.3d 500; 2021 WL 2312775

COMMONWEALTH OF PENNSYLVANIA v. ***CHARLES RICE***, Appellant

**Notice:** PUBLISHED IN TABLE FORMAT IN THE ATLANTIC REPORTER.

NON-PRECEDENTIAL DECISION - SEE *SUPERIOR COURT I.O.P. 65.37*

**Subsequent History:** Rehearing denied by *Commonwealth v. Rice, 2021 Pa. Super. LEXIS 545 (Pa. Super. Ct., Aug. 16, 2021)*

Appeal denied by *Commonwealth v. Rice, 2021 Pa. LEXIS 4402 (Pa., Dec. 30, 2021)*

**Prior History: [*1]** Appeal from the PCRA Order Entered May 30, 2019. In the Court of Common Pleas of Philadelphia County Criminal Division at No(s): CP-51-CR-0013974-2011.

Appeal from the PCRA Order Entered May 30, 2019. In the Court of Common Pleas of Philadelphia County Criminal Division at No(s): CP-51-CR-0013976-2011.

Appeal from the PCRA Order Entered May 30, 2019. In the Court of Common Pleas of Philadelphia County Criminal Division at No(s): CP-51-CR-0013978-2011.

Appeal from the PCRA Order Entered May 30, 2019. In the Court of Common Pleas of Philadelphia County Criminal Division at No(s): CP-51-CR-0013980-2011.

*Commonwealth v. Rice, 136 A.3d 1033, 2016 Pa. Super. Unpub. LEXIS 167, 2016 WL 238824 (Jan. 20, 2016)*

## Core Terms

trial counsel, ineffective, shooting, identification,

preparation, alibi witness, evidentiary hearing, cross-examination, street, arguable merit, prejudiced, decertification, juvenile, bullet, feet, gang, credibility, distance, shooters, questioned, elicited, estimate, identification testimony, direct appeal, prejudicial, cumulative, intestine, asserts, fails, ineffective assistance of counsel

**Judges:** BEFORE: BENDER, P.J.E., OLSON, J., and STRASSBURGER, J.[*] MEMORANDUM BY BENDER, P.J.E. Judge Strassburger did not participate in the consideration or decision of this case.

**Opinion by:** BENDER

## Opinion

MEMORANDUM BY BENDER, P.J.E.:

Appellant, ***Charles Rice***, appeals from the order dismissing his timely petition filed pursuant to the *Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546*. After careful review, we affirm.

The PCRA court summarized the facts and procedural history of this case as follows:

On September 3, 2011, [Appellant] was shot in the leg and abdomen while riding his bike. Khalief Ladson was a person of interest in that shooting. [Appellant] and Mr. Ladson **[*2]** were both seventeen (17) years old and[,] prior to this shooting incident[,] had been friends. On September 25, 2011[,] at 9:30 P.M[.], Latice Johnson, Mr. Ladson's mother, was sitting on the front steps of her mother's home in South

_____

[*] Retired Senior Judge assigned to the Superior Court.

Commonwealth v. Rice

Philadelphia with her seven children—including Mr. Ladson—as well as several nieces and nephews. Two men approached and began shooting at the family. Ms. Johnson and three others suffered multiple gunshot wounds. Ultimately[,] the victims were treated for their injuries and survived.

At the scene, Ms. Johnson described the shooters as two men, one in a gray[-]hooded sweatshirt and black sweatpants and the other in a black[-]hooded sweatshirt and black sweatpants. Mr. Ladson described the shooters as two or three black males in dark hoodies. A third adult victim, Latoya Lane, gave a description of the shooters as two or three black males.

On September 26, 2011, the day following the shooting, a detective showed Ms. Lane and Ms. Johnson a photo array containing a photo of [Appellant] and seven others. Ms. Johnson identified [Appellant] as one of the shooters. Officers obtained an arrest warrant for [Appellant] and on September 27, 2011[,] [Appellant] turned **[*3]** himself into police. [Appellant] was represented at this stage of proceedings by Sanjay Weaver, Esq.

On February 8, 2013, [Appellant] was found guilty of four counts each of Attempted Homicide and Conspiracy to Commit Aggravated Assault, three counts each of Aggravated Assault and Conspiracy to Commit Homicide, and one count each of Firearms Not to Be Carried Without a License, Carrying a Firearm in Public in Philadelphia, and Possession of a Firearm by a Minor.[1] On May 24, 2013, this [c]ourt sentenced [Appellant] to an aggregate [term] of thirty to sixty years['] incarceration.

On June 2, 2013[,] [Appellant] filed a Post-Sentence Motion requesting that this [c]ourt reconsider [his] sentence. Said Motion was denied by operation of law on October 2, 2013. On October 25, 2013[, Appellant] filed an appeal to the Superior Court. ... On January 20, 2016[,] the Superior Court ... affirmed the decision of the trial court. [*Commonwealth v. Rice*, 136 A.3d 1033 (Pa. Super. 2016) (unpublished memorandum).[2]]

On February 23, 2016[, Appellant] filed a PCRA

Petition, bringing several claims of ineffective assistance of counsel. Subsequently, counsel was appointed and filed a PCRA Petition reiterating [Appellant]'s arguments pertaining to ineffective assistance **[*4]** of counsel and asking this [c]ourt to vacate [Appellant]'s conviction and sentence.

On January 25, 2019, this [c]ourt held an evidentiary hearing as to five issues: 1. Failure to Pursue Decertification; 2. Failure to Discuss or Pursue a Plea Offer; 3. Failure to Request a *Kloiber*[3] Instruction; 4. Preparation of Expert Witness Dr. Theodore Tapper; [and] 5. Trial Counsel's Elicitation of Prejudicial Testimony Linking [Appellant] to Criminal and Gang Activity. At this hearing, [Appellant] testified, along with Dr. Tapper, and Dr. Murray Cohen, [Appellant]'s surgeon. After considering the evidence presented at this evidentiary hearing, this [c]ourt denied [Appellant]'s PCRA Petition on May 30, 2019.

On June 11, 2019, [Appellant] filed a Notice of Appeal with the Superior Court. This [c]ourt issued a *[Pa.R.A.P.] 1925(b)* Order on June 19, 2019, and [Appellant] filed his *[Rule 1925(b)* Statement] on July 23, 2019. On August 14, 2019, this [c]ourt granted [Appellant]'s Motion for an Extension of Time to file an Amended Statement of Matters Complained of on Appeal. On September 13, 2019, [Appellant] filed []his Amended [*Rule 1925(b)* Statement].

PCRA Court Opinion ("PCO"), 12/19/19, at 1-4 (footnotes omitted).

Appellant now presents the **[*5]** following question for our review: "Was Appellant's conviction a result of trial counsel's ineffective assistance of counsel, which so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place?" Appellant's Brief at 5. More specifically, Appellant argues that his trial

counsel was ineffective due to inadequate preparation for trial and for the presentation of Appellant's defense at trial. The sum of these deficiencies ... meant that the jury could not have made an accurate determination of [Appellant]'s guilt or innocence. In *Commonwealth v. Perry, ... 537 Pa. 385, 644 A.2d 705 ([Pa.] 1994)*, trial

---

[1] Respectively, *18 Pa.C.S. §§ 901*, *903*, *2702*, *903*, *6106*, *6108*, and *6110.1*.

[2] Appellant did not seek further review by our Supreme Court.

[3] *See Commonwealth v. Kloiber, 378 Pa. 412, 106 A.2d 820 (Pa. 1954).*

Commonwealth v. Rice

counsel was deemed ineffective due to his general unpreparedness for trial. In the instant case, trial counsel's omissions and failures to adequately prepare this case cannot in any way be described as trial strategy. No reasonable explanation can be offered for counsel's virtual abandonment of her client prior to tr[ia]l. Trial counsel's aggregate deficiencies, as presented in the pleadings and evidentiary hearing, constitute ineffective assistance of counsel, requiring that Appellant be provided a new trial.

Appellant's Brief at 41.

We review ineffective assistance of counsel ("IAC") claims under **[\*6]** the following standards.

[I]n order to obtain relief based on [an IAC] claim, a petitioner must establish: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) [the] petitioner suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error.

*Commonwealth v. Reed, 601 Pa. 257, 971 A.2d 1216, 1221 (Pa. 2005)* (citing *Commonwealth v. Pierce, 515 Pa. 153, 527 A.2d 973, 975 (Pa. 1987)*). We presume that counsel was effective and, therefore, a petitioner bears the burden of pleading and proving each of the three factors by a preponderance of the evidence. *Commonwealth v. Rathfon, 2006 PA Super 106, 899 A.2d 365, 369 (Pa. Super. 2006)*. "Failure to prove any prong of this test will defeat an ineffectiveness claim." *Commonwealth v. Fears, 624 Pa. 446, 86 A.3d 795, 804 (Pa. 2014)*.

In his *Rule 1925(b)* statement, Appellant argued that trial counsel was ineffective due to a general lack of preparation. *See Amended Pa.R.A.P. Rule 1925(b)* Statement, 9/13/19, at 2 ¶¶ 2-3 (unnumbered pages). He also asserted the following individual IAC claims:

a. Trial counsel had minimal contact with [Appellant], who was a minor/juvenile, prior to and during trial.

b. Trial counsel failed to obtain and review complete discovery with [Appellant] to adequately prepare for trial.

c. Trial counsel failed to discuss or explore decertification of the case to **[\*7]** Family Court.

d. Trial counsel failed to discuss or explore possible non-trial dispositions of the case with [her] juvenile client, who was in criminal/adult court for the first time.

e. Trial counsel failed to adequately cross-examine or present rebuttal to the sole identification witness offered by the Commonwealth[,] either by calling available police witnesses or offering documents and other evidence that contradicted the identification testimony.

f. Trial counsel failed to request a cautionary instruction to be read to the jury regarding the identification testimony.

g. Trial counsel failed to interview, prepare, or examine ... Dr. Theodore Tapper (a pediatrician). Trial counsel failed to present relevant medical records to this witness for review or to the jury. Through this lack of preparation, trial counsel also failed to realize that Dr. Tapper was not an expert in the relevant area of medicine, and that trial counsel should have presented a trauma expert to independently evaluate offer conclusions regarding Dr. Tapper's observations.

h. Trial counsel failed to investigate or prepare the alibi defense presented to the jury. As a result, trial counsel unwittingly presented a conflicting **[\*8]** alibi that was contradicted by other witnesses and evidence.

i. Trial counsel implicated her own client in gang activity during trial. Testimony linking [Appellant] to a gang was directly elicited by trial counsel's line of questioning. Further, trial counsel ... prejudiced her client by highlighting this testimony—through an untimely and misplaced objection and sidebar—and subsequently failing to request a curative instruction.

*Id.* at 2-4 ¶ 4 (unnumbered pages). Appellant also argued that the PCRA court erred when it limited the scope of the January 25, 2019 evidentiary hearing to the five issues detailed above. *Id.* at 4 ¶ 5; *see also* PCO at 3.

In his brief, however, Appellant inexplicably presents this Court with a single, complex IAC claim, referencing the numerous, individual IAC claims raised in his *Rule 1925(b)* statement in a single narrative that spans the entire argument portion of his brief, disregarding our Rules of Appellate Procedure. *See Pa.R.A.P 2119(a)* ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part--in distinctive type or in type distinctively displayed--the particular point treated therein, followed by such discussion **[\*9]** and citation of authorities as are deemed pertinent."). This has

Commonwealth v. Rice

generally hindered our review of the individual IAC claims that were raised in Appellant's amended *Rule 1925(b)* statement, as the PCRA court concluded that, because Appellant ostensibly failed to prove any individual instance of the ineffectiveness of trial counsel, his claim that counsel was generally ineffective for lack of preparation is meritless. *See* PCO at 17.

Moreover, Appellant does not present those individual IAC claims for our review in his Statement of the Questions Presented and, thus, he has effectively abandoned them.[4] For the same reason, we conclude that his claim that the PCRA court erred by limiting the scope of the PCRA hearing has also been abandoned. However, Appellant has preserved his claim that trial counsel was ineffective due to a general lack of preparation, so, out of an abundance of caution, we will address the merits of that claim, which necessarily involves the individual claims of ineffectiveness, despite these numerous deficiencies in Appellant's brief.

**I**

The PCRA court first considered **[\*10]** Appellant's allegations that trial counsel had only minimal contact with him prior to trial and had failed to discuss trial strategy with him. The court rejected these claims as lacking arguable merit because Appellant

> stated at the [PCRA] hearing that he met with counsel three times in person and spoke with her three times on the phone before trial[.] N.T., 1/25/19, at 29-31. He also said that counsel explained that her strategy would be to attempt to discredit the eyewitness, Ms. Johnson, and that they had discussed his alibi defense—which she presented at trial—when [Appellant] turned himself in[.] *Id.* at 16, 31-33. Clearly, there were discussions of strategy. Further, the docket indicates that an offer was "conveyed and will remain open until trial" on December 13, 2012, disproving [Appellant]'s claim that no offer was conveyed. Moreover, [Appellant] stated on the

record at trial that he was satisfied with counsel[.] N.T.[,] 2/4/13, at 164.

PCO at 6 (citations reformatted). Appellant does not specifically address this analysis in the argument section of his brief. Thus, he has failed to convince us that these claims were of arguable merit.

**II**

Second, the PCRA court considered Appellant's **[\*11]** claims that trial counsel was ineffective for failing to seek decertification of the case to juvenile court, or even discuss that matter with Appellant. The court determined:

> This issue is without merit, as [Appellant] did not suffer prejudice through counsel's inaction. When a case involving a juvenile defendant goes directly to the criminal division, the juvenile can request treatment within the juvenile system through a transfer process called decertification. *Commonwealth v. Thomas, 2013 PA Super 124, 67 A.3d 838, 842 (Pa. Super. []2013)*. A juvenile may obtain decertification if the transfer to the juvenile court system serves the public interest. *Id.* Factors to be considered are (1) the impact of the offense on the victims; (2) the impact of the offense on the community; (3) the threat of the safety to the public posed by the juvenile; (4) the nature and circumstances of the offense; (5) the degree of the child's cu[l]pability; (6) the adequacy and duration of dispositional alternatives; [and] (7) whether the child is amenable to treatment, supervision, or rehabilitation. *Id.* The juvenile bears the burden of proof by a preponderance of the evidence. *Id.* Whether to grant decertification is within the discretion of the trial court. *Id.*

Whether counsel had any **[\*12]** reasonable basis for her failure to file this Motion, the record is silent on this. At the January 25, 2019 evidentiary hearing, [Appellant] failed to present testimony as to this issue.

As stated above, [Appellant] was not prejudiced by counsel's decision not to file this Motion. [Appellant] has failed to provide much detailed information as to what facts would have warranted decertification. [Appellant] has stated that at the time of the underlying crime, he was in the process of joining the Army and had signed up for his SAT's. At the same time, looking to the nature and circumstances of the offense, the charges here are quite serious.

---

[4] *See* *Pa.R.A.P. 2116(a)* ("The statement of the questions involved must state concisely the issues to be resolved, expressed in the terms and circumstances of the case but without unnecessary detail. The statement will be deemed to include every subsidiary question fairly comprised therein. *No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby.*") (emphasis added).

Commonwealth v. Rice

[Appellant] opened fire on a family that included several very young children, suggesting a very serious danger to the community. Even though the injuries caused were solely to the victims['] lower extremities, such injuries could have been fatal. This incident was connected to gang activity and served as a retaliation for a prior shooting allegedly perpetrated by one of the victims, suggesting [Appellant] was involved in groups of individuals that pose a great danger to the community. Taken as a whole, this set of circumstances would not have warranted **[*13]** decertification, even if [Appellant]'s counsel had raised the issue. As such, this issue is without merit, and must fail.

PCO at 6-8.

Again, Appellant fails to present any argument in his brief as to why decertification was warranted under the circumstances of this case and, thus, he fails to establish the claim has arguable merit. We further ascertain no error in the PCRA court's determination that Appellant was not prejudiced by trial counsel's failure to seek decertification, or by her failure to discuss the issue with him.

<u>III</u>

Third, the PCRA court examined Appellant's IAC claims concerning trial counsel's preparation for, and execution of, her cross-examination of Ms. Johnson, specifically with regard to her identification of Appellant. The PCRA court construed these claims as an attempt to relitigate Appellant's direct appeal:

[Appellant] is seeking to re-litigate claims which this [c]ourt has previously addressed in its[] December 23, 2014 opinion, and which the Superior Court declined to overturn on appeal. This [c]ourt held, and the Superior Court affirmed, that the Commonwealth, through Ms. Johnson's testimony, presented sufficient evidence for a jury to convict [Appellant]. In **[*14]** this [c]ourt's December 23, 2014 opinion, this [c]ourt noted that Ms. Johnson unequivocally identified [Appellant] at trial as one of the shooters in this case. Despite extensive cross-examination, Ms. Johnson never wavered. Ms. Johnson testified that she watched [Appellant] walk close to her (twenty feet away), that [Appellant]'s face was fully visible because he was standing near streetlights, that she stared at [Appellant]'s fully visible face when he started shooting, and that she noticed that [Appellant] had braided hair.

Additionally, the day after the shooting, Ms. Johnson, without hesitation, unequivocally identified [Appellant] as the shooter in a photo array of eight individuals. This identification was corroborated by the fact that numerous witnesses testified that [Appellant] had braided hair at, or near, the time of the shooting, and that all of the other interviewed victims in the shooting indicated that the shooters were dark males. As [Appellant] did not prove that Ms. Johnson's testimony was inaccurate, his claims concerning trial counsel's ineffectiveness in failing to adequately challenge this evidence at trial and in the arrest warrant must fail.

*Id.* at 8-9 (citation **[*15]** omitted).

Initially, the PCRA court is simply incorrect in its conclusion that these claims were previously litigated. On direct appeal, Appellant raised sufficiency and weight-of-the-evidence claims regarding his identification by Ms. Johnson. He did not raise any IAC claim pertaining to trial counsel's cross-examination of Ms. Johnson, or counsel's preparation to confront her testimony, which were presented for the first time in Appellant's PCRA petition. Appellant does not now claim that the evidence was insufficient, or that the weight-of-the-evidence was against the verdict. Rather, he claims he was prejudiced by counsel's ostensibly inadequate preparation for, and cross-examination of, Ms. Johnson's identification testimony. While these claims are not completely unrelated, they are legally distinct.[5]

Appellant asserts that:

The PCRA court, in denying Appellant's petition, failed to develop a specific comparison of the evidence presented at trial to the evidence presented throughout PCRA proceedings in this matter. Specifically, since the evidence presented during the PCRA proceedings demonstrated that

---

[5] For instance, on direct appeal, Appellant's sufficiency and weight claims only encompassed consideration of evidence actually admitted at trial. However, under the rubric of an IAC claim, Appellant can posit that certain evidence, omitted from the jury's consideration due to counsel's ostensible ineffectiveness, undermined the fairness of his trial. Even if the jury was permitted to render a guilty verdict based on the evidence presented at trial, Appellant now presents a distinct legal claim that, had counsel provide effective assistance, additional evidence would have been considered by the jury that might have persuaded a juror to reach a different conclusion. This is clearly a distinct legal claim that was not previously litigated on direct appeal.

Commonwealth v. Rice

Ms. Johnson's ability to observe was fundamentally flawed and, at best, incorrect, **[\*16]** it is reasonably probable that at least one juror would have decided that the Commonwealth had failed to meet [its] burden at trial, thereby satisfying the prejudice requirement....

Appellant's Brief at 28-29.

Appellant contends that trial counsel provided ineffective assistance based on the following inaccuracies in Ms. Johnson's identification testimony, which he asserts were established through further investigation: 1) Ms. Johnson claimed that she was about 20 feet away from Appellant when she saw him, when it was more likely to be three times that distance; *see id.* at 30; 2) Ms. Johnson claimed her ability to see Appellant's face was aided by a streetlight, but no streetlight was located near the scene of the crime; *id.*; 3) Ms. Johnson's line of sight was impeded by two vehicles according to the Commonwealth's own diagram of the scene; *id.* at 31; and that 4) despite knowing Appellant, she did not identify him by name until the day after the shooting and, initially, only gave a general description of the perpetrator, *id.* at 31-33. Appellant argues that, had counsel adequately prepared for trial, she could have exploited these discrepancies to undermine the credibility of Ms. Johnson's **[\*17]** identification of Appellant with at least one juror.

While the PCRA erred in determining this issue was previously litigated, we nevertheless conclude that Appellant has not met his burden to demonstrate that he suffered outcome-determinative prejudice due to counsel errors. *Commonwealth v. Ford*, 2012 PA Super 98, 44 A.3d 1190, 1194 (Pa. Super. 2012) ("This Court may affirm a PCRA court's decision on any grounds if the record supports it."). The PCRA provides a remedy only where IAC "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *42 Pa.C.S. § 9543(a)(2)(ii).* "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Here, the question is whether trial counsel's investigation was so deficient as to deprive Appellant of a fair trial with respect to Ms. Johnson's identifying him as the shooter. Although Appellant has now pointed out several additional ways that trial counsel could have challenged her testimony through further investigation, we are not convinced that counsel's failure to do so resulted in outcome-determinative prejudice.

As noted by the Commonwealth, Ms. Johnson was extensively cross-examined at trial. *See* N.T., 1/31/13, **[\*18]** at 70-109. First, with respect to her estimate of 20 feet between Ms. Johnson and Appellant at the time of the shooting, we do not believe this detail, corrected to an estimate of 60 feet, would have had a significant effect at trial. Trial counsel questioned Ms. Johnson about her vantage point compared to the assailants, with reference to aerial photos of the scene. *Id.* at 75-77. Thus, regardless of whether the estimate of 20 feet was accurate, the jury was made aware of the relative positions of the victims and assailants as the assault occurred.

Moreover, it was not Ms. Johnson's estimate of distance in the first instance. The prosecutor asked if she was about 20 feet away, and she agreed that estimate was approximately correct. *Id.* at 52. Nevertheless, the jury was aware that the estimate was for the distance from the porch where Ms. Johnson was sitting to the curb *across the street*, which, common sense dictates, was likely to be a distance greater than 20 feet. While the distance may have been closer to 60 feet as Appellant claims, the jury was aware of the relative distance between Ms. Johnson and Appellant through her testimony, and by reference to the trial exhibits of **[\*19]** the scene, despite the poor estimate offered by the prosecutor. Moreover, we do not believe the longer distance was so great that it made it impossible, or even unlikely, for Ms. Johnson to be able to identify Appellant.

We also attach little significance to Appellant's assertion that Ms. Johnson was incorrect about the lighting on the street. Ms. Johnson was questioned about the lighting on the street in front of her home, and she ultimately admitted, upon cross-examination by trial counsel, that the nearest streetlights were located down the street from her home, by a school. *Id.* at 79.

Appellant also asserts that Ms. Johnson's view of him must have been obstructed by two vehicles, but this ignores the fact that Ms. Johnson never claimed that the assailants were stationary during the entire encounter. She testified that she first observed Appellant and his cohort turn a corner, and then walk down the street toward her home before they started shooting as they reached the curb across the street. Furthermore, Ms. Johnson recognized Appellant's face, not his lower body. It is not at all obvious that the presence of a vehicle between Ms. Johnson and Appellant would have hindered her ability **[\*20]** to identify Appellant by his face, even if the rest of his body was obstructed.

Finally, Appellant insists that it was suspicious that Ms.

Commonwealth v. Rice

Johnson did not immediately identify him by name—despite claiming to have known him for many years—and that trial counsel failed to adequately develop this as a challenge to Ms. Johnson's credibility. We disagree. Trial counsel extensively cross-examined Ms. Johnson about deficiencies in her initial description of the assailants. *Id.* at 85-92. Trial counsel also specifically asked Ms. Johnson if she had initially identified Appellant by name, but Ms. Johnson did not remember. *Id.* at 89. Counsel also asked Ms. Johnson when was the last time she had seen Appellant before the shooting, but she could also not recall that information. *Id.* at 90.

Importantly, the fact that Ms. Johnson did not immediately identify Appellant by name was known to the jury; it was fairly suggested by the fact that she did not recall if she had when directly questioned, and the only evidence of her initial identification of Appellant occurred the following day at a hospital. The shooting occurred around 9:30 p.m. on September 25, 2011. Ms. Johnson testified that, in the immediate **[*21]** aftermath of the shooting, she was in and out of hospitals, for her own care, and for the care of her family members who were also injured. The very next day, at 6 p.m., less than 24 hours later, Ms. Johnson identified Appellant from a photo array when interviewed by detectives. *Id.* at 62-64. Because the jury was aware of these facts, we do not believe any additional focus by trial counsel on the delay in identifying Appellant would have had an impact on their view of Ms. Johnson's credibility in identifying Appellant.

In sum, Appellant has simply failed to meet his burden to prove that any of the alleged deficiencies in trial counsel's cross-examination of Ms. Johnson, or the sum of those deficiencies, resulted in prejudice to the extent that it deprived him of a fair trial. While counsel's cross-examination was not perfect, and can be easily second-guessed in hindsight, Appellant was not entitled to flawless representation, and he has failed to show that trial counsel's performance was constitutionally defective.

## IV

Fourth, the PCRA court considered Appellant's IAC claim that his trial counsel should have requested a *Kloiber* instruction. The court initially found that this claim had **[*22]** essentially been previously litigated on direct appeal. PCO at 9. We disagree. In Appellant's supplemental *Rule 1925(b)* statement, filed during the

litigation of his direct appeal, he asserted that the trial court erred by not issuing a *Kloiber* instruction "as requested[.]" *See* Appellant's *Rule 1925(b)* statement, 2/2/14, at 1 ¶ 1. The trial court determined that counsel had not requested a *Kloiber* instruction, *see* Trial Court Opinion, 12/23/14, at 20, and Appellant subsequently abandoned that claim in his arguments before this Court on direct appeal. Appellant now asserts that a *Kloiber* charge should have been requested. This claim was not previously litigated.

Nevertheless, we conclude that this claim lacks arguable merit because Appellant has failed to demonstrate that the instruction was warranted in the circumstances of this case.

> A *Kloiber* charge is appropriate where there are special identification concerns: a witness did not have the opportunity to clearly view the defendant, equivocated in his identification of a defendant, or had difficulty making an identification in the past. *Commonwealth v. Rollins, ... 558 Pa. 532, 738 A.2d 435, 448 n.14 ([Pa.] 1999); Commonwealth v. Gibson, ... 547 Pa. 71, 688 A.2d 1152, 1163 ([Pa.] 1997)*. However, "[w]hen the witness already knows the defendant, this prior familiarity creates an independent basis for the **[*23]** witness's in-court identification of the defendant and weakens ineffectiveness claims based on counsel['s] failure to seek a *Kloiber* instruction." *Commonwealth v. Ali, 608 Pa. 71, ... 10 A.3d 282, 303 ([Pa.] 2010)* (citations omitted).

*Commonwealth v. Reid, 627 Pa. 78, 99 A.3d 427, 448 (Pa. 2014)*.

Here, as discussed above, Ms. Johnson had a clear opportunity to view Appellant's face from a distance of, at most, 60 feet, and she never wavered in her identification. She never equivocated, nor did she have any difficulty making the identification on a prior occasion. Moreover, Ms. Johnson knew Appellant previously. Thus, we conclude that a *Kloiber* instruction was not warranted, and, therefore, there is no arguable merit to Appellant's claim that counsel was ineffective for failing to request a *Kloiber* instruction.

## V

Next, the PCRA court considered Appellant's IAC claim that trial counsel failed to adequately prepare Dr. Tapper for trial. Appellant asserts that trial counsel failed to elicit testimony from Dr. Tapper regarding the severity

of Appellant's injuries at the time of the shooting. *See* Appellant's Brief at 37. At trial, Dr. Tapper explained the extent of Appellant's wounds from the shooting that occurred while on his bicycle, and the resulting medical care provided, as follows:

> He was shot several times. One **[*24]** of the bullets went into his butt, one of the bullets went into his thigh, one of the bullets went into his belly, his abdomen.
> ...
> When he got to Jefferson Hospital emergency room, they assessed the situation fairly quickly and they took him to the operating room fairly quickly. And they did an exploratory surgery.
> They opened him up from basically right below his breastbone all the way down to his pelvis where the incision went straight up and down the body for 10 inches[,] and using proper surgical technique[,] stuck their hands in there trying to find out where the bullet was. And they eventually found it. The bullet had penetrated -- had gone into his small intestine, large intestine, stomach.
> What damage had the bullet done? Fortunately, they found that that bullet had not done any damage to the small intestine [or] large intestine. But there was a bullet in there, and they had to grope around in there and move intestines this way and that.
> And they finally got the bullet, and they took it out, saved it, and then put everything back in place, and sewed him up.
>
> But they didn't sew him up, they put metal staples in place to close him up. So the staples put the sides of his abdomen together **[*25]** in place. So that when the wound healed, it would heal like this rather than like that.

N.T., 2/4/13, at 13-14.

Appellant argues that trial counsel should have asked Dr. Tapper what would have happened to the staples that bound Appellant's wound if Appellant had been running as described by Ms. Johnson. At the PCRA hearing, Dr. Tapper testified that he would have answered that question as follows:

> [I]t would have been virtually impossible for [Appellant] to be running, let alone walking with any speed down the street, whatever street. He certainly wasn't doing it on the day I saw him, and he wouldn't have been doing it for a week or two or five from that point on because he was severely debilitated and incapacitated with his ability to walk

when he was in my office.
***

> However, had he taken lots of opioids at some point at whatever day, and had he been running, the incision line where the surgeons had opened him up from breastbone to way down eight or nine inches below the breastbone, straight up and [down] the abdomen, that incision probably would have split open to one degree or another and intestines would have been coming out or blood would have been coming out or fluid coming out, **[*26]** if he had been able to run, which I don't think he would have been able to do in the first place.

N.T., 1/25/19, at 56-58. Appellant argues that he was prejudiced by trial counsel's failure to elicit this testimony from Dr. Tapper at trial. This claim lacks arguable merit.

Dr. Tapper testified extensively at trial regarding Appellant's injuries. *See* N.T., 2/4/13, at 7-43. He specifically described the surgical incision to Appellant's abdomen, and the fact that it had been bound with staples instead of stitches. *Id.* at 14. He testified that he saw Appellant nine days after his release from the hospital, where Appellant had been for eight days after he was shot, a visit that occurred just five days prior to the at-issue shooting. *Id.* at 15. Dr. Tapper stated that, during the visit, Appellant exhibited "a moderate amount" of pain, and that it was obvious that Appellant's pain was being triggered by his movement. *Id.* at 17-19. Dr. Tapper ultimately opined that the "amount of pain that I saw him [in,] and [his] inability to stand and get onto and off the table in my office on the 20th of September[,] makes me very dubious as to whether he could walk standing up straight, let alone run with **[*27]** any degree of speed five days after I saw him." *Id.* at 22.

The PCRA court determined that this claim lacked arguable merit, essentially rejecting Dr. Tapper's PCRA hearing testimony as not credible, stating:

> [A]t trial, Dr. Tapper was asked clearly whether [Appellant] could have run and why his condition would affect that ability. Dr. Tapper had every opportunity to explain his conclusions, and he did so, referring to [Appellant]'s level of pain. If he wanted to opine that it was actually impossible for [Appellant] to run, he would have known that at the time, and could have said so in answering any of those questions. At the evidentiary hearing, Dr. Tapper eventually backtracked, again admitting that it was not "impossible" for [Appellant] to run, but

Commonwealth v. Rice

rather "virtually impossible[.]" []N.T.[,] 1/25/19, 56-57, 73-74[].
PCO at 11.

We ascertain no error by the PCRA court, as the record supports its credibility assessment of Dr. Tapper. *See Commonwealth v. Abu-Jamal, 553 Pa. 485, 720 A.2d 79, 99 (Pa. 1998)* ("Just as with any other credibility determination, where the record supports the PCRA court's credibility determinations, those determinations are binding on this [C]ourt."). Accordingly, this IAC claim lacks arguable merit.[6]

## VI

Next, the PCRA court considered **[*28]** Appellant's claim that trial counsel was ineffective for providing conflicting alibi witness testimony to the jury. The entirety of his argument regarding this IAC claim is as follows:

> It is clear from the trial record that counsel was ineffective relating to [her] investigation and presentation of the alibi defense. In failing to adequately prepare an alibi defense—*i.e.*, where defense counsel unwittingly offers alibi evidence that contradicts itself-trials counsel's actions have been found to constitute ineffective assistance of counsel. *Commonwealth v. Johnson, 600 Pa. 329, 966 A.2d 523 (Pa. Super. 2009)*. [T]rial counsel offered two alibi witnesses: Ms. Deania Duncan, [Appellant's] godmother, and Ms. Duncan's son, Q.M., age sixteen (16). The two alibi witnesses contradicted one another regarding numerous key facts. In fact, the PCRA [c]ourt actually acknowledges that counsel put on a conflicting alibi defense. [PCO] ... [at] 13.

Appellant's Brief at 37-38.

Appellant fails to adequately develop any discussion of why counsel's presentation of alibi witnesses at trial was clearly prejudicial to an extent that he was deprived of a fair trial. Critically, Appellant fails to discuss what

---

[6] The PCRA court also determined that Appellant was not prejudiced by counsel's failure to elicit this additional testimony from Dr. Tapper. We do not reach this question. "If an appellant fails to prove by a preponderance of the evidence any of the ... prongs [of the IAC test], the Court need not address the remaining prongs of the test." *Commonwealth v. Fitzgerald, 2009 PA Super 154, 979 A.2d 908, 911 (Pa. Super. 2009)*.

alternative strategies might have resulted in a different verdict. For **[*29]** instance, he does not explain whether counsel should have chosen to not present any alibi witnesses, or only one of the two conflicting alibi witnesses, or how or why such a strategy would have led to a different result.

Furthermore, Appellant also provides no discussion pertaining to his citation of ***Johnson***. In that case, the Commonwealth appealed after the PCRA court granted a new trial based on Johnson's claim(s) that his trial counsel was ineffective. Johnson asserted that his trial counsel had failed to adequately prepare alibi witnesses, and had also failed to call three potential alibi witnesses.

***Johnson*** is distinguishable from the instant matter in several respects. First, the ***Johnson*** decision had a different procedural posture, as the Commonwealth had appealed a ruling favorable to Johnson in the PCRA court. Second, even assuming the arguable merit of Appellant's claim, the potential prejudice that ensued in ***Johnson*** was substantially greater. In that case, both alibi witnesses who testified that Johnson was with them on the date he was accused of murdering the victim mistakenly testified that the date in question fell on a Wednesday, when the murder had occurred on a Tuesday. **[*30]** *Johnson, 966 A.2d at 526*. Additionally, Johnson presented three additional alibi witnesses at his PCRA hearing who had not been interviewed by Johnson's trial counsel, and who, therefore, did not testify at Johnson's trial. *Id. at 527*. Moreover, at the hearing, Johnson also presented one of the Commonwealth's key witnesses, who recanted his identification of Johnson. *Id.*

As the ***Johnson*** Court stated: "To properly grant ***Strickland*** relief here, the PCRA court would have to find that the uncalled fact witnesses and the deficiently prepared alibi witness had relevant evidence that could have aided [Johnson]'s defense, and that there is a reasonable probability that the introduction of such evidence would have altered the outcome of the trial." *Id. at 540*. Because the PCRA court failed to make any credibility determinations regarding the new alibi witnesses, as would be necessary to demonstrate that counsel's errors were outcome determinative, the ***Johnson*** Court remanded for further proceedings. *Id. at 540-41*.

In the instant case, Appellant did not proffer alternative alibi witnesses in his PCRA petition, nor has he demonstrated that the result of his trial would have been different if fewer alibi witnesses had been presented at

his trial, or if **[*31]** they would have been better prepared to testify. Furthermore, unlike what occurred in *Johnson*, the primary identification witness here, Ms. Johnson, has not recanted her identification of Appellant. Accordingly, we conclude that *Johnson* is distinguishable, and does not entitle Appellant to relief. Thus, we ascertain no error in the PCRA court's rejection of this IAC claim.[7]

## VII

Next, the PCRA court addressed Appellant's claim that trial counsel was ineffective for soliciting prejudicial testimony from Officer Donna Simmons. The entirety of Appellant's argument in this regard is as follows:

> Trial counsel, during her cross-examination of Officer Simmons, elicited extremely prejudicial information that [Appellant]'s picture, prior to the officer's interaction with [him] on September 19, 2011, was displayed in the officer's police district as someone associated with '7th Street and 5th Street' gang. This evidence was the same evidence that the PCRA court prevented the Commonwealth from introducing in pretrial motions. This was due to its unsubstantiated and inflammatory nature, which the PCRA court ruled was unduly prejudicial at the time. However, trial counsel not only elicited this evidence **[*32]** before the jury, she then lodged an objection following her own question, and then requested a recess, further highlighting this inflammatory testimony.

Appellant's Brief at 38-39.

The PCRA court found this claim to be meritless, reasoning as follows:

> Prior to trial the parties agreed that such information would be inadmissible at trial, but at trial[,] [Appellant]'s counsel elicited testimony from Officer ... Simmons, in a reference to a picture of [Appellant] at the police station. When asked repeatedly by [Appellant]'s [t]rial [c]ounsel whether she knew [Appellant], Officer Simmons stated that she did not know his name, but she knew who he was because[:] "Back in our district we have

---

[7] To be clear, we discern no error in the PCRA court's conclusion that Appellant was not unduly prejudiced by the presentation of the conflicting testimonies of Ms. Duncan and Q.M. to the extent that a new trial is warranted. However, we reject the PCRA court's alternative conclusion that this claim was previously litigated on direct appeal.

pictures of gentlemen from 7th Street and 5th Street." []N.T.[,] 2/5/13, at 22[]. This picture was how the [o]fficer was familiar with [Appellant]. [Appellant] argues that this testimony was prejudicial to him. [Appellant] has not proven that he was prejudiced by this information being introduced at trial. Officer Simmons did not actually say that [Appellant] was a gang member; she only referred to his picture in passing. A jury would not have deduced that he must be a gang member from that vague testimony, **[*33]** which does not use the word "gang" at any point. [Appellant] simply opines that it painted him in a negative light to the jury. In its [prior] opinion, this [c]ourt found that this testimony "did not have the effect of prejudicing the jury," as it would not have implied any gang affiliation to a layperson. []Trial Court Opinion, 12/23/14, [at] 27[]. Thus, [Appellant] has clearly not proven that this insignificant detail affected the outcome of the trial[.] *See Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693, 701 (Pa. 1998) ("If it is clear that [the a]ppellant has not demonstrated that counsel's act or omission adversely affected the outcome of the proceedings, the claim may be dismissed on that basis alone[.]").

Thus, this claim is without merit.

PCO at 14-15.

We agree with the PCRA court, and Appellant's scant argument is unresponsive to the PCRA court's reasoning for rejecting this claim. Accordingly, we assess no error in the PCRA court's rejection of this claim as lacking merit.

## VIII

The PCRA court next considered Appellant's claim that it should have granted an evidentiary hearing regarding several of the IAC issues raised in his petition. "With respect to the PCRA court's decision to deny a request for an evidentiary hearing, or to hold a limited **[*34]** evidentiary hearing, such a decision is within the discretion of the PCRA court and will not be overturned absent an abuse of discretion." *Commonwealth v. Mason, 634 Pa. 359, 130 A.3d 601, 617 (Pa. 2015)*.

Initially, we reject the court's conclusion, as discussed above, that some of Appellant's IAC claims have been previously litigated on direct appeal, which the court asserts as the primary basis for denying an evidentiary hearing on certain claims set forth in Appellant's amended petition. *See* PCO at 16. Nevertheless,

Appellant fails to convince us that he was prejudiced by the court's failure to hold a hearing.

The PCRA court refused to hold a hearing on Appellant's claims that his trial attorney was ineffective for 1) failing to effectively challenge Ms. Johnson's identification testimony, and 2) failing to adequately develop Appellant's alibi defense. *See* PCO at 15-16. As discussed, *supra*, we are able to determine that these claims were meritless without the benefit of an evidentiary hearing, and this "Court may affirm a PCRA court's decision on any grounds if the record supports it." *Ford, 44 A.3d at 1194*.

In any event, Appellant concedes that at "the PCRA evidentiary hearing held on January 25, 2019, it was stipulated by the parties that Appellant's trial counsel **[*35]** was unavailable for the hearing due to physical and mental-health related reasons—she was incompetent." Appellant's Brief at 21. Thus, trial counsel was not available to testify, even had the PCRA court permitted Appellant to raise those two claims at the hearing. Furthermore, Appellant fails in his brief to identify or discuss what evidence and/or witnesses he intended to present to support these claims at the PCRA hearing, had the court not limited its scope. Accordingly, we have no basis upon which to determine if Appellant was prejudiced by the denial of an evidentiary hearing. For all these reasons, we conclude that Appellant has failed to demonstrate he was prejudiced by the PCRA court's limitations of the scope of the evidentiary hearing, even if the explicit reasons cited by the PCRA court for doing so were erroneous. "Appellant cannot show an abuse of discretion if he fails to show how he was prejudiced by the decision." *Commonwealth v. Ogrod, 576 Pa. 412, 839 A.2d 294, 323 (Pa. 2003)*.

## IX

Finally, the PCRA court considered Appellant's claim that "there is a reasonable probability that the jury's guilty verdicts were a result of trial counsel's cumulative errors." PCO at 17. The court concluded that, because it failed to find merit to any **[*36]** individual IAC claim, Appellant was not entitled to relief on his claim that the cumulative errors of counsel deprived him of a fair trial.

Our Supreme Court has discussed the standard for the assessment of a claim concerning the cumulative errors of counsel as follows:

    We have often held that "no number of failed [IAC]

claims may collectively warrant relief if they fail to do so individually." *Johnson, supra at 532* (quoting *Commonwealth v. Washington, 592 Pa. 698, ... 927 A.2d 586, 617 ([Pa.] 2007)*). However, we have clarified that this principle applies to claims that fail because of lack of merit or arguable merit. When the failure of individual claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed. ... *Johnson, supra at 532* (citing *Commonwealth v. Perry, ... 537 Pa. 385, 644 A.2d 705, 709 ([Pa.] 1994)*, for the principle that a new trial may be awarded due to cumulative prejudice accrued through multiple instances of trial counsel's ineffective representation).

*Commonwealth v. Spotz, 610 Pa. 17, 18 A.3d 244, 321 (Pa. 2011)* (some citations omitted).

Here, the only individual IAC claims that we have rejected solely based on lack of prejudice were regarding counsel's ostensible failure to prepare for the cross-examination of Ms. Johnson, and counsel's presentation of somewhat conflicting alibi witness testimony. We do not find that the cumulative prejudice of **[*37]** these errors was so significant as to affect the outcome of Appellant's trial. Although both errors arguably touched upon the same underlying issue of identification, Appellant has failed to demonstrate that either error (or set of errors) was so significant, even in combination, to undermine the weight afforded by the jury to Ms. Johnson's identification testimony. Accordingly, no relief is due.

Order *affirmed*.

Judge Strassburger did not participate in the consideration or decision of this case.

Judgment Entered.

Date: 6/7/21

**End of Document**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| CHARLES RICE | : | 22 – cv - |
|    Petitioner, | : | |
|  v. | : | |
| | : | |
| TOM McGINLEY, | : | |
|    Sup't SCI Coal Twp. | : | |
|    Respondent. | : | |
| | : | |
| | : | |

_____

**PETITIONER'S PETITION FOR A WRIT OF HABEAS
CORPUS  AND CONSOLIDATED MEMORANDUM
OF  LAW,  PURSUANT TO 28 U.S.C. §2254**

Karl Schwartz
Wiseman & Schwartz, LLP
718 Arch Street, Suite 702 North
Philadelphia, PA 19106
(215) 360-3988
schwartz@wisemanschwartz.com

Counsel for Petitioner
Charles Rice

Dated: December 21, 2022
Philadelphia, PA

# Table of Contents

Preliminary Statement ....................................................................... 1

Parties................................................................................................ 1

Introduction ...................................................................................... 1

This Petition is Timely Under the Antiterrorism and Effective
Death Penalty Act ............................................................................ 3

Statement of the Case...................................................................... 6

Standard of Review.......................................................................... 31

Statement Regarding Exhaustion & Default Regarding the
Ineffectiveness Claims in this Petition........................................... 36

Standards Governing Claims of Ineffective Assistance of Counsel............. 38

Claims for Relief.............................................................................. 40

Claim I – The Commonwealth Violated Petitioner's right to Due
Process Pursuant to *Brady v. Maryland,* and *Napue v. Illinois,*
By Suppressing Exculpatory Evidence Casting Doubt on the
Integrity of Witness Johnson's Identification of Petitioner, and
then By Eliciting False Testimony From Her that She Identified
Petitioner the Night of the Incident................................................. 40

Claims II- - Trial Counsel was Ineffective Under the Sixth Amendment
for Stipulating to the Fact that One of the Victims, Khalief Ladson, was
a Person of Interest in the Shooting of Petitioner that Occurred Three
Weeks Earlier, and For Ignoring a *Bruton* Violation that Compounded
the Error ........................................................................................... 53

Claims III and IV -Ineffectiveness Relating to Instructions

Claim III – Trial Counsel was Ineffective Under the Sixth Amendment
for Failing to Object to an Improper Alibi Instruction ................................. 65

<u>Claim IV</u> - Trial Counsel was Ineffective for Failing to Request
a *Kloiber* Instruction ................................................................... 70

<u>Claim V</u> - Trial Counsel Was Ineffective Under the Sixth Amendment
for Failing to Effectively Utilize Incontrovertible Physical Evidence
that Cast Doubt on the Ability of Witness Latrice Johnson to Identify
the  Perpetrator .............................................................................. 77

<u>Claim VI</u> - Trial Counsel was Ineffective Under the Sixth Amendment
for Failing to Discuss Her Expert's Testimony With Her Expert Before
He Took the Witness Stand ........................................................... 87

<u>Claim VII</u> - Petitioner Is Entitled to Relief Based on the Cumulative
Prejudicial Effect of the Errors in This Case ............................... 93

Conclusion ................................................................................... 95

## PRELIMINARY STATEMENT

Petitioner, Charles Rice, who is serving a sentence of 30 to 60 years incarceration, resulting from his convictions for attempted homicide and related charges, hereby files his *Petition for a Writ of Habeas Corpus and Consolidated Memorandum of Law* ("*Petition*"). Transcripts of state court proceedings are cited by date, followed by page number.

Although most of the cited material in this *Petition* will be locatable in the state court record, certain cited documents from the record can be found in the Appendix filed this date and are cited as "A" followed by Appendix page number.

## PARTIES

Petitioner is a prisoner in the custody of the Pennsylvania Department of Corrections. He is currently incarcerated at the State Correctional Institution at Coal Township, in Coal Township, Pennsylvania, prisoner number LA 6788. Tom McGinley is the Superintendent of the State Correctional Institution at Coal Township, and as such he has immediate control over Petitioner's custody.

## INTRODUCTION

Petitioner, Charles Rice, a 17-year-old at the time of his arrest, is serving a 30 to 60-year sentence for a crime he very likely did not commit. The trial evidence against him was exceedingly thin. There was but one identification witness, who testified to a fleeting incident occurring in the dark of night 60 feet away from her.

1

Although she testified at trial to having known Petitioner from before, the night of the incident, after being taken to the hospital and being asked by a police officer if she knew her assailant, she did not identify him. Her stepdaughter, who was present at the incident, also testified and gave a markedly different account of the actions and location of the individual her stepmother identified as Petitioner.

While that alone surely cast doubt on the integrity of her later identification of Petitioner, there was evidence casting further doubt withheld by the Commonwealth. That evidence included the witness's statements to police at the scene that she could not identify the perpetrator; statements to nurses at the hospital that she could not identify the perpetrator; and statements to doctors at the hospital that she only "heard" shots, after which she ran into her house.

The suppression of this exculpatory evidence was not the only way the integrity of Petitioner's trial was undermined.

Despite the Commonwealth's best efforts to convince the trial court that it should be permitted to introduce evidence of motive against Petitioner – that one of the people who were shot at during the incident (Khalief Ladson) had weeks earlier shot Petitioner – the Commonwealth was unable to provide any evidence to support such a theory. Incredibly and inexplicably, trial counsel then agreed that the jury should be allowed to learn that the Commonwealth considered Ladson a suspect in the earlier shooting of Petitioner. Thus, out of thin air, the Commonwealth was gifted

a motive theory, that helped resolve any concerns that the jury had regarding the weakness of the identification evidence.

Trial counsel also made a series of other blunders that undermined her defense. These included: her failure to utilize readily available evidence from a crime scene diagram obtained in discovery that cast further doubt upon the witness's identification; her failure to object to an erroneous alibi instruction and failure to request an appropriate identification instruction that further undermined her identification defense; and her failure to speak to her medical expert witness, who if properly prepared would have demonstrated the near impossibility that Petitioner, recovering from recent surgery for his gunshot wounds, could have run in the manner suggested by the eyewitness, let alone have participated in the incident.

But for trial counsel's deficiencies in these respective areas, and the due process violations Petitioner suffered, separately and in combination, there is a reasonable probability that Petitioner would have been acquitted. No defendant in a case, no matter his innocence, could survive such an onslaught of constitutional errors.

## THIS PETITION IS TIMELY UNDER THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT

28 U.S.C. § 2244(d)(1) imposes a one-year limitations period for the filing of a petition. In applicable part, the one-year commences at the conclusion of direct

review "or the expiration of the time for seeking such review."

Petitioner's direct appeal was decided by the Superior Court of Pennsylvania on January 20, 2016. He did not seek leave to appeal. Thus, the "expiration of the time for seeking such review" expired 30 days hence, on February 19, 2016, when his period for leave to appeal expired.

The AEDPA limitations period is tolled by a properly filed state post-conviction petition (28 U.S.C. § 2244(d)(2)), which Petitioner filed on February 23, 2016. At the time that he properly filed his PCRA petition, Petitioner had used 4 days of the one-year limitations period.

The limitations period continued to be tolled until December 30, 2021, the date on which his petition for leave to appeal the Superior Court's affirmance of the PCRA denial was denied. On that date that Petitioner had 361 days remaining on his one-year limitations period. Thus, the AEDPA limitations period expires on December 26, 2022, and this *Petition,* filed on December 21, 2022, is timely.

## STATEMENT OF THE CASE

### PROCEDURAL HISTORY

On September 27, 2011, Petitioner surrendered to police on an arrest warrant for a shooting incident that occurred at the corner of Fernon and South 18th Streets in Philadelphia. On December 9, 2011, his preliminary hearing was held and, along with his co-defendant, Tyler Linder, he was held for court on attempted homicide

and related charges. He was represented at the preliminary hearing by Sanjai Weaver, Esq. Linder was represented by Christopher Mannix, Esq. The Commonwealth was represented by Richard Boyd, Esq.

From January 30, 2013, until February 8, 2013, Petitioner was tried before a Philadelphia Common Pleas Court jury, with co-defendant Linder. On February 8, 2013, the jury acquitted Linder, and convicted Petitioner of four counts each of Attempted Homicide and Conspiracy to Commit Aggravated Assault, three counts each of Aggravated Assault and Conspiracy to Commit Homicide, and one count each of Firearms Not to Be Carried Without a License, Carrying a Firearm in Public in Philadelphia, and Possession of a Firearm by a Minor. Petitioner was represented by Ms. Weaver at trial. Linder was represented by Raymond Driscoll, Esq. The Commonwealth was represented bv Assistant District Attorney Eric Stryd.

On January 20, 2016, the Superior Court affirmed Petitioner's convictions and sentence. *Commonwealth v. Rice*, 136 A.3d 1033 (Pa. Super. 2016) (unpublished memorandum). Petitioner was represented on appeal by Ms. Weaver. The Commonwealth was represented by Jennifer Lin, Esq.

On February 23, 2016, Petitioner filed a PCRA Petition. On January 25, 2019, an evidentiary hearing was held on the Petition. On May 30, 2019, the trial court denied the Petition. During PCRA proceedings, Petitioner was represented by Jason Kadish, Esq. The Commonwealth was represented by Matthew Lamonaca, Esq.

On June 20, 2021, the Superior Court affirmed the denial of PCRA relief. *Commonwealth v. Rice,* 2021 Pa. Super. Unpub. LEXIS 1499 (June 7). (hereafter "*Rice*"). On August 16, 2021, rehearing was denied. *Commonwealth v. Rice,* 2021 Pa. Super. LEXIS 545 ((Aug. 16). On December 30, 2021, leave to appeal was denied. *Commonwealth v. Rice,* 2021 Pa. LEXIS 4402 (Pa. Dec. 30). Petitioner was represented on appeal by Mr. Kadish. The Commonwealth was represented by Ms. Lin.

## SUMMARY OF TRIAL PROCEEDINGS

### Hearing on Pretrial Motion

### Trial Prosecutor Stryd

The prosecutor referenced the Commonwealth's pretrial motion which sought permission to alert the jury to the fact that the "person of interest" in a September 3, 2011 shooting of Petitioner was Khalief Ladson, one of the victims at the trial of this case. 1/28/13, 4. The Commonwealth also sought to introduce evidence that Petitioner was a member of a 7th Street gang and Ladson a member of a 5th Street gang. *Id.,* 8.

### Detective Robert Spadaccini

Detective Spadaccini, of South Detectives, testified that he investigated a September 3, 2011 shooting that occurred in the 400 block of Wharton Street. *Id.,* 9. Petitioner had been shot, and Charles Linder had been shot at. *Id.,* 10. South

6

Detectives came up with a person of interest (i.e. suspect), Khalief Ladson. *Id.,* 11. Detective Spadaccini could not recall why Ladson was a person of interest. *Id.* He did not know who or what his source was for that information. *Id.,* 25. No one had been arrested for Petitioner's shooting. *Id.,* 14. Ladson was "affiliated" with the 5th Street gang, and it was "assumed" that Petitioner was a member of the 7th Street gang. *Id.,* 15. There had been an ongoing conflict between these two groups. *Id.* The detective testified that he did not have "anybody that can say that they saw [Petitioner] associated with the 7th Street [gang]," but that he had "sources." *Id.,* 18, 23. Nevertheless, he had no "actual concrete evidence." *Id.,* 31.

### Trial Court Representations

After the Commonwealth rested on the motion, the trial court withheld its ruling; however, the trial court made the following comment regarding the Commonwealth's application that it be permitted to tell the jury that Ladson was a person of interest in Petitioner's shooting:

> **THE COURT**: Hold on. You are saying they had -- police had information from someone -- you have no idea who it was – that Mr. Ladson did the shooting.
>
> **MR. STRYD**: He was a person of interest or a suspect.
>
> **THE COURT**: Okay.
>
> **MR. STRYD**: I think the extent of my argument as far as the shooting --

**THE COURT**: How does -- let's talk about the information that the police had from someone that Ladson was a suspect. How does that come in?

**MR. STRYD**: Judge, I do –

**THE COURT**: You have no idea who the source was. How does that come in? You have no idea who the source was or has any reliability to the source.

**MR. STRYD**: Judge, my argument, I think, would be along the lines that it is not going to the truth of the matter that he was not arrested. It wasn't evidence – enough evidence to make even an arrest in that case. But the fact that he was a person of interest, and just happens to be shot a few weeks later, I think it still goes back to motivation and the state of mind of the defendant.

**THE COURT**: How do you show that the defendants even knew about it? All we know he has a very vague, amorphous, unsubstantiated claim that Ladson was a suspect. You have no idea what the source is, and you're saying the fact that he was a suspect is a motive by the defendants. But, one, we have no idea who, if anyone, was the source. And, two, we have no idea they knew about it. So how does that come in?

**MR. STRYD**: Judge, that's a good point*. **I don't have an answer for that question.***

*Id.,* 43-44.

The trial court made the following comment regarding the Commonwealth's request to allow the jury to learn of the gang affiliations Detective Spadaccini assumed existed:

What I'm specifically saying is the evidence you have about the gang membership rises and falls on sources. Databases, sources. No one knows the source.

8

*Id.,* 52. *See also id.,* 55 ("[W]hat is the source of the information? How is that admissible?" ); *id.,* 58 ( "[T]he whole theory that this is like a gangland shooting or gangland within a shooting is all based upon anonymous sources.") The trial court withheld judgment, inviting the Commonwealth to see if it could find precedent that would permit it to make the suggestions to the jury it had requested, based on information from unknown sources. *Id.,* 53.

### **Pretrial Stipulation**

Just before the trial started, the prosecutor and trial counsel for Petitioner announced the following stipulation, in lieu of a formal ruling on the motion in limine:

- that Petitioner had been shot on September 3, 2011, and that co-defendant Linder was with him at the time;

- that Petitioner came into South Detectives on September 16th, and told Detective Spadaccini that he did not see who shot him and that he did not want to cooperate;

- that Khalief Ladson became the suspect or a suspect in that investigation. 1/30/13, 5-8.

**Trial Testimony**

**Latrice Johnson**

Latrice Johnson testified that on September 25, 2011, at 9:30 pm she was at her mother's house. *Id.,* 40. The house was in the 1600 block of 18th Street, at Morris. *Id.* She was there with her children, nieces and nephews. *Id.,* 41. She was sitting on the outside step of the house at 1618 South 18th. *Id.,* 43-44. Her son Khalief was sitting behind her. *Id.,* 73. He was holding her niece Denean, who was six years old. *Id.,* 42, 80. Some of the children were across the street playing basketball on an adjustable court. *Id.,* 47. She then saw two males – one of whom she testified was Petitioner – and both of whom had come out of Fernon Street, begin shooting. *Id.,* 48-49. She then flipped over onto her children. *Id.,* 51. She never saw a gun, but she did see sparks. *Id.,* 95. She saw one person firing. *Id.,* 128. The person she identified as Petitioner was wearing a gray hoodie, and the other male wearing a black one. *Id.,* 77-78. Fernon Street was north of where Ms. Johnson was sitting. *Id.,* 49-50. After flipping over, she then looked and saw the shooter turned and running down Fernon. *Id.,* 51, 55. She did not know how far the shooter ran down Fernon. *Id.,* 59. Ms. Johnson did not recognize the other male. *Id.,* 53.

Ms. Johnson's niece Denean had been shot in her leg, and Ms. Johnson picked her up. *Id.,* 56, 59. Everyone went inside the house and waited for police. *Id.,* 56. When the police arrived, Ms. Johnson, Denean, Dinean's mother and Dinean's aunt

(both of whom had been around the corner when the shooting occurred) rode with a police officer to the hospital. *Id.,* 57. When Ms. Johnson got to CHOP with Dinean, she realized that she too had been shot in the legs, and went next door to University of Pennsylvania Hospital. *Id.,* 58. The staff at the hospital looked at her legs, cleaned them up, and let her go. *Id.,* 63. After the shooting, Ms. Johnson's father took her stepdaughter Latoya and her son Khalief (both of whom had been shot) to another hospital before Ms. Johnson left the scene with Denean. *Id.,* 60.  Just before the incident, Latoya had been by the steps where Ms. Johnson had been, and then had walked across the street where basketball was being played. *Id.,* 115-116. Khalief had been taken to Methodist Hospital. *Id.,* 97. Apparently her father had come down from upstairs in the house, and left before Ms. Johnson, although she never saw him. *Id.,* 83-84.

On the day after the incident, Ms. Johnson was shown photographs by police, and circled a photograph of Petitioner as one of the perpetrators. *Id.,* 64. She testified that she knew Petitioner as a friend of her son Khalief Ladson, from when they were younger. *Id.,* 64. At that time, Ms. Johnson was interviewed by police in the hospital room where her stepdaughter Latoya Lane was being treated. *Id.,* 101-102.

The prosecutor asked Ms. Johnson if on the evening of the shooting she spoke to uniformed police, and told them "who did the shooting." *Id.,* 58. Her initial answer was that she did not "recall exactly . . . " *Id.* In response, however, the prosecutor

pressed on, asking "did you say you saw the Defendant Rice go down Fernon Street, right?" *Id.* She then answered "yes." *Id.* On cross-examination Ms. Johnson was shown police paperwork with initial flash information of the perpetrator's based on her initial report to police. *Id.,* 85-89. She acknowledged that it did not contain an identification of Petitioner. *Id.,* 88.

**Latoya Lane**

Latoya Lane testified that on the night of the incident she was across the street from her grandmother's house at 1618 South 18th Street, looking at her cell phone. *Id.,* 136. She had been with the other members of the family, but had crossed the street, because they all were about to go home. 1/31/13, 15. Her little sister was with her. *Id.,* 18. She then heard about five shots fired. 1/30/13, 138-39. Her foot felt like it was asleep. *Id.,* 139. She then began running across 18th Street. *Id.,* 158-59. She looked toward Fernon Street and saw the shooter pointing a gun at her. *Id.,* 139.  He was at the corner of Fernon and 18th Street. *Id.,* 160. Ms. Lane testified that she did not actually see the gun, but that she saw sparks from the shooter's hand. *Id.,* 141. She then ran across the street. *Id.,* 139.  Ms. Lane testified that the shooter she saw was co-defendant Tyler Linder. *Id.,* 140. She knew Linder from having gone to school with him. *Id.,* 147. When she spoke with detectives while she was at Methodist Hospital, she told them she last saw him about a month ago, driving. 1/31/13, 49-50.

Ms. Lane was certain that there was no other person at the corner with Mr. Linder, he was shooting by himself. *Id.,* 38-39. She did see a second person, wearing a black hoodie, running on the opposite (left and south) side of her. 1/30/13, 147. That male, the one who was not Linder, ran south toward Morris Street (away from Fernon). 1/31/13, 24-25, 64. Ms. Lane was shot on her left foot, below her knee. 1/30/13, 142. She was sure that Linder was the one who shot her. *Id.,* 161. She ran into her grandmother's house, and her grandfather took her to the hospital. *Id.,* 141-42. Her brother Khalief, who had been shot in his left big toe went with them in her grandfather's car. *Id.,* 144. Before leaving, she saw no police officers at her house. *Id.* They first went to Methodist Hospital, and then Ms. Lane was transferred to University of Pennsylvania. *Id.,* 145. She suffered broken toes in both feet. *Id.* She was in the hospital for a week. *Id.,* 146. While she was in the hospital, Ms. Lane identified a photograph of Mr. Linder when she gave her statement to police at the hospital. *Id.,* 149-152. At the hospital the detectives hand wrote her statement, she did not. *Id.,* 154-55. Early in the statement, she indicated that Linder was the shooter. *Id.,* 156. She had also told the police that when she saw the shooter (Linder), he had been pointing the gun toward her mother and the others by the houses (on the other side of the street). *Id.,* 163-64. Khalief Ladson is her biological brother. *Id.,* 12.

**Latitia Johnson**

Ms. Johnson testified to the minor injuries sustained by her daughter Denean Thomas. *Id.,* 75. Her daughter died of unrelated causes on February 3, 2012. *Id.,* 76.

**Philadelphia Police Officer Charles Forrest**

Officer Forrest testified that he went to 1618 South 18th Street, in response to this incident. *Id.,* 80-. He transported a six-year-old female who had been shot in her left leg, and three adults, to CHOP. *Id.,* 80-81, 87-88.  The girl's name was Denean Thomas. *Id.,* 86. When he arrived there, two of the adults accompanied the child into CHOP, and the third one, Latrice Johnson, who had some scarring on her shin and the back of her leg, went to HUP. *Id.,* 82.

Officer Forrest also interviewed Latrice Johnson. *Id.,* 89. She gave him descriptive information of the alleged perpetrators. *Id.,* 90. One had a gray hoodie, the other a black hoodie, and they both had black sweatpants. *Id.* She provided no name of either of the males involved. *Id.* Ms. Johnson was oriented when Officer Forrest spoke to her. *Id.,* 92. Officer Forrest asked Ms. Johnson who shot her. *Id.,* 93. She was unable to say. *Id.* She never told Officer Forrest that she knew one of the persons involved. *Id.,* 94.

**Philadelphia Police Officer Lynne Zirilli**

Officer Zirilli testified that on the night of the incident, she was directed to Methodist Hospital for two gunshot victims. *Id.,* 103. The first victim she

interviewed was Khalief Ladson, who had an injury to his left foot. *Id.,* 104-107. Ladson told her that he had been sitting on his grandmother's steps when two to three black males in dark hoodies started shooting at him and other family members. *Id.,* He gave no further descriptive information. *Id.* She next interviewed Latoya Lane, *Id.,* 108-109. She had an injury to her left foot. *Id.* She was in a lot of pain, so it was difficult to interview her. *Id.* All she pretty much said was that she heard the gunshots. *Id.* Officer Zirilli testified that Ladson was not as cooperative as Ms. Lane.

### Detective Robert Spadaccini

Detective Spadaccini of South Detectives was called in to process the crime scene at 1618 South 18th Street and arrived there a little before midnight. *Id.,* 126-27. He recovered 12 .380 fired cartridge casings. *Id.,* 129. The casings were close to the corner of Fernon and 18th Street, a lot of them found on the southeast corner. *Id.,* 132.

Detective Spadaccini also worked on the investigation of the incident in which Petitioner had been shot on September 3, 2011. *Id.,* 139-140. Petitioner came to the South Detective Division for an interview on September 16, 2011. *Id.,* 139-141. He came in voluntarily within 24 hours of Spadaccini having contacted his mother. *Id.,* 152. Petitioner had been shot in the flank, hip and buttock, and had been hospitalized. *Id.,* 153. According to Spadaccini, Petitioner was very uncooperative. *Id.,* 139-141. He told Spadaccini that he did not know who shot him, and if he did, he would not

tell him anyway. *Id.* Spadaccini knew from other information he learned about that incident, that it involved a hand coming out of the back window of a car with tinted windows. *Id.,* 150. He also knew that Tyler Linder, who was present at the incident on September 3, had told police that they did not see anyone, because it was dark. *Id.* Linder had given a statement. *Id.,* 167. The person of interest in that case was Khalief Ladson. *Id.,* 143. Spadaccini never tried to contact Ladson, either for the case in which Petitioner was a victim, or the case in which Ladson was the victim. *Id.,* 155. The same day that co-defendant Linder was arrested, September 27, 2011, his brother came to the Detective District to provide Detective Spadaccini with an alibi interview. *Id.,* 145-46.

**Sergeant John Craig**

In September of 2011, Sergeant Craig was a detective assigned to South Detectives. *Id.,* 171. He is the assigned detective for this case. *Id.,* 172. Craig and Detective Aikin interviewed Latoya Lane, a 23-year-old woman at 2:40 pm at HUP, on September 26, 2011. *Id.,* 175. He wrote the interview down, "as best" as he could, and then she signed the document. *Id.,* 175-76. She was shown an array of 8 photographs and circled the one of Tyler Linder. *Id.,* 178-79. A few hours later, He interviewed Latrice Johnson, also at HUP. *Id.,* 181. She was visiting Latoya Lane. *Id.* the interview was conducted in the same room. *Id.* He interviewed her in the same way he interviewed Ms. Lane. *Id.* She was shown an 8 photographic array and circled

the photograph of Petitioner. *Id.,* 184. Craig made numerous attempts to interview Khalief Ladson, but never had any success. *Id.,* 188-89. Craig interviewed co-defendant Linder's girlfriend and her mother, and reviewed video from the Allegheny Metal location at 2200 Adams Avenue. *Id.,* 193-95. He did this investigation after Linder had been arrested. *Id.,* 195. Craig sought Latrice Johnson's help in his effort to get a statement from Khalief Ladson; however, Ms. Johnson told Craig that he would not talk to police. *Id.,* 198. Police never spoke to Ladson. *Id.,* 199.

After police obtained a warrant for Petitioner, Petitioner turned himself in with his mother Crystal. *Id.,* 200.

**Detective Anthony Vega**

Detective Vega of South Detectives was the assigned detective for the shooting incident at 4th and Wharton, on September 3, 2011, when Petitioner was shot. *Id.,* 206. Petitioner was with Tyler Linder at the time. *Id.* While Petitioner was hospitalized Vega made two attempts to interview him but was unsuccessful: the first time because Petitioner was in surgery; and the second time, because he was not in his hospital room at the time. *Id.,* 207. Petitioner eventually did come into the Division to give a statement, and his mother, Crystal Cooper, was helpful in making those arrangements. *Id.,* 232, 237. On September 16, 2011, Petitioner came in and spoke with Detective Spadaccini. *Id.,* 207. Detective Craig was in the Division when

17

Spadaccini spoke with Petitioner, and briefly met Petitioner (in Detective Spadaccini's presence) after the interview. *Id.,* 233-34. Khalief Ladson was a person of interest in that case. *Id.,* 208. The case remained unsolved. *Id.,* 209.

After the September 3, 2011 incident, Linder had been taken to South Detective Division and gave a statement to police about it. *Id.,* 213. As for the September 25, 2011 incident, Linder turned himself in on September 27, 2011, and was with his mother. *Id.,* 214. Vega spoke with his mother, Angelique Linder. *Id.,* 209-210, 214. She provided information and based on that information Detective Vega recovered video from 2200 Adams Avenue. *Id.,* 210-11. The video was shown to the jury, and Detective confirmed that it showed Tyler Linder, his mother and his younger brother at the premises at the Adams Avenue location, up until 8:45 pm on the day of the incident. *Id.,* 221-225. They were cleaning in a building; however, Detective Vega could not obtain video from the other buildings that they claimed to be cleaning later that evening, because the other buildings had no cameras. *Id.,* 222. After obtaining the video, Detective Johnson interviewed Mr. Linder. *Id.,* 210-11. He also reinterviewed Angelique Linder. *Id.,* 216-217.

**Detective John Landis**

Detective John Landis of South Detectives testified that he interviewed Tyler Linder in regard to the September 3, 2011 shooting incident. 2/2/13, 5-7. Linder told him that he was riding bicycles with Petitioner at 4th and Wharton, when a dark

18

colored Oldsmobile with tinted windows pulled up, and a silver handgun came out of the driver's side window and began to shoot at Petitioner. *Id.,* 8-9. Only Petitioner was shot, and Linder said that he did not think the shooter saw him. *Id.* He also said that he did not think that he was the target of the shooting. *Id.,* 10-11.

### Sergeant Francis Kelly

Sergeant Kelly testified that in September of 2011, he was assigned to the criminal intelligence unit. *Id.,* 17. On September 27, 2011, he was at South Detectives when he arrived with his mother. *Id.,* 18-19. They had previously planned to turn him in. *Id.,* 22. Petitioner had staples in his abdomen area and was taking Oxycodone for pain. *Id.,* 20. Sergeant Kelly did not recall whether there was anyone else, including Deania Duncan, with Ms. Cooper and Petitioner. *Id.,* 24-25.

### Firearms Examiner Officer Jesus Cruz

Officer Cruz testified that in this case there were 12 fired cartridge casings recovered and a lead fragment. *Id.,* 39.   5 of the cartridge casings were all fired from the same firearm. *Id.,* 44. 7 had insufficient markings to determine whether they were fired in the same firearm as each other, or the same firearm as the 5 fired from the same firearm. *Id.* All the cartridge casings were .380 auto. *Id.,* 46.

### Stipulations

The parties stipulated that the following individuals suffered the following injuries: Latrice Johnson suffered numerous superficial graze wounds to both of her

legs. *Id.,* 52. Latoya Lane suffered a single gunshot wound to her left leg, causing two broken bones. *Id.,* 53. Khalief Ladson suffered a single gunshot wound to his left large toe, causing it to fracture. *Id.,* 53. Denean Thomas received a graze gunshot wound to her left leg, and a second wound to the left leg, that required the bullet to be removed. *Id.,* 54.

**Defense Case**

**Crystal Cooper**

Ms. Cooper testified that she is Petitioner's mother. *Id.,* 63. Petitioner was shot on September 3, 2011. *Id.,* 64. He was hospitalized, surgery was performed on his stomach, and he was released from the hospital on September 11, 2011. *Id.,* 64-66. He had staples in his stomach. *Id.,* 66. Because Ms. Cooper was afraid for her son's safety in South Philadelphia, she had him stay at the house of his godmother in West Philadelphia, Deania Duncan. *Id.,* 67. Ms. Duncan lived there with her mother, father and children. *Id.,* 94. Ms. Cooper visited Petitioner frequently. *Id.,* 97. September 25, 2011, the day of the incident in this case, was a Sunday. *Id.,* 109. She did not see Petitioner that day, as she was home with the baby. *Id.* She spoke with him by phone a couple of times that day, to check on him. *Id.,* 110. Petitioner was bedridden for most of the time he was with his godmother. *Id.,* 97. Ms. Cooper arranged to have Petitioner go to South Detective Division on September 16, 2011,

along with his godmother, in regard to the incident in which he had been shot. *Id.,* 68.

When she found out that Petitioner was wanted for the incident that occurred on September 25, 2011, she arranged to bring him in. *Id.,* 74-75. She had spoken with Detective Spadaccini, whom she knew. *Id.* They had worked together at the DA's Office, where she still worked. *Id.,* 84. She met Petitioner and Ms. Duncan outside at South Detectives. *Id.,* 76. She called up to Detective Spadaccini, and he said he would send some guys down. *Id.,* 76-77. Two white males came down, and Ms. Cooper directed them to her son in the car. *Id.,* 77. He asked what's taken him so long, and she told him that he was positioning himself to get out of the car. *Id.* She also told them that his godmother was there, and she was a witness, since he had been staying at her house. *Id.* But one of the two men she had been speaking to said that they were not going to take any statements. *Id.* When Petitioner got out of the car, he was taking baby steps, due to his former injuries. *Id.,* 78. He was slightly hunched over. *Id.* From the time he was released from the hospital, until his surrender on the 27th he had trouble walking. *Id.* Ms. Cooper saw him on the 26th, the day before he turned himself in. *Id.,* 80. He was at his godmother's house. *Id.,* It was about a quarter after 4, and he was in bed. *Id.* When she turned him in on the 27th, he told the detectives that it was impossible for him to have committed the crime in this case, as he could barely walk. *Id.* While he was at his godmother's house, he

was on medication, had staples in his stomach, was in pain, and was walking with baby steps. *Id.,* 103. While her son was in the hospital Ms. Cooper asked him if he saw who shot him. *Id.,* 93. He said he did not, *Id.* She believed him. *Id.,* 94.

**Quadifi Malone**

Quadifi Malone, 16, testified that he lives at 5438 South Locust Street with his mother Deania Duncan. *Id.,* 127. On September 11, 2011, Petitioner, who he had known for 4 or 5 years, came to live with them. *Id.,* 128. He was very close to Petitioner, and his mother was like a second mother to him. *Id.,* 142. Due to Petitioner having been shot, he was walking slow, taking baby steps, and needed physical assistance walking up steps. *Id.,* 129. Although Mr. Malone started school on September 12, his grandfather was in the house all day with Petitioner. *Id.,* 145-46. Petitioner did not leave the house. *Id.,* 145. Mr. Malone was with Petitioner all of September 25, 2011, in the house. *Id.,* 131. They started their day with a prayer and prayed 5 times a day. *Id.,* 132-33. But due to Petitioner's injuries, he could not get down on his knees, the way he would if he was not injured. *Id.,* 133. On the 25th, they watched movies for most of the day, in the house. *Id.,* 133-37. Mr. Malone's grandfather was home with them, and his grandmother was at work. *Id.,* 151. They then ate at around 7::30 pm, watched more TV, and then just sat and "chilled." *Id.,* 138. Mr. Malone went to sleep at 1 am (on the 26th). *Id.* He was in the same room as Petitioner. *Id.,* 139. Between 9 and 10 pm, Petitioner was with Mr. Malone. *Id.,* 139.

**Dr. Theodore Tapper**

Dr. Tapper was qualified as an expert in the field of medical pediatric studies. 2/4/13, 10. Petitioner had been a patient of his practice group since the time he was one day old. *Id.,* 11. Dr. Tapper saw Petitioner on September 11, 2011, after he had been released from the hospital following treatment for gunshot wounds to his butt, his thigh and his abdomen. *Id.,* 13. His treatment at Jefferson Hospital included exploratory surgery that involved opening him up from his breastbone to his pelvis, looking for a bullet. *Id.,* 13-14. They eventually found it, the bullet had gone into his small intestine, large intestine, and stomach. *Id.,* 14. The surgery involved groping around and moving the intestines this way and that way. *Id.* His surgical wound was then stapled shut. *Id.*

Dr. Tapper saw Petitioner on September 20, 2011, 9 days after his hospital discharge. *Id.,* 15. He had been in the hospital from the date he had been shot, September 3, 2011. *Id.* He had pneumonia and a lot of pain in the hospital. *Id.* When he saw Petitioner on the 20th he was in a moderate amount of pain, and only got onto the examination table with difficulty. *Id.,* 17. He had an 8 to 10 inch vertical incision down his midline, and roughly 10 to 12 staples holding the incision together. *Id.,* 18. It had opened a bit and was draining yellow fluid. *Id.,* 18. From observing him getting off and on the table, and hesitantly walking around, it was obvious to Dr. Tapper that Petitioner was in pain. *Id.,* 18-19. When Petitioner walked, he took short

23

choppy steps, and he bent forward like an old man. *Id.,* 21. It was also noticeable that he was in pain when he had to change positions on the examination table. *Id.* For example, he had difficulty laying down, and getting back up, and had to use his hands for support. *Id.,* 19-20.   Dr. Tapper testified that based on Petitioner's condition 5 days before the incident, he was "very dubious as to whether he could walk standing up straight, let alone run with any degree of speed five days after I saw him." *Id.,* 22.  Dr. Tapper was not paid for his testimony. *Id.*

On cross-examination, the prosecutor went through some of the hospital records with Dr. Tapper. Dr. Tapper agreed that on September 7, 2011, physical therapy records showed that Petitioner was able to sit up and ascend and descend 10 steps while holding onto a rail. *Id.,* 27-28. On discharge he was noted as being functionally independent. *Id.,* 29-30. The discharge summary also had no restrictions on his walking or use of stairs but indicated that he should stay out of school for two weeks. *Id.,* 32.

**Deania Duncan**

Ms. Duncan testified to Petitioner's good character, affirming that he "has a great reputation" for nonviolence and peacefulness. *Id.,* 46. She is Petitioner's godmother. *Id.,* 60-61. She took Petitioner into her family's home at 5438 Locust Street, after he had released from the hospital after having been shot. *Id.* Her mother, father and children lived there. *Id.* Most of the time Ms. Duncan was in that house,

however, at night she stayed at an apartment in South Philly. *Id.,* 64. Her oldest daughter stayed at that other house, as did her baby. *Id.,* 70. Petitioner needed assistance walking. *Id.,* 47. He walked hunched over and had a heart pillow that he had to hold onto. *Id.* He could not even walk to the bathroom by himself. *Id.* He also needed help walking up stairs. *Id.,* 48. He could barely stand up or sit down by himself. *Id.,* 51. He was in a lot of pain. *Id.*

Ms. Duncan drove Petitioner to the police station on September 16. *Id.,* 49. She had to help him in and help him get to the second floor. *Id.,* 65. She waited there while he spoke to detectives, and then helped him go back downstairs. *Id.* She did not know what Petitioner said to the detectives, but he did tell her that he did not know who shot him. *Id.,* 66. She also took him to his doctor's appointment on September 20, 2011. *Id.,* 50.

On the morning of September 25, 2011, Ms. Duncan had to physically assist Petitioner in dressing, getting in the shower, and washing. *Id.,* 52-53. Ms. Duncan was at the house on the 25th all day, until around 7:00 pm. *Id.,* 53. She had her baby with her. *Id.,* 71. Petitioner was still struggling going up steps. *Id.,* 545. He was still using packing for his wound. *Id.*  When Ms. Duncan left the house at 7:00 pm, her daughter Kandia and her baby accompanied her. *Id.,* 73.

On September 27, 2011, Ms. Duncan again drove Petitioner to the Detective Division. *Id.,* 56. His mother Crystal met them there. *Id.* Ms. Duncan walked with

Petitioner into the police station while his mother went to get him a jacket. *Id.,* 74. Ms. Duncan then told a detective that she had information about where Petitioner was when the incident on the 25th occurred, but they told her they did not need her, and took him into custody. *Id.,* 56-57. The detective was named "Tolliver or something like that." *Id.* After Petitioner's mother gave him a coat, she and his mother left. *Id.,* 76-77.

**Quiana Mack**

Ms. Mack, Petitioner's cousin, testified to his good reputation for peacefulness and nonviolence. *Id.,* 84.

**Crystal Cooper**

Ms. Cooper testified to her son's good reputation for peacefulness and nonviolence. *Id.,* 86-87.

**Defense Case Linder**

**Christopher Lentine**

Mr. Lentine was employed by Vector Security assigned to Allegheny Iron and Metal at 2200 Adams Avenue. *Id.,* 88. He was directed to his daily activity report for the night of September 25, 2011. *Id.,* 95. The report indicated that Ms. Linder and her crew left in her Dodge Nitro at 9:50 pm on the 25th. *Id.,* 96-97.

**Chelsea Hatcher**

Ms. Hatcher testified that Tyler Linder is her daughter's father, and he has an excellent reputation for peacefulness and non-violence. *Id.,* 109-110.

**Commonwealth Rebuttal**

**Officer Donna Simmons**

Officer Simmons testified that on September 19, 2011 at 3:10 pm, she observed Petitioner in the presence of two other black males and one female in South Philadelphia, in the 2400 block of Sheridan Street. *Id.,* 113-16. They were standing in front of a vacant property. *Id.,* 116. She took information from the individuals. *Id.,* 117. Petitioner gave an address of 1612 South Orkney Street, in South Philadelphia. *Id.*

**Detective Robert Spadaccini**

Detective Spadacinni testified that he worked with Crystal Cooper at the District Attorney's Office for two years. *Id.,* 126. They sat across from each other. *Id.* He knew Petitioner as well. *Id.* He met Petitioner outside of the Detective Division when he turned himself in on September 27, 2011. *Id.,* 127. Neither Deania Duncan nor Crystal Cooper came forward to advise him of an alibi defense on behalf of Petitioner. *Id.,* 128. Detective Spadaccini helped Detective Vega investigate Tyler Linder's alibi and took a statement from his 11-year-old brother. *Id.,* 128. When she accompanied her son on the 27th, Crystal Cooper told Detective Spadaccini that her

son could not have committed the crime in this case, since on September 25, 2011, he was still suffering the effects of his gunshot wounds. *Id.,* 131.

**Assistant District Attorney Richard Boyd**

ADA Boyd testified to his efforts to investigate co-defendant Linder's alibi, including speaking with Angelique Linder, and looking at Ms. Linder's workplace video. *Id.,* 136. He also testified to his efforts to bring Khalief Ladson into court. *Id.,* 149-50. Boyd testified that he requested that detectives go out and interview Petitioner's alibi witnesses, but they were unsuccessful. *Id.,* 151. On cross-examination ADA Boyd admitting having multiple conversations with defense counsel about Petitioner's injuries and his alibi witnesses. *Id.,* 154.

**Angelique Linder**

Ms. Linder testified that she was Tyler Linder's mother, and that on September 27, 2011, she took her son to the police station and gave a statement to Detective Vega explaining where Tyler was around the time of the incident. 2/5/13, 7-8. She then testified that she had last seen Petitioner, a friend of her son, a month before the incident. *Id.,* 10. She was then shown her statement, after which she testified that it was 2 days before the shooting that she saw Petitioner, walking on Snyder Avenue around 6th Street. *Id.,* 10-11. He was walking slow, like something was hurting him. *Id.,* 14. According to Ms. Linder, she was at 2200 Adams Avenue

28

on the night of September 25, 2011, cleaning buildings with her two sons Tyler and

Jalen, starting between 6:30 and 6:45. *Id.,* 12-13.

**Officer Donna Simmons**

Officer Simmons testified that when she stopped Petitioner, she did not know

his name, but "[b]ack in our district we have pictures of gentlemen from 7th Street

and 5th Street. *Id.,* 22. Trial counsel's objection was sustained, *id.,* 22.

**Relevant Portion of Instructions**

In instructing the jury the trial judge stated:

The defendants' evidence that he was not present either by himself or
together with another evidence may be sufficient to raise a reasonable
doubt of his guilt in your mind.

2/5/13, 56.

**Relevant Portions of PCRA Evidentiary Hearing Testimony**

**Dr. Theodore Tapper**

In May of 2012, trial counsel Weaver contacted Dr. Tapper and asked him if

he would become involved in the case. 1/25/19, 51. Prior to trial she never contacted

him or provided him with any medical documentation from Jefferson Hospital

relating to Petitioner's treatment for his gunshot wounds. *Id.,* 53. He first met trial

counsel when he showed up to testify at the trial. *Id.,* She spoke with him very

briefly, telling him only that he was about to go in to testify. *Id.,* 53-54. She provided

him with no documents prior to his testimony. *Id.,* 54. Dr. Tapper first looked at the

Jefferson Hospital records in 2016, three years after the trial *Id.,* 55. Trial counsel failed to illicit testimony regarding the severity of Petitioner's incapacitation. *Id.,* 56. Had she, Dr. Tapper would have testified that it would have been virtually impossible for Petitioner to have been running, let alone walking with any speed down the street at the time of the incident. *Id.,* 57. Ultimately, Dr. Tapper testified that in the condition he saw Petitioner on September 20, 2011, five days later he could not have run any distance. *Id.,* 81. He also would have testified, had he been asked, that even if Petitioner had been taking "lots of opioids" to mask the pain, and somehow had been able to run, the "incision probably would have split open to one degree or another and intestines would have been coming out or blood would have been coming out or fluid coming out." *Id.,* 58. Post-operative, Petitioner received 35 staples; when Dr. Tapper saw him, he had 8 to 12 remaining. *Id.,* 87. Dr. Tapper had previously been employed as an expert in civil matters, approximately 30 to 40 times. *Id.,* 61.

**Dr. Murray Cohen**

Dr. Cohen was Petitioner's surgeon. *Id.,* 95. Dr. Cohen performed an exploratory laparotomy on Petitioner, which is an incision in the abdomen to look around and see what damage the bullet may have caused. *Id.,*97. Dr. Cohen found and removed a bullet, and then sutured up the incision and put skin staples on the suture. *Id.,* 98. The surgery took place on September 3, 2011, and Petitioner was

discharged on September 11, 2011. *Id.,* 98-100. There were no complications from the surgery. *Id.,* 100. Dr. Cohen testified that that a person who had the surgery Petitioner had "could [] very well have been able to run on" September 25, 2011, the date of the incident. *Id.,* 101. He qualified that testimony, however, when he acknowledged that because he did not examine Petitioner after he left the hospital, he could not assess Dr. Tapper's September 20, 2011 observations of Petitioner's mobility. *Id.,* 109-10. He did not know if he ever saw Petitioner after the September 3, 2011 operation, *id.,* 104, and he did not recall seeing Petitioner on September 11, 2011, the date he was discharged from the hospital. *Id.,* 105. He testified that a person who could only "shuffle[e] down the hall with baby steps looking like an infirmed 85-year-old" could be typical for someone of Petitioner's age and might be A-typical. *Id.,* 109. Dr. Cohen also testified that the sutures he placed in Petitioner would not have been disturbed by Petitioner running on September 25, 2011. *Id.,* 102.

## STANDARD OF REVIEW

This case is governed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. §2254. Under AEDPA, a federal habeas court cannot grant relief unless the adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision

that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2).

**Section 2254(d)(1)**

Under § 2254(d)(1), "clearly established federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). A state court's decision is "contrary to" clearly established federal law if the state court (1) "applies a rule that contradicts the governing law" set forth in Supreme Court precedent, or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different" from that reached by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405-06. A state court decision is an "unreasonable application of federal law" if the state court "identifies the correct governing legal principle," but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A rule's unreasonable application corresponds to the specificity of the rule itself: "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

**Section 2254(d)(2) Generally**

Under 28 U.S.C. §2254(d)(2), a state court decision is based on an "unreasonable determination of the facts" if the state court's factual findings are

"objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Determinations of factual issues made by state courts are presumed to be correct. *Miller-El*, 537 U.S. at 340. However, "[d]eference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable...." *Id.* at 340.

### When the State Court Misstates or Misapprehends the Record

Where the state court plainly misstates or misapprehends the record in making its factual findings, and the misapprehension goes to a material factual issue, the misapprehension can fatally undermine the fact-finding process, rendering the state court's determination of the facts "unreasonable" under §2254(d)(2). *Wiggins v. Smith*, 539 U.S. 510, 528 (2003) (where state court based its conclusion, in part, on a clear factual error, "[t]his partial reliance on an erroneous factual finding further highlights the unreasonableness of the state court's decision"); *Hall v. Director of Corrections*, 343 F.3d 976, 983 (9th Cir. 2003) (*per curiam*) (rejecting state court's finding as unreasonable where court "proceeded from an incorrect premise"); *Alexander v. Cockrell*, 294 F.3d 626, 631 (5th Cir. 2002) (*per curiam*) (state trial court's finding was unreasonable where it "erred in reading" affidavit of counsel); *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) (when state court misapprehends a material fact central to petitioner's claim, that misapprehension can

fatally undermine the fact-finding process requiring relief under §2254(d)(2)); *Canaan v. McBride*, 395 F.3d 376, 383 (7th Cir. 2005) (state court not entitled to deference when its factual finding was "flatly contradicted" by the record); *Bui v. Haley*, 321 F.3d 1304, 1314-16 (11th Cir. 2003) (state factual findings unreasonable when there were insufficient evidence of record to support the factual inference); *Miller v. Dormire*, 310 F.3d 600, 603-604 (8th Cir. 2002) (same).

**When State Court Ignores Critical Evidence in the Record**

When the state court has before it, yet apparently ignores, evidence that is highly probative and central to the petitioner's claim, this can undermine the fact-finding process. *See, e.g., Guidry v. Dretke*, 397 F.3d 306, 327 (5th Cir. 2005) ("The state trial court's omission, without explanation, of findings on evidence crucial to Guidry's habeas claim, where the witnesses are apparently credible, brought into question whether, under subpart (d)(2), its 'decision…was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding'"). While state courts are not required to address every "jot and tittle" of proof suggested to them, in making factual findings "a judge must acknowledge significant portions of the record, particularly where they are inconsistent with the judge's findings." *Taylor v. Maddox*, 366 F.3d 992, 1001, 1007 (9th Cir. 2004). The "failure to consider key aspects of the record is a defect in the fact-finding process," and if the omitted evidence was "very significant," the state court's factual

determination will be deemed unreasonable and not entitled to deference. *Id.* at 1000-1001.

### Standard of Review for Alternative Grounds When State Ruling Erroneous

When the state court ruling "is based on a reasoned, but erroneous, analysis, federal habeas courts are empowered to engage in an alternate ground analysis—relying on any ground properly presented—but, in such a case, the federal court owes no deference to the state court." *Dennis v. Sec'y, Pa Dep't of Corr.*, 834 F.3d 263, 283 (3d Cir. 2016) (citing *Lafler v. Cooper*, 566 U.S. 156 (2012)). Federal courts "will not gap-fill when the state court has articulated its own clear reasoning. Instead, we will evaluate the state court's analysis and review *de novo* any properly presented alternative ground(s) supporting its judgment." *Id.* at 284.

If the state court does not examine all prongs of a legal test because it wrongfully concludes relief is foreclosed by one of the prongs, then the federal court should examine the entirety of the legal test *de novo*. *See Boyd v. Waymart*, 579 F.3d 330, 337 (3d Cir. 2009) (citing *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (examining the prejudice prong of a *Strickland* claim *de novo* because the state courts, having unreasonably found counsel's performance adequate, never reached that issue)); *Breakiron v. Horn*, 642 F.3d 126, 137 (3d Cir. 2011) (reviewing the issue of trial counsel's performance under *Strickland de novo* because the state court had wrongly rejected the claim solely on the ground of prejudice).

Thus, if this Court were to determine that the state court's factual findings were unreasonable under (d)(2) or that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law under (d)(1), then this Court "must review the claim *de novo* to determine whether [Petitioner] is entitled to relief." *Breakiron v. Horn*, 642 F.3d 126, 138 (3d Cir. 2011).

## STATEMENT REGARDING EXHAUSTION & DEFAULT REGARDING THE INEFFECTIVENESS CLAIMS IN THIS PETITION

Each ineffectiveness claim for relief raised and discussed in this *Petition,* was either fairly presented to the Pennsylvania courts, or else exhaustion is excused, or was or remains futile. The point at which each claim was presented is discussed in the body of each claim.

The ineffectiveness claims not presented to the state courts were not presented because of the ineffective failure of initial state post-conviction counsel to do so. In those instances, Petitioner can overcome any procedural bar that Respondents may raise, due to state post-conviction counsel's ineffectiveness per *Martinez v. Ryan*, 566 U.S. 1 (2012).

"A federal habeas court may excuse a prisoner's procedural default if the prisoner can show both cause for the default and resulting prejudice." *Id*. As to the

defaulted claims here, the rule of *Martinez v. Ryan* supplies those ingredients. 566

U.S. 1 (2012). As the Third Circuit explained, *Martinez* provides that

> where [as here] state law requires a prisoner to raise claims of
> ineffective assistance of trial counsel in a collateral proceeding, rather
> than on direct review, a procedural default of those claims will not bar
> their review by a federal habeas court if three conditions are met: (a)
> the default was caused by ineffective assistance of post-conviction
> counsel or the absence of counsel (b) in the initial-review collateral
> proceeding (i.e., the first collateral proceeding in which the claim could
> be heard) and (c) the underlying claim of trial counsel ineffectiveness
> is "substantial," meaning "the claim has some merit," analogous to the
> substantiality requirement for a certificate of appealability.

*Cox v. Horn*, 757 F.3d 113, 119 (3d Cir. 2014).

Each of the claims not raised by post-conviction counsel was simply a product

of omission, and each satisfy *Martinez*'s "some merit" requirement. Petitioner

submits that even if a portion of a claim was not presented to the state courts, there

is no longer an available remedy to exhaust that aspect of the claim and therefore the

claim is arguably procedurally defaulted. Should Respondents raise this affirmative

defense of procedural bar, Petitioner will demonstrate how and where initial PCRA's

counsel's ineffectiveness provides cause to overcome any asserted default.

Procedural bars are an affirmative defense that must be raised by Respondents

or waived, *Trest v. Cain*, 522 U.S. 87, 89 (1997) ("[i]n the habeas context, the

application of the independent and adequate state ground doctrine, of which a

procedural default is typically an instance, is grounded in concerns of comity and

federalism. . . .Thus, procedural default is normally a defense that the State is

obligated to raise and preserv[e] if it is not to "lose the right to assert the defense thereafter.") (internal citations and quotation marks omitted). Therefore, Petitioner will not anticipate which bars, if any, will be raised by Respondents. Petitioner will fully and particularly address any bar arguments in a reply to Respondents' answer.

### STANDARDS GOVERNING CLAIMS OF
### INEFFECTIVE ASSISTANCE OF COUNSEL

Because most of the claims pled herein are grounded in allegations of ineffective assistance of counsel in violation of the Sixth Amendment, Petitioner sets forth the following general principles and incorporates them into all ineffectiveness claims below.

Ineffective assistance of counsel claims under the Sixth and Fourteenth Amendments are evaluated under the familiar two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984). Thus, to prevail, Petitioner must show: (1) counsel's deficient performance, i.e., that his attorney's performance fell below "an objective standard of reasonableness," *id.* at 688; and (2) prejudice, i.e., that confidence in the result of the original proceeding is undermined because of counsel's deficiencies. *Id.* at 694; *see also Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005).

Counsel has "a duty to bring to bear such skill and knowledge as will render the [proceeding] a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. This can be done only if counsel investigates the facts and circumstances surrounding the charges against his client. *See id.* at 691; ABA STANDARDS FOR CRIMINAL JUSTICE, 4-4(a) (3d ed. 1993) ("Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction."). This national standard was cited in *Strickland* as a guide to determining what constitutes reasonable performance. *Strickland*, 466 U.S. at 688-89.

Moreover, a reasonably competent attorney under *Strickland* knows the relevant law or "performs basic research" to learn the relevant law. *Hinton v. Alabama*, 571 U.S. 263, 274 (2014).

Because a reasonable probability is one "sufficient to undermine confidence in the outcome," *id.* at 694, the *Strickland* prejudice standard is not "stringent" – it is, in fact, "less demanding than the preponderance standard." *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001) (quoting *Barker v. Barbo*, 177 F.3d 149, 154 (3d Cir. 1999)); *see also Woodford v. Visciotti*, 537 U.S. 19, 22 (2002) (*Strickland* "specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered.").

## CLAIMS FOR RELIEF

## CLAIM I

**THE COMMONWEALTH VIOLATED PETITIONER'S RIGHT TO DUE PROCESS PURSUANT TO *BRADY V. MARYLAND*, AND *NAPUE V. ILLINOIS*, BY SUPPRESSING EXCULPATORY EVIDENCE CASTING DOUBT ON THE INTEGRITY OF WITNESS JOHNSON'S IDENTIFICATION OF PETITIONER, AND THEN BY ELICITING FALSE TESTIMONY FROM HER THAT SHE IDENTIFIED PETITIONER THE NIGHT OF THE INCIDENT**

Identification witness Latrice Johnson, told numerous individuals, including officers at the scene and nurses at the hospital that she could not identify who shot at her. The Commonwealth documented this but declined to turn the information over to the defense. As a result, none of it was presented at trial. Additionally, the Commonwealth had in its possession hospital records containing statements of doctors, that made it clear that Ms. Johnson only "heard" the shots. Again, the Commonwealth failed to disclose this evidence to the defense. Worse, the Commonwealth's attorney sat silent when Ms. Johnson, after having been asked whether she told officers at the scene that she knew the shooter, answered falsely that she identified Petitioner to them.

These actions constitute paradigmatic due process violations, material in a case in which Ms. Johnson was the Commonwealth's only identification witness.

**Facts Supporting the Claim**

The only person to identify Petitioner as a shooter in this case was Latrice Johnson. The prosecutor asked her if she told police "who did the shooting." 1/30/13, 58. Her initial answer was that she did not "recall exactly . . . " *Id.* In response, however, the prosecutor pressed on, asking "did you say you saw the Defendant Rice go down Fernon Street, right?" *Id.* She then answered "yes." *Id.* The prosecutor did nothing to correct what he knew was false testimony. The Commonwealth had ample evidence in its possession demonstrating that the answer was false. That evidence, kept from trial counsel, cast further doubt on the witness's ability to identify the shooter. All of it related to initial statements to police and others disavowing any ability to identify the shooter. It was discovered only years after the trial, when the District Attorney's Conviction Integrity Unit disclosed the trial file. It included documentation that:

- Johnson was unable to tell the nurses at the hospital who shot her, A2. The trial prosecutor wrote this information in an internal document, which contained the proviso "This memo is to be emailed to the Unit Chief. It should never be placed in trial file." A1.

- The Commonwealth knew that Ms. Johnson "could not tell the police at the scene who did the shooting." *Id.* Again, this was part of the memorandum that

contained the proviso "This memo is to be emailed to the Unit Chief. It should never be placed in trial file." A1.

- The Commonwealth knew that the same night of the shooting, Ms. Johnson told Dr. David Lambert, of the Hospital of the University of Pennsylvania that she was "sitting on porch, *heard shots* then felt wounds." A3.

- The Commonwealth knew that the day after Petitioner was arrested Ms. Johnson told Dr. Robert Neumar, of the University of Pennsylvania Hospital that "she was sitting on front porch, *heard* shooting, ran into house and felt bur[n]ing in her legs." A3.

**The Commonwealth Suppressed Exculpatory Evidence**

Due process requires the prosecution to disclose evidence favorable to the defense. *Banks v. Dretke*, 540 U.S. 668 (2004); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 153-56 (1972); *Brady*, 373 U.S. at 87. There are two components to a *Brady* claim: (1) the government suppressed favorable evidence, either intentionally or inadvertently; and (2) the suppressed evidence was material to the outcome of the trial. *Slutzker v. Johnson*, 393 F.3d 373, 386 (3d Cir. 2004). Favorable evidence includes impeachment evidence and exculpatory evidence. *Bagley*, 473 U.S. at 676.

A prosecutor's failure to disclose *Brady* material requires a new trial when the exculpatory evidence would have been material to the trial. *Kyles*, 514 U.S. at 432

(quoting *Brady*, 373 U.S. at 87); *see also Banks*, 540 U.S. at 675-76. The prosecution's disclosure duty is not limited to information known to the trial prosecutor but, instead, includes all information in the possession of the prosecutor's office, police, and others responsible for or acting on behalf of the prosecutor's office. *Id.* at 437, 482 ("prosecutor is responsible for any favorable evidence known to the others acting on the government's behalf in this case, including the police"; "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf"); *Giglio*, 405 U.S. at 154 ("prosecutor's office is an entity"; knowledge of anyone in office attributed to the trial prosecutor).

The prosecution also violates due process when, "although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois,* 360 U.S. 264, 269 (1959). The state may not knowingly rely on false evidence, or evidence which creates a false implication, even where such evidence goes only to the credibility of a witness, because "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors…that a defendant's life or liberty may depend." *Id.*; *see also Banks v. Dretke,* 540 U.S. U.S. 668, 694 (2004) ("It has long been established that the prosecution's deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice.").

Thus, in *Napue,* where a key witness denied having received any promise of lenient treatment, the prosecutor's failure to correct that testimony, which he knew to be false, resulted in a denial of due process. *Napue*, 360 U.S. at 270-71. *See also United States v. Davis*, 609 F.3d 663, 696 (5th Cir. 2010) ("A *Giglio* violation usually occurs when a cooperating witness denies having a pela agreement and the prosecutor fails to correct the misstatement.'"); *Jenkins v. Artuz*, 294 F.3d 284, 292-93 (2d Cir. 2002) (holding prosecution's knowing use of false testimony by witness, consisting of witness's statement that he had not entered a plea agreement with the state, could reasonably have affected the outcome, and state therefore violated *Napue* and *Giglio*); *Ouimette v. Moran*, 942 F.2d 1, 9-12 (1st Cir. 1991) (holding defendant's due process rights were violated by state's failure to disclose witness's criminal record, as well as existence and nature of deals between witness and state); *United States v. Barham*, 595 F.2d 231, 242-43 (5th Cir. 1979) (holding defendant's due process rights violated by prosecutor's failure to correct false testimony concerning promises of lenience made to government witnesses, which prosecutor knew to be false).

The materiality threshold imposed when the prosecution fails to correct a witness's false or misleading (even unintentionally misleading) testimony is lower than the "reasonable probability" bar a petitioner must clear for a successful *Brady* claim. It is sufficient for a *Napue*/*Giglio* claim that there is "any reasonable

likelihood" that the testimony could have affected the jury's verdict." *United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985) (emphasis added). This standard is equivalent to the harmless error standard articulated in *Chapman v. California*, 386 U.S. 18, 24 (1967) (requiring the beneficiary—the prosecution—of a constitutional error to demonstrate that it was harmless beyond a reasonable doubt), *see Bagley*, 473 U.S. at 680 n. 9. This is the only prejudice showing that must be made, even on federal habeas review. *See Haskell v. Superintendent Green SCI*, 866 F.3d 139, 152 (3d Cir. 2017) (holding that even on habeas review, when there is false evidence claim, no additional "actual prejudice" showing under *Brecht* need be shown).

The exculpatory nature of the above-referenced evidence cannot be disputed. As the Supreme Court held in *United States v. Bagley,* 473 U.S. 667, 676 (1980), impeachment evidence falls squarely within *Brady*'s ambit. The impeachment evidence here flatly contradicts a finding that Ms. Johnson's photo identification of Petitioner the next day, and in court testimony, was based on her observations during the incident.

In two statements to doctors, she made no reference to having seen a shooter. The context of both statements involved detailed descriptions of her other observations and actions: that she **heard** the shots; that she experienced pain; and that she ran inside. That context surely suggests that the omission that she saw anything was critically exculpatory.

Additionally, the trial jury never learned – what the prosecutor knew  – that Ms. Johnson "could not tell the police at the scene who did the shooting." This was evidence that was never disclosed to counsel. The statement she "could not tell the police" would never have been entered in the confidential memorandum, had the witness not been asked by police if she could make an identification, and then told police that she could not. Why else would the prosecutor conclude that she was unable to do so?

Worse, on the prosecutor's direct examination, Ms. Johnson's testimony that she told uniformed police at the scene that she saw Petitioner running, allowed the jury to find that she made a positive identification at the scene. The prosecutor knew that she had been asked at the scene to do so, and that she had told police that she could not; his memorandum made that clear. Yet, he said nothing and did nothing to correct her testimony. Even if Ms. Johnson had only said "I don't recall" if I identified him, and the prosecutor had not pressed her further, the prosecutor still had a duty to reveal that in reality she did not identify Petitioner. The due process violation thus ran afoul of *Napue,* in addition to *Brady.*

Finally, the prosecutor was obliged to disclose the evidence that he had that Ms. Johnson had told nurses at the hospital that she could not make an identification. Whether that information came to the nurse unprompted, or as is more likely, in response to inquiry, Petitioner was entitled to know it, as was his jury.

### The Suppression Was Material

Whether analyzed under the *Brady* materiality standard or the more favorable *Napue* standard, the suppression of the exculpatory evidence was material. The only person in the courtroom who knew that Ms. Johnson could not tell the nurses who shot at her, did not tell the officers at the scene who shot at her, and that she had told doctors that she only "heard" the shots, was the prosecutor. The information was never provided to trial counsel – indeed, the prosecutor's notation – that asserted that the memorandum revealing much of this information "should never be placed in trial file," made clear that it would not be disclosed.

Even in the absence of this material *Brady* violation, the prosecutor standing silent after eliciting false testimony that Ms. Johnson identified Petitioner to police on the scene (not to mention letting a failure of recollection trump what the prosecutor knew to be true) violated *Napue* and requires relief unless the Commonwealth can show that the error was harmless beyond a reasonable doubt. *Haskell,* 866 F.3d at 152.

The materiality/prejudice analysis in this case, as in any case, is necessarily intertwined with the strength or weakness of the State's case. *See, e.g., Albrecht v. Horn*, 485 F.3d 103, 129 (3d Cir. 2007) (tying quantum of evidence to prejudice determination); *see also Atkins v. Attorney General of Alabama*, 932 F.2d 1430, 1433 (11th Cir. 1991) (where "evidence of guilt not overwhelming" trial counsel's

deficiency—there, permitting evidence of a prior arrest—was likely to have prejudiced petitioner). In this respect, Petitioner demonstrates that the due process violations were material.

Ms. Johnson's identification was based on her observations of a fleeting incident, where after the shooting began, she "flipped over on to the younger kids," and when she next looked up the shooter was "fleeing" away. 1/30/13, 51. The incident occurred in the dark of night, and it is notable that the testimony of her stepdaughter Latoya Lane, placed the very same shooter in an entirely different place than Ms. Johnson did. According to Ms. Lane, the shooter who her stepmother identified ran south toward Morris Street, in the opposite direction of Fernon Street, where Ms. Johnson claimed the shooter ran. 1/31/13, 24-25, 61-65. Additionally, even the trial evidence revealed that when Officer Forrest asked Ms. Johnson at the hospital if she knew who shot her, she was unable to say. 1/31/13, 93. These facts alone dispel any serious argument that the suppressed exculpatory evidence was not material.

The Third Circuit has recognized powerfully prejudicial impact of suppressed impeachment when the government's witness is the only witness to testify to a defendant's presence at a scene. *See Grant v. Lockett,* 709 F.3d 224, 236 (3d Cir. 2013) (finding prejudice due to counsel's ineffectiveness for failing to uncover parole status of witness). *Grant* is recognition of the fact that a lost opportunity to

undermine the Government's only witness on the scene, can rarely be deemed immaterial.

As for her statements to doctors that she (only) heard the shots and nurses that she could not identify the shooter, they would have impacted the jury more significantly than anything she said to Officer Forrest. Jurors understand the fear victims feel during police questioning. Speaking with doctors and nurses is a very different experience. People tend to be honest with their treatment providers. The jury would have had reason to credit Ms. Johnson's earlier statements to those providers, in lieu of her identification of Petitioner only after the police placed him in the array. Additionally, evidence from police officers on the scene that she was unable to identify Petitioner – evidence characterized in the same unqualified way as the prosecutor characterized it in his memorandum – would have shed serious doubt on the reliability of her photographic identification the next day. Finally, removing from the jury's consideration the testimony elicited by the prosecutor that Ms. Johnson identified Petitioner the night of the incident to uniformed police, undoubtedly would have made a difference to the trial jury. The false testimony of an on the scene identification cannot be minimized. Under *Napue*'s standard, the Commonwealth cannot demonstrate harmlessness beyond a reasonable doubt.

**Exhaustion & Procedural Default**

This claim was not exhausted in state court. The failure to exhaust was directly attributable to the Commonwealth's suppression of evidence and the prosecutor's failure to correct the witness's false testimony. A rule that declares a "'prosecutor may hide, defendant must seek' is not tenable in a system constitutionally bound to accord defendants' due process." *Banks v. Dretke,* 540 U.S. 668, 696 (2004). Thus, "under United States Supreme Court precedent, it is clear that there is no . . . 'hide and seek' exception depending on defense counsel's knowledge or diligence." *Dennis v. Secretary, Pa. Dep't of Corr.*, 834 F.3d 263, 293 (3d Cir. 2016) (en banc) (citing *Banks*, 540 U.S. at 696); *see also Com. v. Lambert*, 884 A.2d 848, 853–54 (Pa. 2005) ("The Supreme Court subsequently held that the duty to disclose such evidence is applicable even if there has been no request by the accused." (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)).

Petitioner can demonstrate cause and prejudice to excuse the default of this claim. He demonstrates that the Commonwealth failed to disclose exculpatory evidence, and that but for that failure there is a reasonable probability that the result of the proceeding would be different. *Strickler v. Greene,* 527 U.S. 263, 296 (1999).

Because Petitioner's failure to exhaust this claim is due to the Commonwealth's due process violations, Petitioner requests that the Commonwealth waive exhaustion, or alternatively that the Court excuse exhaustion

and consider his *Brady/Napue* claim on the merits. If those requests are denied, under 42 Pa.C.S. § 9545(b)(1)(i), there remains a potential avenue for exhaustion of this claim in state court, and Petitioner will promptly ask this Court to stay the habeas proceeding pursuant to *Rhines v. Weber,* 544 U.S. 269 (2005), and permit him to exhaust this *Brady/Napue* claim in state court.

### Alternative Ineffective Claim and Exhaustion of Such a Claim

If this Court should find that trial counsel should have discovered some or all this evidence, *but see Banks v. Dretke* discussion above, Petitioner would argue that his trial counsel performed deficiently in failing to discover and present it. If that is the case, Petitioner incorporates his materiality argument here, and would argue that counsel was ineffective for failing to discover and present this evidence. Because *Strickland*'s prejudice prong and *Brady*'s materiality prong are identical, *Marshall v. Hendricks,* 307 F.3d 36, 52 (3d Cir. 2002), Petitioner would satisfy both of *Strickland*'s prongs.

As to any of this claim that would be based on ineffective assistance, the PCRA statute of limitations precludes a return to state court to exhaust. *Branch v. Tennis,* 2008 U.S. Dist. LEXIS 108718 at *22 (E.D.Pa. Sept. 29, 2008). Where, as here, there is no available state remedy for a particular claim, and a return to state court on that claim would be futile, Petitioner would be excused from the exhaustion requirement. *Slutzker v. Johnson*, 393 F.3d 373, 380 (3d Cir. 2004). Futility is

established where exhaustion is not possible because the state court would refuse on procedural grounds to hear the merits of the case. *Lines v. Larkins*, 208 F.3d 153, 163 (3d Cir. 2000). Such a determination results in the procedurally defaulted claim to be exhausted. *Id.* at 166, citing *Coleman v. Thompson*, 501 U.S. at 722, 732 (1991).

Petitioner incorporates his discussion of *Martinez v. Ryan,* 566 U.S. 1 (2012), *supra,* 36-38. He is prepared to demonstrate that he satisfies *Martinez*'s requirements, in the event Respondent raises the defense of procedural default. To the extent that there are any concerns regarding Petitioner's failure to develop this claim in state court, for reasons discussed throughout this *Petition,* and incorporated by reference, Petitioner also satisfies the *Schlup v. Delo*, 513 U.S. 298 (1995) gateway for review of an otherwise defaulted claim. This provides Petitioner with a separate and mutually consistent avenue of review that avoids any failure to develop issue. *Schlup* involved discovery of new evidence in federal court, *id.,* 331-32, and the Petitioner's entitlement to present it when appropriate. Newly discovered evidence in this context includes even evidence that competent trial counsel could have discovered but did not. *See Reeves v SCI.,* 897 F.3d 154, 164 (3d Cir. 2018) ("[[W]hen a petitioner asserts ineffective assistance of counsel based on counsel's failure to discover or present to the fact-finder the very exculpatory evidence that

demonstrates his actual innocence, such evidence constitutes new evidence for purposes of the _Schlup_ actual innocence gateway.").

## CLAIM II

### TRIAL COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AMENDMENT FOR STIPULATING TO THE FACT THAT ONE OF THE VICTIMS, KHALIEF LADSON, WAS A PERSON OF INTEREST IN THE SHOOTING OF PETITIONER THAT OCCURRED THREE WEEKS EARLIER, AND FOR IGNORING A _BRUTON_ VIOLATION THAT COMPOUNDED THE ERROR

The Commonwealth's theory was that Petitioner shot at Khalief Ladson and members of his family, in retaliation for Ladson having shot him three weeks earlier. As discussed below, that theory ran through the trial, was advanced by several witnesses, and ultimately was one of the critical distinctions between the evidence presented against the co-defendant Tyler Linder – who not coincidentally was acquitted – and Petitioner.

The theory, however, would only be possible if the Commonwealth were able to demonstrate that Ladson had shot Petitioner previously; or that there was reason to believe that he did; or that Petitioner thought that he did.

The Commonwealth had no evidence to support any of these suppositions. During the Rule 404(b) hearing, when the Commonwealth sought to introduce evidence through police sources that Ladson was a person of interest in the shooting of Petitioner, this became eminently clear. After the hearing, and before a certain

adverse ruling, the prosecutor somehow secured a stipulation from trial counsel that Ladson was a person of interest in the shooting of Petitioner. Trial counsel's inexplicable decision to stipulate to a Commonwealth theory that could not otherwise be presented, converted a weak and troubling identification case into one supported by a motive particular to Petitioner.

None of the motive "evidence" was admissible. A thorough, granular review of the state court record reveals no reason to believe that it even was true. Trial counsel failed to perform as the effective advocate guaranteed by the Constitution in agreeing to allow the jury to be advised that one of the victims, Ladson, was a person of interest in the shooting of Petitioner.

### Facts Supporting the Claim

Prior to trial the Commonwealth filed a motion to allow a detective to testify that Khalief Ladson, one of the victims in this case, was a suspect and "person of interest" in the shooting of Petitioner in the 400 block of Wharton Street on September 3, 2011. 1/28/13, 9. The problem for the Commonwealth was the witness called to establish this fact, Detective Robert Spadaccini, did not know why Ladson was a person of interest nor what anyone based that information on. *Id.,* 14, 25. Devoid of any evidence, or even information supporting this designation, it was hardly surprising that Ladson had not been arrested for the incident. *Id.,* 14.

Following Detective Spadaccini's testimony, the trial court left little doubt as to whether, based on the Commonwealth's evidentiary presentation, the Commonwealth would be allowed to introduce this "evidence" of motive. The answer would be "no":

> **THE COURT**: You have no idea who the source was. How does that come in? You have no idea who the source was or has any reliability to the source.
>
> **MR. STRYD**: Judge, my argument, I think, would be along the lines that it is not going to the truth of the matter that he was not arrested. It wasn't evidence – enough evidence to make even an arrest in that case. But the fact that he was a person of interest, and just happens to be shot a few weeks later, I think it still goes back to motivation and the state of mind of the defendant.
>
> **THE COURT**: How do you show that the defendants even knew about it? All we know he has a very vague, amorphous, unsubstantiated claim that Ladson was a suspect. You have no idea what the source is, and you're saying the fact that he was a suspect is a motive by the defendants. But, one, we have no idea who, if anyone, was the source. And, two, we have no idea they knew about it. So how does that come in?
>
> **MR. STRYD**: Judge, that's a good point. **_I don't have an answer for that question._**

*Id.,* 44.

Thus, the trial court made clear that there were two barriers to admissibility that the Commonwealth had not gotten over: (1) that the Commonwealth needed to present *some* proof that Petitioner knew that Ladson was a suspect, before suggesting he was motivated to shoot Ladson for allegedly shooting him; and, (2) even

assuming that such proof was unnecessary, the Commonwealth needed to present *something, anything,* to demonstrate why anyone (including police) would have suspected Ladson's involvement in the earlier shooting of Petitioner.

The trial court held its ruling under advisement; however, it was clear by the conclusion of the hearing that the Commonwealth had provided the trial court with no basis for admissibility.

On the first day of trial, trial counsel announced that she had agreed to a stipulation with the Commonwealth, to be announced to the jury that Khalief Ladson became the suspect in the investigation of Petitioner's shooting. 1/30/13, 5-8. That stipulation unleashed a torrent of prejudicial motive evidence against Petitioner that included the following:

- The testimony of Detective Robert Spadaccini that when he had earlier questioned Petitioner about his having been shot, Petitioner was "very uncooperative" and that Petitioner stated that "he didn't know who shot him and if he did, he wouldn't tell me anyway." 1/31/13, 140.

- The testimony of Detective Spadaccini that Khalief Ladson was "a person of interest" in the shooting of Petitioner. *Id.,* 143.

- Trial counsel's unsuccessful attempts in cross-examining Detective Spadaccini to minimize the devastatingly prejudicial impact of her stipulation, attempts that only exacerbated the prejudice. *See, e.g.,* 1/31/13, 148

(unsuccessfully trying to elicit from the detective that Petitioner's statement that he would not tell the detective the identity of the shooter if he knew it, was not being uncooperative); *id.* 149-50 (eliciting that Petitioner did not tell the detective details of the incident that the detective learned later); *id.,* 150 (eliciting testimony from the detective detailing the extent of his noncooperation – i.e., not looking at photos, refusing to sign anything); *id.,* 152 (eliciting from the detective his efforts at trying to convince Petitioner to cooperate); *id.,* 155 (reminding the jury that Khalief Ladson was a person of interest and potential suspect)

- The testimony of Detective Spadaccini that he thought Ladson was the person who had tried to kill Petitioner a few weeks earlier. *Id.,* 166-67.

- The testimony of Detective Spadaccini that, in contrast to Petitioner, co-defendant Tyler Linder was cooperative, and gave a statement regarding the September 3, 2011 incident. *Id.,* 167.

- The testimony of Detective Spadaccini that even if Petitioner could not identify the person who shot him, he could have provided useful information had he cooperated. *Id.,* 169-70.

- The testimony of Detective Anthony Vega assigned detective in the case involving the shooting of Petitioner, that a photograph of Khalief Ladson was

placed in the detective's file relating to the shooting of Petitioner, because Ladson was a person of interest in the shooting of Petitioner. *Id.,* 208.

- The testimony of Detective Vega that Petitioner never came to talk with him after he had been shot. *Id.,* 209.

- The testimony of Detective Vega that, in contrast to Petitioner, co-defendant was cooperative in the investigation of the September 3, 2011 shooting. *Id.,* 213.

- The testimony of Detective Vega that Petitioner was not cooperative when he engaged with him on September 16th, 2011, the day he came to South Detectives about having been shot. *Id.,* 233-34.

- The testimony of Detective Landis that Tyler Linder told him that ***he*** was not the person targeted in the shooting on September 3, 2011. 2/2/13, 10-11.

**Trial Counsel Performed Deficiently in Agreeing to the Stipulation**

In Pennsylvania motive evidence must be competent evidence. *See Commonwealth v. Myers,* 609 A.2d 162, 164 (Pa. 1992). In *Myers,* while not disputing the relevancy of motive evidence (concerning a decedent's prior statement to another about the defendant beating her), the Pennsylvania Supreme Court held that motive "evidence, *is subject to the general evidentiary rules governing competency and relevancy.*" (emphasis in original). Notably, in *Myers,* the case for competency was stronger than here, since there was actual evidence, albeit hearsay

evidence, tending to prove motive. Here, there was no evidence presented at the *in limine* hearing suggesting an evidentiary basis for Petitioner's purported motive, that Ladson had shot Petitioner. Thus, even assuming relevancy, under Pennsylvania precedent the Commonwealth's proffer – that Ladson was a suspect, but no one knew why – was woefully insufficient.

Additionally, here in contrast to *Myers,* the evidence was not even relevant, a point made clear by the trial judge. As he stated, "we have no idea" whether Petitioner knew that Ladson was a person of interest. 1/28/13, 44. "So how does that come in?" *Id.* To which the prosecutor answered, "I don't have an answer for that question." *Id.* When there is no evidence that the defendant had knowledge of the actions of others – here that police designated Ladson as a person of interest – *his actions* cannot be linked to their actions. *See Commonwealth v. Brown,* 2015 Pa. Super. Unpub. LEXIS 578 (Mar. 20) at *59 (in case where Commonwealth argued son's motive, Court held "the Commonwealth does not point to any evidence that Appellee knew of, much less shared, his mother's potential motive" in discounting the relevance of the "motive" evidence): *see also Commonwealth v. Ragan,* 645 A.2d 811, 824 (1994) (actions of third persons "are not relevant unless it is shown that the defendant is linked in some way" to them).

A reasonably competent attorney under *Strickland* knows the relevant law or "performs basic research" to learn the relevant law. *Hinton v. Alabama*, 571 U.S.

263, 274 (2014). Counsel should have known that Pennsylvania law precluded admission of a detective's testimony that Petitioner was a person of interest, on these two separate grounds. Her stipulation to this purported evidence, which provided the Commonwealth with a powerful theory of motive, in the absence of anything remotely approaching powerful *evidence* of guilt, constituted deficient performance.

### Petitioner was Prejudiced by Counsel's Acquiescence to the Stipulation

In a multitude of ways Petitioner suffered *Strickland* prejudice.

First, the mere fact that the jury was repeatedly informed that Ladson was a "suspect," "person of interest," and the person detectives believed shot Petitioner, would have led any reasonable juror to ascribe a motive to Petitioner, in a case otherwise without a motive.

Second, Detective Spadaccini's and Vega's testimony that Petitioner did not cooperate in the investigation of his own shooting, and failed to provide them with critical information, was only relevant to corroborate the Commonwealth's unsupported theory that this was a revenge shooting. It was presented to persuade the jury to find that rather than working with the police, Petitioner had decided to take matters into his own hands. But absent any evidence that Ladson was truly a suspect, or in any way involved in the previous incident, and absent any evidence that Petitioner knew he was a suspect, Petitioner's alleged reluctance to talk to police about an unrelated shooting – his own – was irrelevant. But for the stipulation, that

reluctance would never have come into evidence. There are many reasons why 17-year-old victims like Petitioner are reluctant to involve the police. However, because the alleged noncooperation came in, it offered copious corroboration of a baseless theory of revenge. It also prejudiced Petitioner generally in the eyes of the jurors, as a person who was antagonistic to police and unwilling to assist law enforcement.

Third, the stipulation that allowed the Commonwealth to advance its revenge theory, opened the door to evidence encouraging the jury to contrast and compare co-defendant Linder's alleged cooperation around the September 3rd, 2011 shooting. *See, e.g., supra,* 17-19 (testimony of Detectives Landis and Vega). But Linder had every reason to be cooperative if, as everyone assumed, no one was looking to kill him. On the other hand, it is entirely understandable why a 17-year-old who knows that *someone* was trying to kill him, might be reluctant to be regarded as a "snitch." Of course, all of this was irrelevant, since the Commonwealth was clearly unable to convince the trial court that it had evidence to support its revenge theory. But for the stipulation, essentially a stipulation to an unfounded revenge theory, highly prejudicial evidence of how Linder responded to an unrelated shooting would have had no part in this trial.

### The *Bruton* Violation Was Particularly Prejudicial

Preclusion of that theory also would have precluded the *Bruton* violation to which trial counsel never objected, and which further prejudiced her client. On cross-

examination of Detective Landis, co-counsel was permitted to elicit from him that his client, co-defendant Linder, told Landis that he was not the person targeted in the shooting on September 3, 2011. 2/2/13, 10-11.

Since as far back as *Bruton v. U.S.*, 391 U.S. 123 (1968), courts have recognized the unfair prejudice in allowing the admission of a co-defendant's statement when that person is not testifying and subject to cross examination. "A defendant may be prejudiced by the admission in evidence against a co-defendant of a statement or confession made by that co-defendant. This prejudice cannot be dispelled by cross-examination if the co-defendant does not take the stand." *Id*. at 132. *Bruton* is founded on the notion that no part of the co-defendant's statement may be used against the defendant at a joint trial.

Here trial counsel stood silent while the detective was permitted to provide the final inadmissible, prejudicial piece of the revenge theory – that it was Petitioner who would have had the motive, since he was the one targeted, and Linder was not. Trial counsel was ineffective for failing object on confrontation grounds to this constitutionally inadmissible testimony, which further prejudiced Petitioner.

Of course, but for the stipulation, conceding an evidentiary inference that placed revenge at the center of the case against Petitioner, this evidence would have also been irrelevant. In addition to its irrelevance, however, it was constitutionally impermissible and thus inadmissible.

62

Petitioner incorporates by reference his prejudice arguments set forth within each of the other claims in this *Petition.*

### Exhaustion

This claim was not raised in PCRA proceedings due to PCRA counsel's ineffectiveness. Because this claim is procedurally defaulted, Petitioner invokes *Martinez v. Ryan*, 566 U.S. 1 (2012) to demonstrate cause for the default of this ground. There is no longer an avenue for exhaustion in state court. This claim is "substantial" and PCRA counsel ineffectively failed to raise this claim in the PCRA petition to allow for merits review. Petitioner incorporates by reference his argument based on *Martinez v. Ryan*, 566 U.S. 1 (2012), *supra,* 36-38.

## CLAIMS III AND IV

## INEFFECTIVENESS RELATING TO INSTRUCTIONS

Under *Strickland v. Washington*, 466 U.S. 668 (1984), counsel's failure to object to improper instructions or request proper ones is deficient because counsel is required by the Sixth Amendment to be familiar with the relevant law. *See e.g.*, *Williams*, 529 U.S. at 395 (counsel ineffective because his decision was "not because of any strategic calculation but because" he misunderstood state law); *Hinton*, 571 U.S. 263, 274. Indeed, counsel have been held ineffective in habeas proceedings for the very type of deficiencies alleged here. *See Bey v. Superintendent Greene SCI*, 856 F.3d 230, 244 (3d Cir. 2017) (counsel ineffective for failure to object to

defective *Kloiber* instruction); *Everett v. Beard*, 290 F.3d 500, 516 (3d Cir. 2002) (counsel ineffective for failing to object to a jury charge not requiring the Commonwealth to prove accomplice's intent to kill to convict of first-degree murder); *see also id.,* 516 ("Several other of our sister circuits have granted habeas petitions on the grounds that counsel was ineffective for failing to object to or to propose jury instructions. *See, e.g., Burns v. Gammon,* 260 F.3d 892, 897 (8th Cir. 2001) (granting habeas on ineffective assistance grounds due to counsel's failure to object and thus to prompt a curative cautionary jury instruction); *Freeman v. Class,* 95 F.3d 639, 642 (8th Cir. 1996) (granting habeas on ineffective assistance grounds due to counsel's failure to request cautionary instructions on accomplice testimony); *United States v. Span*, 75 F.3d 1383, 1389–90 (9th Cir. 1996) (finding ineffective assistance because counsel failed to request a significant jury instruction); *Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (finding ineffective assistance due, inter alia, [for] 'failure to propose, or except to, jury instructions'); *Gray v. Lynn*, 6 F.3d 265, 271 (5th Cir.1993) (finding ineffectiveness because counsel failed to object to erroneous jury instructions)"); *Combs v. Coyle,* 205 F.3d 269, 286 (6th Cir. 2000) (counsel ineffective for failure to object, on both constitutional and evidentiary grounds, to jury instructions on the consideration of pre-arrest silence as substantive evidence).

# CLAIM III

## TRIAL COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AMENDMENT FOR FAILING TO OBJECT TO AN IMPROPER ALIBI INSTRUCTION

In Pennsylvania, a defendant who presents an alibi defense is entitled to an instruction that "explicitly informs the jury that that alibi evidence, either by itself or together with other evidence, could raise a reasonable doubt as to the defendant's guilt . . . ." *Commonwealth v. Saunders,* 602 A.2d 816, 818 (Pa. 1992). In Petitioner's case no such instruction was given. Counsel's failure to object and request that the proper instruction be given prejudiced Petitioner and warrants relief under *Strickland.*

### Facts Supporting the Claim

Quadifi Malone, 16, was Petitioner's alibi witness. Mr. Malone provided a detailed account of his and Petitioner's activities inside his home, including from around 7::30 pm (about two hours prior to the shooting incident on the other part of town) through the rest of the night. That evening, he and Petitioner watched TV, and then just sat and "chilled." 2/2/13, 138. Mr. Malone went to sleep at 1 am (on the 26th). *Id.* He was in the same room as Petitioner. *Id.,* 139. Between 9 and 10 pm, Petitioner was with Mr. Malone. *Id.,* 139.

In instructing the jury on how to consider the alibi evidence, the trial court stated:

> The defendants' evidence that he was not present either by himself or together with another evidence may be sufficient to raise a reasonable doubt of his guilt in your mind.

2/5/13, 56. This was a critical miswording of the standard instruction, that reads in relevant part: "either by itself or together with other evidence, may be sufficient to raise a reasonable doubt of his guilt." SSJI § 3.11.

### Trial Counsel Performed Deficiently in Failing to Object to the Improper Alibi Instruction

In *Commonwealth v. Pounds,* 417 A.2d 597, 603 (Pa. 1980), the Pennsylvania Supreme Court reversed a conviction due to a faulty alibi instruction. The Court held that because the jury was not instructed "that it should acquit if Pounds' alibi evidence, even if not wholly believed, raised a reasonable doubt of his presence at the scene of the crime at the time of its commission and, thus, of his guilt[,]" his conviction must be vacated. *Id.,* 603. The Court found that this specific language was required in the alibi instruction, "due to the danger that the failure to prove the defense will be taken by the jury as a sign of the defendant's guilt." *Id.* (citations omitted).

After *Pounds,* the Pennsylvania Supreme Court later ruled that *Pounds'* specific language would no longer be required. *Commonwealth v. Saunders,* 602 A.2d 816, 818 (Pa. 1992). However, the Court continued to require that the alibi instruction make clear to the jury "that a defendant's failure to prove alibi is not in itself a basis for a finding of guilt . . . ." *Id.* Thus, an alibi instruction is proper if it

"expressly informs the jury that the alibi evidence, either by itself or together with other evidence, could raise a reasonable doubt as to the defendant's guilt and clearly directs the jury to consider this evidence in determining *whether the Commonwealth met its burden* of proving beyond a reasonable doubt that the crime was committed by the defendant." *Id.* (emphasis in original).

Indeed, the Pennsylvania Standard Jury Instruction (§ 3.11) employed at the *Saunders* trial, like the one in existence at the time of Petitioner's trial, expressly informs the jury that the alibi evidence "either by itself or together with other evidence, may be sufficient to raise a reasonable doubt of his guilt." That, however, was not the alibi instruction the jury received. The instruction the jury received changed the meaning of the instruction to something entirely different and having nothing to do with the concerns of *Pounds* or *Saunders.* In lieu of the standard instruction, the jury was charged that the "defendants' evidence that he was not present either by himself or together with another evidence may be sufficient to raise a reasonable doubt of his guilt in your mind." *Id.,* 2/5/13, 56. The insertion of the word "another" altered the instruction to mean that both defendants' evidence that they were neither present individually, nor with each other, could raise a reasonable doubt. In changing the meaning of the phrase, the trial court omitted the required express language, and the required express message, that the evidence "by itself or together with other evidence" could raise a reasonable doubt.

This was no trivial mistake of nomenclature. As the *Pounds* and *Saunders* Courts made clear, without the phrase "by itself or together with other evidence" there posed too great a risk that a jury would convict if it did not accept the alibi.

When trial counsel heard this erroneous instruction, she was duty bound to object. In failing to do so, she failed her client.

**Prejudice**

Petitioner incorporates his prejudice arguments set forth within each of the claims asserted in this *Petition.*

The prosecutor cross-examined Petitioner's 16-year-old alibi witness Mr. Malone aggressively. To expose bias, he elicited that Petitioner's mother was like a second mother to Mr. Malone, and their families were quite close. 2/2/13, 142. He challenged Mr. Malone's testimony that Petitioner was largely housebound, a challenge based in part on the fact that Mr. Malone began his new school year on September 12, 2013, shortly after Petitioner arrived at his home. *Id.,* 144-46. He suggested the unlikelihood of Mr. Malone being able to remember all the granular details of September 25, 2011, the day of the incident, and challenged a suggestion that Petitioner during that day "never left his sight." *Id.,* 151-52. He questioned why if Mr. Malone knew that Petitioner was with him at the time of the incident, why he did not go down to the police station to tell the police. *Id.,* 156. He also questioned

Mr. Malone why his day of trial testimony was the first time he was going officially on record to present the alibi. *Id.,* 157.

While it cannot be known how effective the prosecutor's questioning of Mr. Malone may have been in the eyes of the jury, there can be no doubt that the prosecutor, in a multitude of ways, attempted to raise questions about his credibility, and the credibility of his account. Accordingly, this was a trial at which the proper instruction, expressly advising the jury that the alibi evidence "by itself or with other evidence" could raise a reasonable doubt, was necessary. Indeed, the jury's verdict made clear that it rejected the alibi. What is not clear is whether in doing so, the jurors assumed (why wouldn't they?) that if they rejected the alibi, they must convict. We cannot know because they were never given the standard instruction that told them otherwise.

That instruction was also crucial considering the Commonwealth's evidence. This was a one witness identification case, involving a fleeting incident in the dark of night. By the witness's testimony the person who shot at her was wearing a hooded sweatshirt with the hood up over his head. 1/30/13, 50. Immediately after he started shooting, she "flipped over on to the younger kids," and when she looked up the shooter was "fleeing" away. *Id.,* 51. The witness's testimony was drastically different than her stepdaughter's, who placed the same man in an entirely different location nowhere near the southeast corner of South 18th Street and Fernon Street,

where her stepmother placed him. 1/31/13, 24-25, 61-65. That the witness Ms. Johnson later testified that she knew the shooter from before, loses much of its persuasive value considering that when asked by the police after the incident if she knew who shot her, she could not answer that question.

*Strickland* prejudice is established.

**Exhaustion and Procedural Default**

This claim was not raised in PCRA proceedings due to PCRA counsel's ineffectiveness. Because this claim is procedurally defaulted, Petitioner invokes *Martinez v. Ryan*, 566 U.S. 1 (2012) to demonstrate cause for the default of this ground. This claim is "substantial" and PCRA counsel ineffectively failed to raise this claim in the PCRA petition to allow for merits review. There is no avenue for exhaustion in state court any longer. Petitioner incorporates by reference his argument based on *Martinez v. Ryan*, 566 U.S. 1 (2012), *supra,* 36-38.

# CLAIM IV

## TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO REQUEST A *KLOIBER* INSTRUCTION

The eyewitness, Latrice Johnson, failed to identify Petitioner, someone she claimed to know, when asked at the hospital if she knew who shot at her. Under Pennsylvania case law, Petitioner was thus entitled to an instruction that her

identification must be received with caution. *Commonwealth v. Kloiber,* 106 A.2d 820 (Pa. 1954). Trial counsel was ineffective for failing request the instruction.

### Facts Supporting the Claim

The single identification witness in the case, Latrice Johnson, along with a child victim and two other adults, was taken from the scene by Officer Charles Forrest. 1/31/13, 77-91. When they all arrived at CHOP, the child was taken to emergency and Ms. Johnson walked over to HUP. *Id.,* 81-82. Shortly thereafter, Officer Forrest walked over to HUP to see Ms. Johnson. *Id.,* 88.

When Officer Forrest arrived at HUP, he went to Ms. Johnson who was coherent and was able to answer his questions. *Id.,* 92. He asked her "who shot you." *Id.,* 93. She could not answer the question. *Id.* Officer Forrest estimated that he was with Ms. Johnson for seven minutes. *Id.,* 97. During that time she was unable to give Officer Forrest any information about the identity of the person who shot at her. *Id.,* 98.

At trial Ms. Johnson testified that during the incident – which preceded her interaction with Officer Forrest – she recognized the shooter as Petitioner. *Id.,* 49.

The trial court's charge to the jury did not advise the jury that if it found that Ms. Johnson failed to identify the perpetrator as Petitioner when she spoke with Officer Forrest shortly after the incident, it must receive her in-court identification

with caution. Trial counsel did not request such an instruction; nor did trial counsel

object to the absence of the instruction.

**Trial Counsel Performed Deficiently by Not Requesting a *Kloiber* Charge**

In *Commonwealth v. Kloiber,* 106 A.2d 820 (Pa. 1954), the Pennsylvania

Supreme Court held that:

> [W]here the witness is not in a position to clearly observe the assailant,
> or he is not positive as to identity, or his positive statements as to
> identity are weakened by qualification or by failure to identify
> defendant on one or more prior occasions, the accuracy of the
> identification is so doubtful that the Court should warn the jury that the
> testimony as to identity must be received with caution.

*Id*. 826–27.

The directives of *Kloiber* have stood the test of time in Pennsylvania. *See*

*Commonwealth v. Brown,* 196 A.3d 130, 163 (Pa. 2018) ("A trial judge must provide

the instruction where the eyewitness: (1) did not have an opportunity to clearly view

the defendant; (2) equivocated on the identification of the defendant; or (3) had a

problem making an identification in the past.") (citation and quotation marks

omitted)). The instruction has been codified in the Pennsylvania Standard Criminal

Jury Instruction 4.07B:

> Identification testimony must be received with caution [] if the
> witness's positive testimony as to identity is weakened by [] his not
> identifying the defendant [] before the trial . . . .

As the standard instruction makes clear, a jury has no discretion to receive the

identification without caution:

> [w]here a witness['s] . . . positive statements of identification are
> weakened by qualification or ***failure to identify the assailant on one
> or more occasions***, the accuracy of the identification ***is in doubt and
> the jury must be so informed***. *Commonwealth v. Mouzon*, 456 Pa. 230,
> 318 A.2d 703 (1974).

*Commonwealth v. Whitman,* 380 A.2d 1284, 1289 (Pa. Super. 1977) (other citations

omitted, emphasis added). Notably, Pennsylvania courts will find trial counsel

ineffective for failing to request the charge when the evidence requires it. *See, e.g.,*

*Commonwealth v. Simmons,* 647 A.2d 568, 570 (Pa. Super. 1994) (trial counsel

ineffective for failing to request charged); *Commonwealth v. McKnight,* 453 A.2d 1,

4 (Pa. Super. 1982) (same).

The question of whether a *Kloiber* instruction is merited, redounds to the

question of whether one of *Kloiber*'s factors warranting the instruction apply to the

witness's identification. *Commonwealth v. Gibson,* 688 A.2d 1152, 1163 (Pa. 1997).

At least one of those circumstances was incontrovertibly present at Petitioner's trial,

i.e., the witness's "not identifying the defendant as the criminal [when Officer

Forrest asked if Ms. Johnson could identify him] before the trial." Pa. SSJI (Crim),

§ 4.07B. When one of *Kloiber*'s factors are present, the witness's claim of prior

acquaintance with the defendant is irrelevant. In *Commonwealth v. Simmons,* 647

A.2d 568 (Pa. Super. 1994), the Commonwealth argued that because the witness was

acquainted with the defendant there was no need for a *Kloiber* charge. *See id.,* 569

(arguing that the *Kloiber* instruction was unnecessary because the witness "was

acquainted with Appellee" and because trial counsel's strategy was to show "witness was lying"). In repudiating this argument, the Pennsylvania Superior Court held that a *Kloiber* charge must be given when one of its factors are present (there, the factor that the witness was not positioned to clearly observe the assailant.). *See also Commonwealth v. McKnight,* 453 A.2d 1, 3-4 (Pa. Super. 1982) (rejecting Commonwealth argument that defense theory of fabrication and witness's testimony that he was acquainted with the defendant eliminated need for *Kloiber* charge).

Officer Forrest's testimony was neither equivocal nor vague on the fact that Ms. Johnson could not tell him who shot her, *id.,* 93, nor provide him with any information about the identity of the person who did so. *Id.,* 98. She had not identified Petitioner when given the opportunity to do so previously.

Although the witness's prior failure to identify alone warranted the *Kloiber* charge, Petitioner incorporates his argument as detailed in each of the prejudice sections in this *Petition,* regarding Ms. Johnson's compromised ability to observe the offender, due to the fleeting nature of the incident, that it occurred at night and that she flipped or turned over immediately after the shooting began, *and* the additional factors set forth in the entirety of Claim V. These facts provided an additional basis for the *Kloiber* charge: that she was not in a position to clearly identify the assailant.

74

**Petitioner was Prejudiced by Trial Counsel's Deficiency**

Again, Petitioner incorporates his prejudice and materiality arguments set forth in each of the respective claims in this *Petition*. Where the witness in question is "the *only* witness to identify [the defendant] as the shooter or otherwise directly implicate [him] in the incident," an instruction that requires the jury to receive that testimony cautiously is necessarily impactful. *Grant v. Lockett*, 709 F.3d 224, 236 (3d Cir. 2013). (emphasis in original). As in *Grant*, this witness was "the most essential Commonwealth witness, one without whom this case probably couldn't proceed." (quotation marks and alterations omitted). Accordingly, Petitioner suffered *Strickland* prejudice because of his counsel's deficiency.

**Exhaustion**

This claim was exhausted on state post-conviction review.

**The Superior Court Decision Involved an Unreasonable Determination of the Facts**

The Superior Court simply omitted from its recitation of the facts and its analysis the interaction between Officer Forrest and Latrice Johnson that occurred shortly after the incident. *Rice.* A review of the Opinion reveals nothing of Officer Forrest's testimony that he asked Ms. Johnson if she knew who shot her, and that she could not answer the question. Despite her testimony that she knew Petitioner, and knew him to be the shooter, she could not identify the shooter to Officer Forrest. Only because the Superior Court eliminated those critical facts from its Opinion,

was the Court then able to make the following erroneous observation, that dispensed with the need for a *Kloiber* charge. *See Rice* at *23 ("She never equivocated, nor did she have any difficulty making the identification on a prior occasion."). As discussed above, the trial record provides incontrovertible evidence – ignored by the Superior Court – that she did.

On that basis alone, the Superior Court's decision involves an unreasonable determination of the facts. *Guidry v. Dretke*, 397 F.3d 306, 327 (5th Cir. 2005). There is, however, a second reason why the Court's factual basis for dispensing with the need for a *Kloiber* charge was unreasonable. The Court found that Ms. Johnson had "a clear opportunity to view Appellant's face . . . ." *Rice* at *23. As discussed throughout each of the prejudice and materiality sections in this *Petition,* and in Claim V, and incorporated by reference, the record reveals a very different story. The incident occurred in the dark of night, was fleeting in nature, and by her own testimony the person who shot at her was wearing a hooded sweatshirt with the hood up over his head. 1/30/13, 50. Immediately after he started shooting, she "flipped over on to the younger kids," and when she looked up the shooter was "fleeing" away. *Id.,* 51.  The facts referenced in Claim V reveal that Ms. Johnson was 60 feet, not 20 feet from the shooter, her view was obstructed by at least two cars, and contrary to her testimony, there were no streetlights in the immediate area of the

shooter. The factual record simply does not support the Superior Court's factual determination that she had a clear opportunity to view the assailant's face.

## CLAIM V

### TRIAL COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AMENDMENT FOR FAILING TO EFFECTIVELY UTILIZE INCONTROVERTIBLE PHYSICAL EVIDENCE THAT CAST DOUBT ON THE ABILITY OF WITNESS LATRICE JOHNSON TO IDENTIFY THE PERPETRATOR

There were three incontrovertible physical facts bearing on identification that trial counsel should have known, each flatly contradicting the witness, Latrice Johnson's testimony. First, that contrary to her testimony that the shooter was 20 feet away from her, he was at least 60 feet away from her; second, contrary to her testimony that there were streetlights on or near the same corner of 18th and Fernon Streets where the shooter was shooting, that would have illuminated the shooter's face, there were no streetlights there; and third, that although she claimed to be staring at the shooters while they were on the southeast corner of 18th Street and Fernon, her view was actually obstructed. There were two cars parked between where she sat and where the shooters were when they shot the guns.

Trial counsel realizing none of this, failed to utilize any of this readily available information in her cross-examination of the only witness at the trial to identify her client. Her advocacy, such as it was, constituted deficient performance that prejudiced Petitioner.

77

**Facts Supporting the Claim**

Ms. Johnson testified that the men who were shooting were doing so from the southeast corner of Fernon and South 18th Street. 1/30/13, 112. *See also id.,* 48-51 (while sitting on her steps she "noticed two guys come up out of Fernon Street [] when they got like almost to the curb, they just stopped right there and they just started shooting."). According to Ms. Johnson, the shooter was about 20 feet from her. *Id.,* 52. After the shooting, Ms. Johnson flipped over. *Id.,* 93. After she flipped over she could not see the males. *Id.,* 94. When she looked back up the shooter (who she identified as Petitioner) was fleeing down Fernon Street. *Id.,* 93.

According to Ms. Johnson, there were streetlights outside of the school that sits just south of the southeast corner of Fernon and 18th Street, on 18th Street, *Id.,* 53 and there were streetlights on that same southeast corner of Fernon and 18th Street, where the individuals walked from. *Id.,* 79.

At the preliminary hearing, held over one year before the trial, Ms. Johnson had testified that the perpetrators had committed the shooting from the corner of Fernon and South 18th Street. A5. Trial counsel had received in discovery a scene diagram created by Sgt. Morton on the evening of the incident. A6. Review of the scene diagram reveals also that the shooters were standing near or on the southeast corner of Fernon and South 18th Street, based on the location of the cartridge casings noted by Sgt. Morton. A6. Because the scene diagram included the porch on which

78

Ms. Johnson was sitting and the relatively precise location of the shooters, along with the notes of testimony from the preliminary hearing, it allowed counsel to definitively determine the distance between Ms. Johnson and the shooters. Although trial counsel never did so, postconviction counsel did. *See Brief for Appellant, Commonwealth v. Rice,* Superior Court No. 1709 EDA 2019 at 15:

> According to her testimony, she would have been at least sixty-six (66) feet away from the perpetrator(s). A simple check of a map of the area shows that the distance of twenty (20) feet given by Ms. Johnson at trial is woefully inaccurate. For example, Google Maps shows the distance to be at least sixty-six (66) feet away. Ms. Johnson was neither confronted through adequate cross examination regarding this erroneous testimony nor was rebuttal evidence ever presented to show that the witness had lied or was mistaken about this critical fact.

The Superior Court accepted postconviction counsel's proffer (no hearing was granted on the claim). *See Rice,* at *18 (holding that the distance was corrected to an estimate of 60 feet). The scene diagram also revealed an absence of streetlights near the school and near the corner, where Ms. Johnson claimed the streetlights were located. Finally, the scene diagram revealed the presence of two parked cars (one on the west side of South 18th, and one on the east side of South 18th, directly blocking the view from 1618 South 18th Street to the southeast corner of Fernon and South 18th Street.

### Counsel Performed Deficiently in Failing to Utilize this Evidence

Had trial counsel been operating as the reasonably effective advocate guaranteed by the Sixth Amendment, she would have realized that three aspects of

79

Ms. Johnson's testimony, critical to the integrity of her identification were rebutted by the incontrovertible physical evidence. She had been provided the notes of testimony from the preliminary hearing and Sgt. Morton's scene diagram before trial, yet she made no use of them. She could have demonstrated to the jury that Ms. Johnson's observation of a fleeting incident in the dead of night occurred not from 20 feet away, but from 60 feet away, and her observations were unaided by any illumination, since the streetlights she placed at and near the southeast corner of Fernon and South 18th, did not exist. Counsel also could have demonstrated that Ms. Johnson's view was necessarily obstructed by the presence of not one, but two cars.

It is a fundamental principle of effective advocacy that trial counsel is obliged to investigate the case, which includes, at minimum, developing and presenting exculpatory evidence that would be plainly apparent upon reasonable case analysis. *Gregg v. Superintendent Rockview SCI*, 596 Fed. Appx. 72, 77-78 (3d Cir. Oct. 2, 2014); *Blackmon v. Williams*, 823 F.3d 1088, 1104-1107 (7th Cir. 2016). Under *Strickland v. Washington*, 466 U.S. 668, 691 (1984), "counsel has a duty to make reasonable investigations or to make a reasonable decision that make particular investigations unnecessary." *See also Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997); *Coleman v. Brown*, 802 F.2d 1227, 1233-34 (10th Cir. 1986). Such a duty necessarily involves investigation of evidence that may "cast doubt upon [a witness's] identification." *Berryman v. Morton*, 100 F.3d 1089, 1101 (3d Cir. 1996)

(counsel ineffective for failing to investigate witness whose testimony would have tended to discredit the complainant's identification).

Here, the necessary investigation as it was, involved *nothing more than reviewing the discovery,* and doing minimal work in utilizing it. In *Rompilla v. Beard,* 545 U.S. 374, 383, 393 (2005), a case arising in a sentencing context, the Court held that trial counsel was ineffective for failing to obtain and examine his client's case file from a prior conviction, where the state had charged as an aggravating factor a significant history of felony convictions. The Court noted the ease with which trial counsel could have obtained the file: "It is [] undisputed that the prior conviction file was a public document, readily available for the asking at the very courthouse where Rompilla was to be tried." *Id.,* 384. Here, trial counsel did not even need to go looking in a courthouse; the sketch of the crime scene was handed to her in discovery. Counsel was obliged to review it and use it to her client's advantage.

Trial counsel acts deficiently when she fails to review the entirety of police discovery. Such review often reveals evidence of consequence to the defense, despite that the government may have no interest in highlighting the particular evidence. *See, e.g., Washington v. Smith,* 219 F.3d 620, 634-35, (7th Cir. 2000) (trial counsel ineffective for failing to read police report that would have yielded fruitful cross-examination of detective and impelled investigation of witness); *State v. Thiel,*

665 N.W.2d 305, P57 (Wisc. 2003) (counsel ineffective in part for failure to read discovery materials and undertake independent investigation).

It is inconceivable that trial counsel reviewed the sketch, because had she done so, she would have learned about the distance between the witness and the shooters, the obstructions that were present between them, and the absence of illumination. In the unlikely event that she reviewed the diagram, then it is utterly inexplicable that she did not utilize it. Her failure to do so constituted deficient performance.

**Petitioner was Prejudiced by Counsel's Deficiency**

Petitioner incorporates his prejudice arguments from each of the claims set forth in this *Petition*.

This conviction rested upon a one witness identification. The witness by her own admission had only the most fleeting opportunity to observe the perpetrator, having flipped over as soon as the shooting started, and when she next looked up the shooter was fleeing. Although she claimed to have recognized him because she knew him, when asked that night if she knew who shot at her, she could not say. Additionally, her stepdaughter's testimony regarding the location of the person Ms. Johnson identified as Petitioner was wildly at odds with hers.

In addition to all of this, had the jury also known that there were obstructions between the witness and the perpetrator (two cars), that the incident occurred at a distance three times the estimate the witness gave the jury, and that the perpetrators

82

were not illuminated by nearby streetlights, there is a reasonable probability that the jury would have acquitted Petitioner. This last point may be the most critical one, because whether one knows someone or not, if the person purportedly known cannot be seen because of darkness, the prior knowledge is of little benefit. Here the jury was advised that there were nearby streetlights, easing any concerns the jurors may have had about the difficulty in making an identification in the dead of night. There were no such streetlights.

*Strickland* prejudice has been established.

**Exhaustion**

This claim was fully exhausted in state court.

**The State Court Decision Was Both an Unreasonable Application of Supreme Court Law and Involved an Unreasonable Determination of the Facts**

**Unreasonable Determination of the Facts**

 First, the Superior Court ruled that the distance between Ms. Johnson and the perpetrators was irrelevant, since the "jury was made aware of the relative positions of the victims and assailants" through "aerial photos." *Rice* at *18. First, it is worth noting that the relative positions according to Ms. Johnson were dramatically different than the relative positions reported by her stepdaughter. Indeed, even if the relative positions of the victims and assailants were clear and consistent, it would be of no moment. The critical question was how far away the assailants were from the

witness, as it is in many identification cases. Thus, that the victim may be situated southwest of the assailant (as Ms. Johnson testified here) tells the factfinder very little, if the factfinder has no information as to the distance between the two. The unreasonableness of this factual determination was only enhanced by the fact that the incident occurred at night, where the greater distance would surely have a greater impact upon the witness's ability to observe.

Second, the Superior Court also found that the 20-foot estimate was the prosecutor's, not the witness's. *Id.* This was an incorrect reading of the factual record, and thus another unreasonable determination of the facts. While it true that the prosecutor suggested 20 feet, that was only his numerical characterization of the witness's estimate based on the distance between where the witness sat in the courtroom and where the prosecutor stood. 1/30/13, 52. The record provides no reason to doubt that the prosecutor correctly approximated *the witness's* estimate. The witness concurred, and by their silence both defense counsel and the trial court did as well. *Id.*

Third, the Superior Court held that the jury surely must have known that the witness's estimate was wrong, since "common sense dictates" it to be so. *Id.* However, why the jurors would know this if they were not familiar with the area, especially considering the plethora of tiny alley streets in Center City Philadelphia, is an answer known only to the Superior Court.

Fourth, the Superior Court found that the issue involving the location of the streetlights was of little significance because the witness "ultimately admitted, upon cross-examination by trial counsel, that the nearest streetlights were located down the street from her home, by a school." *Rice* at 19. That holding involved yet another unreasonable determination of the facts. First, the witness's testimony about streetlights by the school (which is actually near, and on the same side of South 18th Street as, the southeast corner), 1/30/13, 53, did not retract her testimony that there were other streetlights nearby directly on the southeast corner of Fernon and South 18th, the corner from which the perpetrators shot. *Id.,* 79. In fact her testimony about the streetlights on the corner came after her reference to the streetlights at the school. Regardless, Sgt. Morton's diagram makes clear there were streetlights at *neither* location. A6.

### Unreasonable Application of *Strickland*

The Superior Court minimized the significance of trial counsel's failure to effectively cross on distance and the obstruction of the two vehicles, by employing an incorrect and overly restrictive prejudice standard, unknown to *Strickland.* As for distance, the Court held that "we do not believe the longer distance was so great that it made it impossible, or even unlikely, for Ms. Johnson to be able to identify Appellant." *Rice* at *19. As for cars obstructing the view of the southeast corner, the

Court held that it "is not at all obvious that the presence of a vehicle[1] between Ms. Johnson and Appellant would have hindered her ability to identify Appellant by his face, even if the rest of his body was obstructed." *Id.*

Impossibility of conviction (or even unlikeliness of conviction, which suggests a preponderance) are standards foreign to *Strickland.* So too is whether had counsel not failed to act, it must be "obvious" that the result would have been different. Prejudice is present whenever "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995);[2] *see also Strickland*, 466 U.S. at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"). Although under the elevated standard employed by the Superior Court Petitioner *may* have suffered no prejudice; under *Strickland,* he did.

---

[1] There were actually two vehicles. A6.

[2] Although Kyles addressed a *Brady v. Maryland*, 373 U.S. 83 (1963) due process violation, *Brady* materiality and *Strickland* prejudice are coextensive. *Marshall v. Hendricks*, 307 F.3d 36, 53, 85, n.9 (3d Cir. 2002).

## CLAIM VI

## TRIAL COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AMENDMENT FOR FAILING TO DISCUSS HER EXPERT'S TESTIMONY WITH HER EXPERT BEFORE HE TOOK THE WITNESS STAND

Trial counsel never once spoke with her expert about his testimony before he testified. As a result, the expert was unprepared to properly address the critical issue for which he was called: How severely incapacitated Petitioner was based on what his doctor found on examination on the day of his office visit, September 20, 2011. The doctor never offered that testimony, opining only that he was "very dubious," as to whether Petitioner could have run. His dubiousness or, for that matter, his confidence, while perhaps relevant to a conclusion, was meaningless in the absence of a conclusion. Had trial counsel spent even 5 minutes with her expert, explaining that his testimony had to address the degree of Petitioner's incapacitation as it related to his ability to run on the evening of September 25, 2011, he would have offered the testimony he offered at the postconviction evidentiary hearing – that it would have been "virtually impossible" for Petitioner to have done so. Trial counsel's failure in this regard constituted deficient performance, and the deficiency prejudiced Petitioner.

**Facts Supporting the Claim**

At trial, Dr. Tapper, Petitioner's pediatrician, testified that he saw Petitioner on September 20, 2011, nine days after he had been released from the hospital following surgery for gunshot wounds to his butt, his thigh, and abdomen. 2/4/13, 13, 15. He had an 8-10-inch vertical incision down his midline, and roughly 10 to 12 staples holding the incision together. *Id.,* 18. It had opened a bit and was draining yellow fluid. *Id.,* 18. The surgery involved groping around and moving the intestines this way and that way. *Id.* His surgical wound had been stapled shut. *Id.* Petitioner had difficulty walking and getting off and on the table, and appeared to be in pain. *Id.,* 18-19. When he walked, he took short choppy steps, and he bent forward like an old man. *Id.,* 21. It was also noticeable that he was in pain when he had to change positions on the examination table. *Id.* For example, he had difficulty laying down, and getting back up, and had to use his hands for support. *Id.,* 19-20. Dr. Tapper testified that based on Petitioner's condition 5 days before the incident, he was "very dubious as to whether he could walk standing up straight, let alone run with any degree of speed five days after [he] saw him." *Id.,* 22.

During the PCRA evidentiary hearing, Dr. Tapper testified that although he was retained (at no cost) by the defense in this case, trial counsel never spoke to him about his testimony before he testified., nor did she provide him with any medical documentation from Jefferson Hospital relating to Petitioner's treatment for his

gunshot wounds. 1/25/19, 53. He first met trial counsel when he showed up to testify at the trial. *Id.,* She spoke with him very briefly, and not about the substance of his testimony. *Id.,* 53-54. She provided him with no documents prior to his testimony. *Id.,* 54. As a result, according to Dr. Tapper, trial counsel failed to illicit testimony regarding the severity of Petitioner's incapacitation. *Id.,* 56. Had she done so, Dr. Tapper would have testified that it would have been *virtually impossible* for Petitioner to be running, let alone walking with any speed down the street at the time of the incident. *Id.,* 57. Dr. Tapper also testified that in the condition he saw Petitioner on September 20, 2011, five days later he could not have run any distance. *Id.,* 81.

### Trial Counsel Performed Deficiently

Trial counsel performs deficiently when she fails to adequately prepare her expert witness. *See, e.g., Bean v. Calderon,* 163 F.3d 1073, 1078 (9th Cir. 2009) (defense counsel ineffective when he "did not contact [the defense expert] to prepare him for [his testimony] until a day or two before his testimony, when he expended only one or two hours in readying his testimony); *Clabourne v. Lewis,* 64 F.3d 1373 (9th Cir. 1995) (holding trial counsel ineffective for failing to adequately prepare testifying trial expert with recent mental health records which would have changed the defense expert's diagnosis, as well as state expert's diagnoses).

Here, trial counsel *never* engaged with her witness. The expert was placed on the stand "cold," and – understandably – did not have a clue as to the irrelevance of his "dubious[ness]." What was relevant, and what the jury never heard, was his expert opinion that it would have been virtually impossible for Petitioner to be running, let alone walking with any speed down the street at the time of the incident, *id.,* 57, and that in the condition he saw Petitioner on September 20, 2011, five days later he could not have run any distance. *Id.,* 81. "[H]e would not have been able to run, alone walk fast." *Id.,* 58.

**Trial Counsel's Deficiency Prejudiced Petitioner**

Petitioner incorporates his prejudice arguments presented within each of the other claims in this *Petition.*

It is simply impossible to reconcile Dr. Tapper's postconviction hearing testimony with the testimony of Latrice Johnson, that has the person she identifies as Petitioner, running. But that was not the case regarding their respective trial testimony. This was ***not*** because Dr. Tapper testified to a higher degree of impairment in postconviction; rather, it is because his postconviction testimony addressed Petitioner's condition, as opposed to Dr. Tapper's testimony at trial which did not do so to any effective degree. A juror could have rationally concluded that notwithstanding Dr. Tapper's dubiousness, it was still reasonably possible for the running perpetrator to have been Petitioner. Dr. Tapper's doubtfulness, as it was, did

90

not speak to the severity of Petitioner's impairment. Had Dr. Tapper been prepared, let alone properly prepared, he would have understood that his testimony had to address the degree of that severity, so the jury could determine whether the impairment Petitioner was suffering should lead *them* to be "dubious" about Ms. Johnson's testimony.

That is what occurred at the postconviction evidentiary hearing. Had the jurors heard that testimony, it would have given them another reason along with all the other reasons in this case to doubt the reliability of Ms. Johnson's identification. It provides another basis to find that but for counsel's failure, there was a reasonable probability that the result of the trial would have been different.

The expert the Commonwealth called at the postconviction hearing, Dr. Cohen, provided testimony that supports a finding of *Strickland* prejudice. Dr. Cohen acknowledged that he had no memory of Petitioner after the surgery. *Id.,* 105, 109. Dr. Tapper, however, did, having seen him on September 20, 2011. 2/4/13, 15. Dr. Cohen's testified that a person who could only "shuffle[e] down the hall with baby steps looking like an infirmed 85-year-old," as Dr. Tapper described his patient 5 days before the incident, could be typical for someone of Petitioner's age. *Id.,* 109. It could also be atypical. *Id.* Thus, Dr. Tapper, who saw Petitioner, would have been best positioned, indeed the only doctor positioned, to known if that condition – one that made it exceedingly unlikely that 5 days later Petitioner was running – was

typical for Petitioner. That was a fact that surely would not have been lost on the jury, and thus his testimony that flight would have been virtually impossible would have carried great weight with the jury. The jury never heard that testimony.

**Exhaustion**

This claim was fully exhausted in state postconviction review.

**The State Court Decision Involved an Unreasonable Determination of the Facts**

The Superior Court found that the record supported the trial court's assessment that Dr. Tapper had the opportunity to testify at trial in the same way he testified in the postconviction hearing if he had wanted to. *Rice* at *27. The record provides no support for such a finding and supports a contrary finding. Doctors are not lawyers and do not assume the duty of proving the defendant's case, or even knowing what is legally relevant in that regard. *Cf. Shire ViroPharma Inc. v. CSL Behring LLC,* 2021 U.S. Dist. LEXIS 61551 (Del. Dist. Ct. Mar. 31, 2021) (noting distinction in medical and legal training); *Williams v. Thomas Jefferson University,* 54 F.R.D. 615 at *617 (E.D. Pa. Feb. 23, 1972) (same). The record supports a finding that the engagement between counsel and expert, that would alert the expert as to what would be probative and relevant to the defense, never occurred. The trial court's (and Superior Court's) finding assumes, without any basis, that Dr. Tapper knew what that evidence was.

The Superior Court's other finding, that there is so discernible a difference between references in Dr. Tapper's letters to the impossibility of Petitioner having been able to run, and his testimony that it was "virtually impossible," as to undermine his testimony, was also an unreasonable factual determination. *Id.* It is a hair-splitting assessment that capitalizes on a distinction of nomenclature without a substantive difference. As Dr. Tapper explained, the qualification "virtually" is no more significant than the identical qualification he would ascribe to the chances that the courtroom ceiling would collapse. 1/25/19, 73-74. Neither were, to say the least, likely. Whether it was impossible, or virtually impossible, was a distinction without an appreciable difference.

## CLAIM VII

### PETITIONER IS ENTITLED TO RELIEF BASED ON THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE

If this Court finds that Petitioner is not entitled to relief based on the individual grounds alleged, Petitioner is entitled to relief based on the cumulative error doctrine, where, as here, the cumulative effect of errors amounted to a violation of due process. *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007); *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008)). Because the cumulative effect of the errors pled above "undermined the fundamental fairness of [Petitioner's] trial and denied him

his constitutional right to due process," Petitioner is entitled to relief.  *Fahy*, 516 F.3d at 205.

Petitioner is also entitled to relief on an alternative theory of cumulative error regarding the ineffectiveness claims.  This Court may find that trial counsel was deficient in more than one respect, but that the individual instances of deficient performance did not independently prejudice Petitioner per *Strickland*.  If the Court so concludes, it should then proceed to cumulate each deficiency and analyze whether, under *Strickland*, the cumulative effect of those errors prejudiced Petitioner.  *Commonwealth v. Perry*, 644 A.2d 705, 709 (Pa. 1994); *Dugas v. Coplan*, 428 F.3d 317, 335 (1st Cir. 2005); *Lindstadt v. Keane*, 239 F.3d 191, 199 (2nd Cir. 2001).

Finally, the prejudice and/or materiality resulting from all of the constitutional violations (i.e., relating to ineffectiveness and due process) in this case, are a third basis for cumulative relief. Considering the thinness of the case against Petitioner, and how the constitutional violations all impacted the critical question of identification, the writ must issue.

### Exhaustion

This claim was not raised in PCRA proceedings due to PCRA counsel's ineffectiveness. To the extent that a cumulative error claim must be exhausted, and this claim is procedurally defaulted, Petitioner invokes *Martinez v. Ryan*, 566 U.S.

1 (2012) to demonstrate cause for the default of this ground. This claim is "substantial" and PCRA counsel ineffectively failed to raise this claim in the PCRA petition to allow for merits review. Petitioner incorporates by reference his argument based on *Martinez v. Ryan*, 566 U.S. 1 (2012), *supra,* 36-38.

## CONCLUSION

For all of the above reasons, and based upon the full record of this matter, Petitioner, Charles Rice, requests that the Court provide the following relief:

A) That leave to amend this Petition, if necessary, be granted;

B) That an evidentiary hearing be conducted on all claims involving disputed issues of fact;

C) That Respondents be ordered to respond to this Petition; and

D) That Petitioner's convictions and sentence be vacated.

Respectfully Submitted:

*s/Karl Schwartz_____*
KARL SCHWARTZ, ESQ.
Wiseman & Schwartz, LLP
718 Arch Street, Suite 702 N
Philadelphia, PA 19106
schwartz@wisemanschwartz.com
(215) 360 – 3988


DATE:      December 21, 2022
           Philadelphia, PA

**Certificate of Service**

I, Karl Schwartz, hereby certify that on this 21st day of December, 2022, I served the foregoing upon the following persons by filing the same with this Court's ECF Filing System:

> Matthew Stiegler
> Federal Litigation Supervisor
> Philadelphia County
> District Attorney's Office

> */s/ Karl Schwartz*

> Karl Schwartz