**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHARLES RICE, | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| TOM MCGINLEY, et al., | : | No. 22-5105 |
| Respondents. | : | |

**RESPONSE TO PETITION FOR A WRIT OF HABEAS CORPUS**

The Sixth Amendment to the United States Constitution guarantees every criminal defendant the right to the effective assistance of counsel. At petitioner Charles Rice's trial for a 2011 shooting in Philadelphia, his counsel stipulated to an otherwise inadmissible fact that established a motive for Rice to commit the crime. The prosecution's theory was that the shooting was retaliation against one of the victims for shooting Rice three weeks earlier. However, neither the police nor the prosecutor could offer any concrete evidence supporting the victim's culpability for the earlier shooting, and the trial court was prepared to exclude the motive evidence for being more prejudicial than probative. Instead, on the morning of trial, Rice's counsel stipulated that the evidence could come in.

Trial counsel's decision to agree to that stipulation was objectively unreasonable, as the evidence was otherwise inadmissible and only could have hurt her client. And there is a reasonable probability that the jury would have reached a different result if counsel had not made the stipulation; the evidence of Rice's guilt wasn't strong, and the prosecution acknowledged that establishing his motive was "extremely important" to the case. After careful review of the record, the Commonwealth agrees with

Rice that he was denied the effective assistance of counsel, and he is due a new trial as a result.

The Commonwealth is mindful that prosecutors have "a special duty to seek justice." *Connick v. Thompson*, 563 U.S. 51, 65–66 (2011) (internal quotation omitted). A prosecutor's interest in a criminal prosecution is "not that he shall win a case, but that justice shall be done." *Dennis v. Sec'y, Pa. Dep't of Corrs.*, 834 F.3d 263, 290 (3d Cir. 2016) (en banc) (internal quotation omitted) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)); *see also* Explanatory Comment 1, Pa. R. Prof. Conduct 3.8 ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate"). Accordingly, the Commonwealth's conclusion here is the product of a thorough review of the record and "careful consideration," in light of its "'primary authority for defining and enforcing the criminal law.'" *Kennedy v. Superintendent Dallas SCI*, 50 F.4th 377, 382 (3d Cir. 2022) (quoting *Engle v. Isaac*, 456 U.S. 107, 128 (1982)).

Rice's habeas petition should be granted, and the Commonwealth should be ordered to retry or release him within 180 days.

## BACKGROUND

On September 3, 2011, someone shot and injured petitioner Charles Rice in south Philadelphia. N.T. 1/28/13 at 10. Rice, who was 17 years old at the time of the shooting, was with Tyler Linder; Linder was not injured. *Id*.

About three weeks later, on the evening of September 25, two men rounded a corner and opened fire at the home of Latrice Johnson's mother, also in south Philadelphia. N.T. 1/30/13 at 40. Latrice Johnson, her daughter

Latoya Lane, her son Khalief Ladson, and her niece Denean Thomas, the victims in this case, were injured in the shooting.

The Commonwealth charged Rice and Linder with the September 25 shooting, and the case headed toward trial.[1]

## I.      The pretrial hearing

Before the trial started, the prosecution filed a motion to allow it to introduce evidence related to the September 3 shooting.  The prosecution's theory was that one of the victims of the September 25 shooting, Khalief Ladson, had committed the September 3 shooting and that Rice and Linder's motive for the September 25 shooting was to retaliate against Ladson.  N.T. 1/28/13 at 4–7.

After the prosecution filed a motion to admit prior bad acts, the trial court held a hearing two days before the start of trial.  The prosecution called a detective, who testified that the police's suspect in the September 3 shooting was Ladson.  *Id*. at 11.  However, the detective could not recall where he had gotten that information, and none of the witnesses to the September 3 shooting had identified Ladson.  *Id*. at 11–12.  Rice came in for an interview, but was "uncooperative," saying that "if he knew [who shot him] he wouldn't tell [the detective] anyway."  *Id*. at 14.  The detective testified that Rice is "assumed to be a 7th Street gang member" and Ladson was a member of a 5th Street gang; the two gangs were part of an "ongoing conflict."  *Id*. at 15.  The detective later clarified that he did not have "actual concrete evidence" of the gang affiliations.  *Id*. at 31.

---

[1]      Rice was represented by Sandjai Weaver, while Linder's counsel was Ray Driscoll.  Eric Stryd prosecuted the case in front of Judge Denis P. Cohen of the Philadelphia Court of Common Pleas.

After the testimony, the prosecutor argued that Ladson's status as a person of interest should come in at trial, as it went to "motivation and the state of mind of the defendant." *Id*. at 44. The court disagreed:

> THE COURT: How do you show that the defendants even knew about it? All we know he has a very vague, amorphous, unsubstantiated claim that Ladson was a suspect. You have no idea what the source is, and you're saying the fact that he was a suspect is a motive by the defendants. But, one, we have no idea who, if anyone, was the source. And, two, we have no idea they knew about it. So how does that come in?
>
> MR. STRYD: Judge, that's a good point. I don't have an answer to that question.
>
> THE COURT: Well, I'm going to need an answer if I'm going to rule in your favor, because right now I don't see how that comes in.

*Id*. at 44. The court pointed out that the motive evidence could be prejudicial to the defendants and asked the prosecutor about its probative value. *Id*. at 53. The prosecutor acknowledged that establishing motive was "extremely, extremely important to the Commonwealth . . . to give any sort of picture about why and the circumstances surrounding the shooting." *Id*. at 54–55. The prosecutor also argued that Rice's lack of cooperation with the investigation of the September 3 shooting was part of the "full picture" to establish his motive. *Id*. at 49.

Wrapping up, the court again expressed skepticism about admitting the evidence, noting that the prosecution's theory was "all based upon anonymous sources." *Id*. at 58. Ultimately, the court deferred a concrete ruling until the first day of trial, inviting the parties to submit case law. *Id*. at 57.

After the hearing, the prosecutor sent an email to several other prosecutors at the District Attorney's Office, asking if they knew how he might be able to get in evidence of the previous shooting. Ex. A. The prosecutor said that he didn't have "any hard evidence" to support his theory, nor "any specifics about who the 'sources' are or where this information came from." *Id*. Another prosecutor responded that "it looks like you lack foundation (i.e. it's all rank hearsay)." *Id*. He suggested that the prosecutor cross-examine Ladson: "If he gives it to you, great. If he denies it, the jury knows what is up with the case because you asked the question but they just technically cannot use it." *Id*.

## II.    The trial

On the morning of trial, the parties informed the court that they had reached stipulations about what evidence could come in. Two stipulations are relevant here. First, the parties agreed that evidence that (1) Rice did not cooperate with the investigation into the September 3 shooting and (2) "when asked who shot, he stated, I don't know, and if I did, I wouldn't tell [the detective]," would be admissible at trial. N.T. 1/30/13 at 8.

Second, and most importantly, Rice's counsel introduced this stipulation:

> We've also agreed with respect to that stipulation or agreement that the Commonwealth may, in fact, use detectives to state that Mr. Khalief Ladson became the suspect or a suspect in that investigation.

*Id*. The parties agreed that any reference to the 5th or 7th Street gangs would not be admissible. *Id*. at 8–9.

The Commonwealth now summarizes the evidence presented at trial, as relevant to this habeas petition.[2]

### A.   The Commonwealth's case-in-chief

Latrice Johnson testified that, around 9:30 p.m. on the night of September 25, 2011, she was sitting on the steps of her mom's house in south Philadelphia with her family members, including four children.   N.T. 1/30/13 at 42–45.   Two men came around the corner, who she said were about 20 feet away from her.   *Id*. at 49, 52.   The two men started shooting. *Id*. at 51.   Johnson "flipped over on to the younger kids" when the shots started.   *Id*. When they stopped, she saw one of the men turn and run away. *Id*.   His face was illuminated by a streetlight, which was on the opposite side of the street and down to her right.   *Id*. at 53, 79–80.   Johnson was shot in the leg.   *Id*. at 57.

Johnson did not identify either man on the night of the shooting, though she gave a general description of what the two shooters were wearing and said where she thought they had run.   *Id*. at 58, 90–91. Johnson was interviewed by detectives at the hospital the next day.   *Id*. at 62.   She identified Rice from a photo array as the shooter who had ran away, but she did not identify the other shooter.   *Id*. at 64.   Rice had been friends with her son Khalief Ladson when they were younger.   *Id*. at 64.   On cross-examination, Johnson admitted that she likely had not seen Rice in approximately four years, since he was in middle school and no more than 13 years old.   *Id*. at 90.   She testified that Rice was wearing a hoodie with

---

2     Unfortunately, the opening and closing statements of the trial were not transcribed.   The Commonwealth understands that Rice's current counsel reached out to the state courts to attempt to get a transcription, but it was no longer possible to do so.

6

the hood up and that she could see his whole face and braids on the side. *Id*. at 50.

On cross-examination, Linder's counsel asked whether Johnson was aware that her son, Khalief, was a suspect in the September 3 shooting. *Id*. at 117. She said that she was not. *Id*.

Latoya Lane, Johnson's daughter, testified that she had been looking at her phone when she heard gunshots. *Id*. at 138. She saw a shooter pointing the gun directly at her, after which she felt her leg go numb. *Id*. at 139. She identified Linder in court as that shooter but did not recognize the other shooter. *Id*. at 140–43. She knew Linder because he went to school with her cousins. *Id*. at 147. She identified Linder from a photo array while being treated at the hospital. *Id*. at 150.

Latitia Johnson, Latrice Johnson's sister, testified that her six-year-old daughter, Denean Thomas, suffered gunshot wounds in her leg. N.T. 1/31/13 at 76. Thomas passed away of brain cancer in February 2012. *Id*.

Police officers testified about their interactions with the victims on the night of the shooting. One officer testified that he interviewed Latrice Johnson at the hospital that evening. *Id*. at 89. She described the two shooters as "one black male wearing a gray hoodie and the other with a black hoodie and they both had black sweatpants." *Id*. at 90. She did not give him the name of either of the shooters at that time. *Id*. at 91. Another officer testified that he talked to both Latoya Lane and Khalief Ladson that evening. Ladson described the shooters as two to three "black males in dark hoodies." *Id*. at 107. Lane described the shooters as two to three black males. *Id*. at 108. The officer asked Lane if she knew who had shot her, and she could not answer. *Id*. at 113.

Detectives testified about the investigation of the September 3 shooting. The detective who had testified in the pretrial hearing testified that he had talked to Rice in mid-September about the September 3 shooting and that Rice was very uncooperative. *Id*. at 140. Specifically, Rice told him that "he didn't know who shot him; and if he did, he wouldn't tell [the detective] anyway." *Id*. On cross-examination, Linder's counsel elicited that Khalief Ladson was a person of interest in the September 3 shooting. *Id*. at 143. Another detective testified that he had been investigating the September 3 shooting. There was a picture of Khalief Ladson in his file, which was printed on September 6, 2011. *Id*. at 208. Ladson was a person of interest in the shooting, but there wasn't enough evidence to apply for an arrest warrant. *Id*. at 208–09. Rice did not cooperate in the investigation into the shooting, but his co-defendant, Linder, did. *Id*. at 209, 213, 233–34. And another detective testified that he had interviewed co-defendant Linder about the September 3 shooting. Linder told him that a car with tinted windows pulled up to where he and Rice were riding bikes. N.T. 2/2/13 at 8–9. A silver handgun came out of the window and shot at Rice. *Id*. at 9. Linder didn't think that he was the target of the shooting. *Id*. at 10–11.

Another officer testified that, when Rice surrendered on September 27, he had staples in his abdomen and was taking Oxycodone for pain, but walked into the station under his own power. *Id*. at 20.

Finally, a firearms expert testified that there were 12 fired cartridge casings, all .380 automatic, recovered on the scene. *Id*. at 39, 46. Five were fired from the same firearm, while the other seven had insufficient markings to place them to any firearm. *Id*. at 44.

The prosecution did not introduce any physical evidence tying Rice to the shooting, and no gun was ever recovered.

8

**B.  The defense cases**

Rice called his mother, Crystal Cooper, in his defense.  She testified that Rice had been shot on September 3 and was not discharged until September 11.  *Id*. at 66.  He had surgery on his stomach during that time.  *Id*.  When he was discharged, he went to his godmother's house in West Philadelphia, as Cooper was afraid for his safety in South Philadelphia.  *Id*. at 67.  After his release, Rice walked with a hunch and had a pillow that he held against his stomach to protect the staples.  *Id*. at 78–79.  On September 27, when Rice went to the police station, Cooper described him as taking "baby steps" as he got out of the car.  *Id*. at 78.

Rice's godmother's son, Quadafi Malone, testified that Rice was having a hard time moving when he was released from the hospital.  *Id*. at 129.  Malone testified as an alibi witness, saying that Rice was never out of his sight on the evening of September 25.  *Id*. at 139.  On cross-examination, Malone admitted that this was the first time he had told anyone other than defense counsel, his mother, and Rice's mother that he had been with Rice all day on September 25.  *Id*. at 157–59.

Dr. Theodore Tapper testified that he had examined Rice on September 20.  N.T. 2/4/13 at 17.  As a result of the surgery after the September 3 shooting, Rice had an eight-to-ten-inch incision running vertically down his chest, which was held together by somewhere between eight and twelve staples.  *Id*. at 18.  Dr. Tapper described Rice as being in a "moderate amount" of pain, observing that Rice moved "very hesitatingly."  *Id*. at 17, 19.  In Dr. Tapper's view, he was "very dubious" that Rice could "walk standing up straight, let alone run with any degree of speed" on the night of the September 25 shooting.  *Id*. at 22.  On cross-examination, Dr. Tapper admitted that he did not know how many painkillers Rice had taken on the

night of the shooting and that it wasn't "impossible" that Rice could have been running down the street that night.  *Id.* at 39.

Rice's godmother, Deania Duncan, testified that she took Rice in after his discharge from the hospital on September 11.  Rice needed assistance walking, was hunched over, and carried a pillow to hold over his stomach.  *Id.* at 47–48.  She took him to see Dr. Tapper on September 20; Rice was still hunched over and needed assistance standing up or sitting down.  *Id.* at 51.

Linder called one witness, a security guard at a business where Linder's mom was a cleaner, who testified that Linder's mom and others were cleaning the buildings from 8:45 p.m. to 9:50 p.m. on the night of the shootings.  N.T. 2/4/13 at 96.  The witness did not see who else was with Linder's mom.  *Id.* at 101.  Through cross-examination of one of the detectives, Linder introduced security camera footage that showed him cleaning buildings with his mom up until 8:45 p.m.  N.T. 1/31/13 at 220–31.

### C.   The prosecution's rebuttal

On rebuttal, the prosecution called a police officer, who testified that he saw Rice in South Philadelphia on the afternoon of September 19, standing with two men and a woman.  *Id.* at 116.

### D.   Deliberations, verdict, sentence, and appeal

The jury began to deliberate at 3:30 p.m. on February 5.  N.T. 2/5/13 at 86.  The next day, the jury asked for a written definition of "reasonable doubt."  N.T. 2/6/13 at 4.  The court repeated its oral reasonable-doubt instruction.  *Id.* at 6–7.  The next afternoon, after two days of deliberating, the jury sent a note that it had reached a verdict as to one of the defendants, and asked what to do if it was at an "impasse" on another.  N.T. 2/7/13 at 3.  The jury filled out the verdict sheet for one defendant, which the court sealed with duct tape.  *Id.* at 5.  The court instructed the jury to continue its

10

deliberations as to the other defendant. *Id*. at 5–6. Finally, at 12:50 p.m. the next day, after three days' deliberation, the jury announced its verdict for both defendants: guilty on all counts for Rice and not guilty on all counts for Linder. N.T. 2/8/13 at 4–14.[3] The trial court sentenced Rice to thirty to sixty years' imprisonment. N.T. 5/24/13 at 45.[4]

Rice appealed, and the Pennsylvania Superior Court affirmed his convictions and sentence. *Commonwealth v. Rice*, 2016 WL 238824 (Pa. Super. Ct. Jan. 20, 2016). Rice did not seek further review in the Pennsylvania Supreme Court.

## III. State post-conviction proceedings

Next, Rice filed a *pro se* petition for relief under Pennsylvania's Post-Conviction Relief Act, 42 Pa.C.S. §§ 9541 *et seq*.[5] Rice later retained Jason Kadish, who filed an amended petition. None of the petitions raised a claim about the pre-trial stipulation regarding Khalief Ladson.

The PCRA court held an evidentiary hearing in January 2019. At the time of the evidentiary hearing, trial counsel was "physically and cognitively unavailable," so she did not testify. N.T. 1/25/19 at 5. The

---

[3]   Specifically, the jury found Rice guilty of four counts of attempted homicide, three counts of aggravated assault, three counts of conspiracy to commit homicide, four counts of conspiracy to commit aggravated assault, one count of firearms not to be carried without a license, one count of carrying firearms in public in Philadelphia, and one count of possession of a firearm by a minor. *Commonwealth v. Rice*, 2016 WL 238824, at *1 (Pa. Super. Ct. Jan. 20, 2016).

[4]   Before sentencing, Rice also pleaded guilty to possession with intent to distribute, a charge arising out of an incident earlier in 2011.

[5]   The Commonwealth construes all of Rice's *pro se* filings liberally. *See Higgs v. Att'y Gen.*, 655 F.3d 333, 339–40 (3d Cir. 2011).

Commonwealth understands that trial counsel has since passed away. *See* "Weaver, Sandjai," The Disciplinary Board of the Supreme Court of Pennsylvania, https://www.padisciplinaryboard.org/for-the-public/find-attorney/attorney-detail/55184 (last accessed September 22, 2023).

At the evidentiary hearing, Dr. Tapper testified that the only time he spoke with trial counsel before testifying at trial was "very briefly" in the hallway before going in to testify. N.T. 1/25/19 at 53. Dr. Tapper testified that, in his view, it would have been "virtually impossible" for Rice to be running on the day of the incident, as his incision would have "split open to one degree or another and [his] intestines would have been coming out." *Id*. at 56–58. Dr. Tapper would have shared this opinion prior to trial if he had met with trial counsel and/or would have testified as such at trial if he had been asked about Rice's ability to run, but trial counsel did not meet with him before trial or ask him about it at trial. *Id*. at 59.

After the hearing, the PCRA court denied all claims in the petition. Rice appealed, and the Pennsylvania Superior Court affirmed the PCRA court. *Commonwealth v. Rice*, 2021 WL 2312775, at *1 (Pa. Super. Ct. June 7, 2021). As relevant here, the court concluded that the PCRA court had determined that Dr. Tapper's PCRA hearing testimony was "not credible" given his extensive testimony at trial about Rice's injuries. *Id*. at *9.

The Pennsylvania Supreme Court denied Rice's petition for allocatur. *Commonwealth v. Rice*, 270 A.3d 432 (Pa. 2021) (table).

## IV.   This habeas petition

Rice filed this counseled petition for a writ of habeas corpus on December 21, 2022.   ECF No. 1.[6]  In the petition, he claims that:

(1) The Commonwealth violated Rice's right to due process by suppressing exculpatory evidence casting doubt on eyewitness Latrice Johnson's identification, and by eliciting false testimony that she identified Rice on the night of the incident;

(2) Trial counsel was ineffective for stipulating to the fact that one of the victims, Khalief Ladson, was a person of interest in the shooting of Rice that occurred three weeks earlier, and for ignoring a *Bruton* violation that compounded the error;

(3) Trial counsel was ineffective for failing to object to an improper alibi instruction;

(4) Trial counsel was ineffective for failing to request a *Kloiber* instruction;

(5) Trial counsel was ineffective for failing to use physical evidence that cast doubt on Johnson's ability to identify Rice;

---

[6]   This petition is timely.   AEDPA requires Rice to have brought this petition within one year of (as applicable here) the day his conviction became final.  28 U.S.C. § 2244(d)(1)(A).   That day was February 19, 2016—the last day to seek review of his conviction in the Pennsylvania Supreme Court.  210 Pa. Code § 1113.   The clock then ran for four days, until the filing of Rice's PCRA petition on February 23, 2016 stopped the clock.  28 U.S.C. § 2244(d)(2). The clock started again on December 30, 2021, the day the Pennsylvania Supreme Court denied review of his PCRA petition.   Thus, Rice's clock ran out 361 days later, on December 26, 2022.    Because Rice filed his petition on December 21, 2022, five days before his clock ran out, his petition is timely.  ECF No. 1.

13

(6) Trial counsel was ineffective for failing to discuss her expert's testimony with that expert before he took the witness stand; and

(7) Rice is entitled to relief based on the cumulative effect on the errors in this case.

*Id.* at 56–57.

## DISCUSSION

After careful review of the record, the Commonwealth concedes that Rice is entitled to habeas relief on the second claim in his habeas petition, which is that his trial counsel performed ineffectively by stipulating that one of the victims, Khalief Ladson, was a person of interest in the September 3 shooting that injured Charles Rice.[7]  That stipulation provided a key part of the prosecution's case against Rice, as it established Rice's motive to commit the September 25 shooting.

Rice's petition satisfies both prongs of the test for ineffective assistance of counsel—deficient performance and prejudice.  *See Strickland v. Washington*, 466 U.S. 668 (1984).  Trial counsel performed deficiently because there was no plausible strategic reason for her to agree to this stipulation.  As a hearing two days before trial made clear, the evidence was inadmissible at trial because the prosecution could not establish any foundation for it—i.e., how the police concluded that Ladson was a person of interest.  Instead of keeping this damaging fact out of the trial, trial counsel handed the prosecution a gift, allowing them to introduce an

---

[7]  In the interests of judicial economy, the Commonwealth only responds to Rice's second claim.  Rice is due complete relief on this claim, and disposing of this claim will moot the rest of Rice's petition.  Should the Court wish to hear from the Commonwealth regarding the remaining six claims, the Commonwealth respectfully requests the opportunity to supplement this response.

14

"extremely, extremely important" piece of its case without any adversarial testing.  N.T. 1/28/13 at 54–55.

The stipulation prejudiced Rice because there is a reasonable probability that the jury would not have convicted him if this evidence was excluded.  The prosecution's case against Rice was not strong, resting almost entirely on one problematic eyewitness identification weighed against medical evidence that Rice was injured, in pain, and likely unable to run at the time of the shooting.  The jury took a long time to deliberate, and ultimately rejected the prosecution's overall theory of the case by acquitting Rice's co-defendant.  Given this background, the motive stipulation—buttressed by Rice's unwillingness to cooperate with the police after the September 3 shooting—played a significant role in the case against Rice.  If the jury hadn't heard that Rice had a motive to commit the shooting, there is a reasonable probability it would have reached a different result, so Rice is entitled to a new trial.

To be clear, the Commonwealth's concession here is not an agreement that Rice has proven his innocence.  The prosecution presented legally sufficient evidence at trial to convict Rice on all counts, and the Commonwealth acknowledges the witnesses who testified against Rice at trial.  But, given counsel's serious error at trial, the Commonwealth no longer has confidence that Rice received "a trial whose result is reliable." *See Strickland*, 466 U.S. at 687.  The Court should grant a conditional writ of habeas corpus on Rice's second claim and allow the Commonwealth to retry Rice.

15

**I.**     **The procedural default of this claim can be excused because PCRA counsel performed ineffectively by not raising it.**

Although Rice did not exhaust this claim in state court, that default is excused because his state-court PCRA counsel performed ineffectively, so this Court can and should consider his claim on the merits.

Habeas petitioners like Rice are required to exhaust their claims in state court.   28 U.S.C. § 2254(b)(1)(A).   A claim is exhausted if it was fairly presented in state court through one complete round of the state's review process.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 846 (1999).  A claim that was not exhausted is deemed procedurally defaulted, and relief is foreclosed unless the petitioner establishes cause and prejudice or a fundamental miscarriage of justice.  *Coleman v. Thompson*, 501 U.S. 722, 749 (1991).  Rice acknowledges that he did not exhaust this claim in state court.  ECF No. 1 at 120.

However, a petitioner can excuse the default of a trial-counsel ineffective-assistance claim by showing that their post-conviction counsel performed ineffectively by not raising the claim.  *Martinez v. Ryan*, 566 U.S. 1 (2012).  Here, that requires Rice to show that (1) the defaulted trial-counsel ineffective-assistance claim has "some merit," and (2) post-conviction counsel performed deficiently. *Workman v. Superintendent Albion SCI*, 915 F.3d 928, 937 (3d Cir. 2019).

Both prongs of *Martinez*'s test are met here.  As discussed in more detail in the next section, this claim has "some merit," as Rice has shown that he is entitled to relief on the merits of his ineffective-assistance claim.  *See Workman*, 915 F.3d at 938.  And Rice has shown that PCRA counsel's performance fell below an objective standard of reasonableness.  Although there is a "strong presumption" that an attorney has made a tactical choice

16

by pursuing some claims over others, that presumption may be rebutted by "showing that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *See id*. at 942. This claim is significant and obvious, yet PCRA counsel pursued much weaker claims.  For example, among the nine claims raised on appeal, PCRA counsel claimed that trial counsel performed deficiently by not moving to have this case decertified to juvenile court.  As the PCRA court pointed out, however, the circumstances of this case "would not have warranted decertification," given the "very serious danger to the community" caused by the charged conduct.  *Rice*, 2021 WL 23112775, at *4. In sum, the record shows that PCRA counsel performed deficiently by not raising this claim, so *Martinez* applies and this Court should consider the claim on the merits.[8]

In the alternative, the Commonwealth affirmatively waives its exhaustion defense to this claim.  Exhaustion is not a jurisdictional bar to relief.  *See Trest v. Cain*, 522 U.S. 87, 89 (1997).  Rather, it is an affirmative defense that the state may waive.  *See* 28 U.S.C. § 2254(b)(3); *Kennedy v. Superintendent Dallas SCI*, 50 F.4th 377, 381–82 (3d Cir. 2022).  Because accepting a state's waiver "respects the [state's] primary authority for defining and enforcing the criminal law," *Kennedy*, 50 F.4th at 382 (internal quotation omitted), a court may not "bypass, override, or excuse a State's deliberate waiver" of affirmative defenses.  *See Wood v. Milyard*, 566 U.S. 463, 466 (2012).

---

[8]    Rice's PCRA counsel, Jason Kadish, has signed a declaration agreeing that he "had no reasonable strategic rationale" for not raising the claim, and that "[h]ad [he] considered the issue, [he] would have raised the claim."  ECF No. 17-1 at 3.

17

Because Rice's convictions resulted, in part, from the ineffective assistance of trial counsel, the Commonwealth lacks confidence in the integrity of the verdict.  After careful consideration, the Commonwealth has concluded that relying on a procedural bar to defeat this claim would not advance justice.  *See* Explanatory Comment 1, Pa. R. Prof. Conduct 3.8; *see also* AMERICAN BAR ASSOCIATION, *Criminal Justice Standards for the Prosecution Function*, Standard 3-8.5 (4th Ed. 2017) ("The prosecutor need not . . . invoke every possible defense to a collateral attack, and should consider potential negotiated dispositions or other remedies if the prosecutor and the prosecutor's office reasonably conclude that the interests of justice are thereby served.").  Accordingly, the Commonwealth does not assert and affirmatively waives any procedural defense that would otherwise bar consideration on the merits of Rice's second claim.

## II.      Rice's trial counsel performed ineffectively by stipulating to the admission of evidence that established Rice's motive to commit the shooting.

Rice claims that his trial counsel performed ineffectively by stipulating that the prosecution could introduce evidence that one of the victims, Khalief Ladson, was a "person of interest" in the September 3 shooting that injured Rice.  ECF No. 1 at 110–20.[9]  To make out a claim of ineffective assistance of counsel, Rice must show that trial counsel performed

---

[9]    Rice's claim also argues that some of the evidence that came in as a result of this stipulation violated the rule of *Bruton v. United States*, 391 U.S. 123 (1968), which prohibits the government from introducing the inculpatory statements of a non-testifying co-defendant as substantive evidence against the defendant.  Because Rice is due relief regardless of whether a *Bruton* violation occurred, the Commonwealth does not analyze this issue.

deficiently, and that the deficient performance prejudiced his defense. *Strickland*, 466 U.S. 668. [10]

### A.    Trial counsel's decision to agree to the stipulation fell below an objective standard of reasonableness.

To establish deficient performance, a petitioner must show that his counsel's performance fell below "an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  Thus, Rice must overcome the presumption that the challenged action "might be considered sound trial strategy." *Id.* at 689; *see also Workman*, 915 F.3d at 944 (when "[n]o sound strategy" supports "counsel's choices," counsel's "performance falls below an objective standard of reasonable performance").

The challenged action here was a stipulation Rice's counsel agreed to prior to trial.  Recall that the prosecution's theory of the case was that Rice (and his co-defendant) had committed the shooting in order to retaliate against one of the victims, Khalief Ladson, because Ladson had shot Rice on September 3.   The prosecution viewed this motive evidence as "extremely, extremely important . . . to give any sort of picture about why and the circumstances surrounding the shooting."   N.T. 1/28/13 at 54–55. The key piece of evidence supporting this theory was that the police viewed Ladson as a "person of interest" in the September 3 shooting.  *Id*. at 11.

But the foundation of that evidence was flimsy.  The detective who testified that Ladson was a person of interest could not recall where he had gotten the information that made Ladson a person of interest.  *Id*. at 11–12. None of the witnesses to the September 3 shooting had identified Ladson

---

[10]    This Court reviews the claim *de novo* because the state courts did not pass on the merits of the claim.  *See, e.g., Cone v. Bell*, 556 U.S. 449, 472 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

19

as the shooter. *Id*. Similarly, the detective believed that Rice and Ladson were members of rival gangs, but he did not have "actual concrete evidence" of their gang affiliations. *Id*. at 31. When the trial court pointed out that the detective had only presented a "very vague, amorphous, unsubstantiated claim that Ladson was a suspect," the prosecutor could not articulate a basis for the evidence to be admitted. *Id*. at 44.

The prosecution's files offer no additional foundation. After the hearing, the prosecutor asked other ADAs how he might be able to get the evidence in, acknowledging that he didn't have "any hard evidence" to support the retaliation theory nor "any specifics about who the 'sources' are or where this information came from." Ex. A. Another prosecutor responded that it wasn't admissible because it "lack[ed] foundation (i.e. it's all rank hearsay)." *Id*.[11]

At the end of the pretrial hearing, it was clear that the trial court was not going to allow the prosecution to introduce evidence that Ladson was a "person of interest" in the September 3 shooting. N.T. 1/28/13 at 44 ("[R]ight now I don't see how that comes in."). The trial court pointed out that "we have no idea who, if anyone, was the source" and "no idea how they knew about it." *Id*. at 44. The trial court also noted that the motive evidence could be extremely prejudicial to Rice's defense. *Id*. at 53, 58. If the motive evidence did not come in, it would have seriously damaged the prosecution's case, as the prosecutor acknowledged during his argument. *Id*. at 54 ("There's identifications that are made in the case . . . [b]ut to give

---

[11]   Undersigned counsel has reviewed the prosecution's trial file and has not identified any piece of evidence supporting the prosecution's theory or the police's determination that Ladson was a person of interest not already on the record.

20

any sort of picture about why and the circumstances surrounding the shooting, I think it's very, very important.").

On the morning of trial, however, trial counsel stipulated that "the Commonwealth may, in fact, use detectives to state that [Ladson] became the suspect or a suspect in that [September 3 shooting] investigation." N.T. 1/30/13 at 8. Rice argues that there was no reasonable basis for trial counsel to agree to this stipulation. The Commonwealth agrees for three reasons.

*First*, the evidence would have been inadmissible without the stipulation. It appears that the trial court viewed the evidence as inadmissible under Pa. R.E. 403, which allows the court to exclude relevant evidence "if its probative value is outweighed by a danger of . . . unfair prejudice." The trial court acknowledged that testimony about Ladson had "serious potential for prejudice" against Rice and his co-defendant. *See* N.T. 1/28/13 at 58. And the evidence was of limited probative value, as the police's conclusion that Ladson was a person of interest was based on unknown or anonymous sources whose reliability could not be meaningfully tested. *See id*. at 56 (trial court concluding that the source of information "is a factor in balancing probative value versus prejudicial value").[12] Indeed, the detective's pretrial proffer did not even make clear that he had personal knowledge of why Ladson was a person of interest, as he could not recall where he had gotten that information. *See id*. at 11–12;

---

[12]   It also appears that the evidence would have been inadmissible under the rule against hearsay. Pa. R.E. 803. The fact that Ladson was viewed as a person of interest was being admitted for the truth of the matter asserted; in other words, because Ladson was a person of interest in shooting Rice, Rice was more likely to have shot at Ladson in retaliation. So the prosecution would have needed a basis for admitting whatever out-of-court statements supported the police's conclusion.

*cf.* Pa. R.E. 602.  Without the stipulation, this extremely damaging fact would not have been heard by the jury at trial.

*Second*, by stipulating to the fact, trial counsel allowed the fact to be presented in a way that was maximally damaging to her client.  The trial court had heard in the pretrial hearing that Ladson's status as a suspect was a vague conclusion built on unknown sources.  But, during the trial, neither Rice's counsel or his co-defendant's counsel asked either testifying detective why the police believed Ladson was a person of interest or how the police had reached that conclusion.  *See* N.T. 1/31/13 at 143, 155–56, 231–37.  By stipulating that the evidence was admissible, Rice's counsel protected the jury from the extremely weak foundation of the prosecution's theory of motive.

*Third*, the Commonwealth cannot discern any plausible strategic reason why trial counsel stipulated to this fact.  It was clear from the pre-trial hearing that the trial court was not going to admit the evidence, and the prosecution was not able to articulate a basis for changing the trial court's mind.  And the evidence was massively damaging to Rice, establishing a central pillar of the prosecution's case.  While there is a strong presumption that counsel's performance was reasonable, *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001), the challenged action must still be viewed in light of all the circumstances of the case. *Jacobs v. Horn*, 395 F.3d 92, 107 (3d Cir. 2005).[13] Nothing on the record before the trial court or in the prosecution's files explains trial counsel's decision or suggests that she had some reason to agree to the stipulation.  Under all the circumstances of this case, there is no

---

[13]  Because Weaver has passed away, it isn't possible to hold an evidentiary hearing to take her testimony.

reason to conclude that counsel's decision fell within the wide range of reasonable trial strategy.

### B.     Trial counsel's error prejudiced Rice.

In order to show prejudice under *Strickland*, a petitioner must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* This standard is "not stringent" and is "less demanding than the preponderance standard." *Branch v. Sweeney*, 758 F.3d 226, 238 (3d Cir. 2014) (citations omitted). Still, a reasonable probability must be more than merely "conceivable." *Tyson v. Superintendent Houtzdale-SCI*, 976 F.3d 382, 396 (3d Cir. 2020).

Rice has met this standard because the evidence against him was not strong, which made the motive evidence particularly important. *See Branch*, 758 F.3d at 238 ("[A] verdict . . . only weakly supported by the record is more likely to have affected by errors than one with overwhelming record support."). As a result, there is a reasonable possibility that "at least one juror would have harbored a reasonable doubt" about Rice's guilt if trial counsel had not stipulated to a basis for Rice to commit the shooting. *See Buck v. Davis*, 580 U.S. 100, 120 (2017).

No physical evidence tied Rice to the crime, and only one of the several eyewitnesses positively identified Rice as the shooter at any point during the investigation and trial. The prosecution's case rested almost entirely on eyewitness Latrice Johnson's identification of Rice as one of the shooters, coupled with the motive evidence. Eyewitness identifications warrant close scrutiny, *see Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 314 (3d Cir. 2016)

(McKee, C.J., concurring), and Johnson's identification suffers under that scrutiny. *See Branch*, 758 F.3d at 239 (analyzing weaknesses from the state's eyewitnesses and concluding that petitioner had established prejudice). Johnson did not identify Rice as one of the shooters until the day after the shooting; at the hospital that night, she was only able to give a general description of what the two shooters were wearing and said where she thought they had run. *See* N.T. 1/30/13 at 58, 90–91.[14] She testified that she had seen Rice clearly, despite it being well after sundown, from a distance of at least 20 feet,[15] and in a fast-moving shooting incident. *See id*. at 50, 52; *see also* 2019 REPORT OF THE THIRD CIRCUIT TASK FORCE ON EYEWITNESS IDENTIFICATIONS 19–22 (stress, exposure, distance, lighting can all affect the quality of a memory). Although Johnson said that she knew Rice from the neighborhood, she also testified that she hadn't seen Rice in at least four years, when he would have been no more than 13 years old. *See* N.T. 1/30/13 at 64–65, 90. Rice was 17 at the time of the shooting. And she testified that the man she identified as Rice had run away from the shooting around the corner, *see id*. at 51, which strongly clashed with the doctor's testimony that

---

[14]   Rice also identifies a page of Johnson's hospital records, in which Johnson reports that she "heard shots" but says nothing about identifying a shooter. ECF No. 1-1 at 5. Rice claims that this is exculpatory evidence that was never turned over to the defense, and that he is due relief under *Brady v. Maryland*, 373 U.S. 83 (1963), as a result. ECF No. 1 at 97–110. The Commonwealth takes no position on that claim in this response.

[15]   The estimate of 20 feet was suggested by the attorneys. *See* N.T. 1/30/13 at 52. In reality, "common sense dictates" that the distance was likely "greater than 20 feet," and "may have been closer to 60 feet." *See Rice*, 2021 WL 2312775, at *7. Rice claims in this petition that trial counsel should have used this evidence to cast doubt on Johnson's identification. ECF No. 1 at 134–143.

it was "very dubious" that Rice could "walk standing up straight, let alone run with any degree of speed" that night. *See id*. at 51; N.T. 2/4/13 at 17.[16]

The length of the jury deliberations, which dragged on for several days, show that the jury did not view Johnson's testimony as unassailable proof of Rice's guilt. *Johnson v. Superintendent Fayette SCI*, 949 F.3d 791, 805 (3d Cir. 2020) (length of deliberations "may be one consideration in assessing the strength of the prosecution's case"). The jury heard just under four days' worth of evidence; a little more than two days' evidence from the prosecution and a little less than two days' evidence from the defense. After that, it took the jury two full days to reach a verdict against one defendant, declaring that they were at an "impasse" on another. *See* N.T. 2/7/13 at 3. The next day, the jury finally reached a verdict as to the other defendant. While it isn't possible to know which defendant's fate the jury resolved first, the record shows that the deliberations took a substantial amount of time and effort, requiring the jury to overcome an impasse in the verdict against at least one defendant. The jury's note asking the judge to provide a definition of "reasonable doubt" also shows that they were struggling with their decision. *See* N.T. 2/6/13 at 4.

The jury's acquittal of the co-defendant, Linder, also suggests that the overall case was weak. The prosecution's theory, after all, was that the two

---

[16]   The prosecution suggested on cross-examination that Rice could have been using painkillers on the night of the shooting. N.T. 2/4/13 at 39. Later, in the PCRA proceedings, Dr. Tapper testified that trial counsel did not prepare him to testify, and that his medical opinion was that it would have been "virtually impossible" for Rice to have committed the shooting as described. *See* N.T. 1/25/19 at 53–58. This testimony raises additional concerns about trial counsel's performance and Rice's guilt, which are the core of the sixth claim in Rice's habeas petition. *See* ECF No. 1 at 144–50.

had committed the shooting together. One eyewitness had identified Linder, while another had identified Rice, with both identifications under similar circumstances. Yet the jury ultimately acquitted Linder while convicting Rice. Perhaps the jury was more persuaded by Linder's alibi defense than by Rice's.[17] Or the jury found Latrice Johnson's identification of Rice more probative than Latoya Lane's identification of Linder. Or— maybe most likely—the jury concluded that *Rice* had a motive to commit the crime, but *Linder* did not. After all, the jury heard that Linder did not view himself as the target of the September 3 shooting, and unlike Rice he cooperated with the police regarding that investigation. *See* N.T. 1/31/13 at 207, 213; N.T. 2/2/13 at 8–11. As a result, Rice's retaliatory motive would have been seen as much stronger than Linder's. No matter the reason, though, the jury acquitting Linder shows that it rejected the prosecution's overall theory of the case.

This context establishes that the motive evidence played an important role in the prosecution's case against Rice. The prosecution explained at the

---

[17] Both defenses had their problems. Rice's mother and godmother both testified that Rice needed help walking after his discharge from the hospital. *See* N.T. 2/2/13 at 78–79, 2/4/13 at 47–48. And Rice's godmother's son testified that he had been with Rice the night of the shooting, a fact that he had previously not told the police. *See* N.T. 2/2/13 at 157–59. But the prosecution rebutted this defense through a police officer, who testified that he had seen Rice on the street in south Philadelphia on September 19, six days before the shooting. *See* N.T. 2/4/13 at 116. Meanwhile, Linder's sole witness, a security guard at a business where Linder's mom was a cleaner, testified that Linder's mom and others were cleaning the buildings from 8:45 p.m. to 9:50 p.m. on the night of the shootings. N.T. 2/4/13 at 96. The witness did not see who else was with Linder's mom. *Id.* at 101. Linder also introduced security camera footage that showed him cleaning buildings with his mom up until 8:45 p.m. N.T. 1/31/13 at 220–31.

pretrial hearing that the motive evidence was "extremely, extremely important" to the case. *See* N.T. 1/28/13 at 54–55. That's because, as the prosecutor acknowledged, juries want to hear an explanation as to why a crime was committed. *Id*. The jury received a questionable identification from just one eyewitness fingering Rice as a shooter, which it had to weigh against testimony from a disinterested doctor that Rice had been recently shot, was recovering from serious surgery, and likely could not "walk standing up straight, let alone run with any degree of speed" on the night of the shooting. *See* N.T. 2/4/13 at 18, 22. Without offering a motive, the prosecution understood that it would be very hard to persuade the jury that Rice, a seriously injured teenager, had opened fire on a family sitting on their front stoop before sprinting away into the night.

With the motive stipulation, the picture changed. The jury heard that the police believed that Rice had a reason to commit the crime: to retaliate against Ladson for shooting him on September 3. The evidence about Rice's conduct after that shooting snapped into place, too. The prosecution had focused on Rice's conduct after he was shot, particularly his statement to the police that even if he knew who had shot him, he wouldn't tell the police. *See, e.g.*, N.T. 1/31/13 at 140. Without evidence that Ladson was connected to the September 3 shooting, Rice's post-shooting conduct can't reasonably be described as proving that he committed the September 25 shooting; at most, it shows that he was a teenager who did not want to be involved with the police. [18]  With the motive evidence, though, Rice's

---

[18]   Rice does not raise a claim related to the admissibility of this evidence on its own. It isn't clear from the pretrial hearing transcript whether the trial court viewed it as admissible, and ultimately the parties stipulated that it was admissible. *See* N.T. 1/30/13 at 8.

27

behavior could be seen as making more sense: he wasn't cooperating with the police because he had his own version of justice in mind. *See* N.T. 1/28/13 at 48–49 (prosecutor explaining that "the fact that [Rice] did not cooperate with detectives" was relevant to establish motive).

In sum, the case was relatively weak, resting almost entirely on a problematic eyewitness who the jury reasonably could have disbelieved. The jury's behavior, including lengthy deliberations and its mixed verdict against the two defendants, supports the conclusion that this was a close case where the outcome was never certain. With this background in mind, there is a reasonable probability that the motive stipulation, which the prosecution argued before trial was "extremely important" to the case, caused at least one juror to vote to convict Rice. *See Buck*, 580 U.S. at 120. Thus, Rice has established that his counsel's error caused him prejudice.

* * *

The Commonwealth concludes that Rice's trial counsel performed deficiently by stipulating to the motive evidence, and that her deficient performance caused Rice prejudice in light of the weaknesses of the Commonwealth's case. Because of her error, the Commonwealth no longer has confidence that Rice received "a trial whose result is reliable." *See Strickland*, 466 U.S. at 687. He is due habeas relief.

## CONCLUSION

For these reasons, the Commonwealth respectfully requests that the Court grant a conditional writ of habeas corpus and order that Rice be retried within 180 days or released from custody.

Respectfully submitted,

*/s/ Peter F. Andrews*
PETER F. ANDREWS
Assistant District Attorney
Federal Litigation Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
Email: peter.andrews@phila.gov

**CERTIFICATE OF SERVICE**

I, Peter F. Andrews, certify that on September 22, 2023, a copy of this response was served on all counsel of record by the Court's CM/ECF system.

/s/ *Peter F. Andrews*
Peter F. Andrews
Assistant District Attorney
Federal Litigation Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107